## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

RICARDO NATIVIDAD, :
:
Petitioner, : CIVIL NO.: 08-0449
:
v. :
:
JOHN E. WETZEL, Secretary, Pennsylvania : **THIS IS A CAPITAL CASE**
Department of Corrections, TAMMY FERGUSON, :
Superintendent of the State Correctional Institution : Electronically Filed
at Phoenix, and STEVEN GLUNT, Superintendent :
of the State Correction Institution at Rockview, :
:
Respondents. :
:

## MEMORANDUM OF LAW IN SUPPORT OF
## AMENDED PETITION FOR WRIT OF HABEAS CORPUS

LEIGH M. SKIPPER
Chief Federal Defender
STUART B. LEV
SAMUEL J.B. ANGELL
AYANNA WILLIAMS
Assistant Federal Defenders
Federal Community Defender Office
  for the Eastern District of Pennsylvania
The Curtis Center
601 Walnut St., Suite 545 West
Philadelphia, PA 19106
(215) 928-0520
Stuart_Lev@fd.org
Samuel_Angell@fd.org
Ayanna_Williams@fd.org

Counsel for Petitioner Ricardo Natividad

Dated: October 21, 2019

## PRELIMINARY STATEMENT

Transcripts from the trial and post-conviction hearing are cited as "NT" followed by the applicable date and page number. The Pennsylvania Supreme Court has issued three substantive opinions in this case. They are *Commonwealth v. Natividad*, 773 A.2d 167 (Pa. 2001) (direct appeal); *Commonwealth v. Natividad*, 938 A.2d 310 (Pa. 2007) (initial PCRA appeal); and *Commonwealth v. Natividad*, 200 A.3d 11 (Pa. 2019) (successor PCRA appeal). They will be cited as *Natividad-1*, *Natividad-2*, and *Natividad-3*, respectively.

Petitioner Ricardo Natividad will be referred to by name or as "Petitioner." Respondents will be referred to as "the Commonwealth."

All emphasis in this Memorandum of Law is supplied unless otherwise indicated.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. i

INTRODUCTION .............................................................................................. 1

PROCEDURAL HISTORY ................................................................................... 2

STATEMENT OF THE CASE ................................................................................ 6

EXHAUSTION AND DEFAULT ............................................................................ 8

STANDARD OF REVIEW ................................................................................... 8

Supplemented Claim V .................................................................................... 12

V.    Petitioner Was Denied a Fair Trial Because the Commonwealth Violated the Due
      Process Clause When It Did Not Disclose Exculpatory Information Material to
      Petitioner's Ability to Present a Defense at Trial. ............................................. 12

      A.    The Discovery of Suppressed Evidence ................................................. 13

      B.    The Withheld Evidence .......................................................................... 14

            1.    Someone else confessed to murdering Robert Campbell ................................ 14

            2.    An eyewitness identified someone other than Petitioner as the shooter ......... 17

      C.    Legal Standards .................................................................................... 19

      D.    The Commonwealth Violated Petitioner's Due Process Rights ............................. 21

            1.    The Commonwealth suppressed evidence ...................................... 21

            2.    The suppressed evidence was favorable to the defense .................................. 21

            3.    The suppressed evidence was material ........................................... 23

      E.    The State Court Opinion ....................................................................... 28

            1.    The Robinson evidence was material ............................................. 28

            2.    The McCullough claim was timely filed ......................................... 32

            3.    The state courts did not consider the cumulative effect of the suppressed
                  evidence on Petitioner's trial .................................................... 37

CLAIMS FOR HABEAS RELIEF AS INITIALLY FILED .................................................. 37

I.    There Was Insufficient Evidence of a Robbery of Robert Campbell such that
      Petitioner's Conviction on that Charge Violated Due Process; as the Erroneous
      Robbery Conviction was an Aggravator, Petitioner's Death Sentence Violates
      Pennsylvania Law and the Eighth Amendment; Furthermore, Petitioner Was
      Denied the Effective Assistance of Counsel; Direct Appeal Counsel Failed to
      Properly Present His Claim of Evidentiary Insufficiency .................................... 37

      A.    Background .......................................................................................... 38

      B.    Ineffective Assistance of Counsel .......................................................... 42

      C.    The State Court Opinions ...................................................................... 43

      D.    State Post-Conviction Counsel Was Ineffective Under *Martinez* .......................... 44

II.   Petitioner Was Denied Due Process and the Effective Assistance of Counsel by the Trial Court's Admission of Other Crimes Evidence; by the Prosecutor's Use of the Evidence for Improper Purposes; and by Counsel's Failure to Seek Appropriate Limiting Instructions, Object to the Absence of Those Instructions, and Object to the Prosecutor's Improper Use of the Evidence. ................................................................... 45

    A.   Legal Standards ............................................................................................ 47

    B.   Joinder Violated Due Process ....................................................................... 49

    C.   Counsel Was Ineffective ............................................................................... 50

    D.   The State Court Opinions .............................................................................. 52

III.   Petitioner Was Denied Due Process and the Effective Assistance of Counsel Where the Trial Court's Instructions Unconstitutionally Diminished the Commonwealth's Burden of Proof and Negated the Partial Defense of Imperfect Self-Defense, and Where Trial Counsel Failed to Object or Request Appropriate Instructions. ................... 55

    A.   Legal Standards ............................................................................................ 56

       1.   Instructional error ................................................................................. 56

       2.   Ineffective assistance of counsel ......................................................... 57

    B.   Malice Instructions ....................................................................................... 58

    C.   Instructions on the Interrelationship between Malice and Self-Defense ................ 59

    D.   Self-Defense Instructions .............................................................................. 61

    E.   Counsel Was Ineffective ............................................................................... 61

    F.   The State Court Opinion ............................................................................... 62

       1.   Malice instructions ............................................................................... 63

       2.   Malice and self-defense ........................................................................ 65

       3.   Self-defense "free from fault" instruction ........................................... 65

    G.   Conclusion .................................................................................................... 65

IV.   Petitioner Was Denied the Effective Assistance of Counsel, Due Process, and His Rights under the Eighth Amendment and a Fair and Reliable Guilt-Innocence and Penalty Proceeding by Trial Counsel's Failure to OBTAIN Evidence Regarding the Homicide Victim's Firearm Non-Licensure (the Non-Disclosure of which Violated *Brady v. Maryland*). ............................................................................... 66

    A.   Impact on Petitioner's Defense ..................................................................... 67

    B.   Prejudice at the Sentencing Phase ................................................................ 67

    C.   Trial Counsel's Deficient Performance ......................................................... 68

    D.   Due Process Violations ................................................................................. 69

    E.   The State Court Opinion ............................................................................... 70

    F.   The State Court's Decision Is Contrary to Federal Law and Based on Unreasonable Determinations of Fact .......................................................... 71

V.    Petitioner Was Denied a Fair Trial Because the Commonwealth Violated the Due
      Process Clause When It Did Not Disclose Exculpatory Information Material to
      Petitioner's Ability to Present a Defense at Trial. ............................................................ 74

VI.   Petitioner Was Denied His Right to the Effective Assistance of Counsel Where
      Trial Counsel Failed to Impeach Michael Havens with His Prior Statements and
      Where Trial Counsel Opened the Door to Third-Party Threats of a Witness. .................. 74

      A.    *Strickland* and the Duties of Capital Counsel ............................................ 74

      B.    Failure to Impeach Michael Havens ............................................................. 75

            1.   Counsel's performance was deficient ................................................. 75

            2.   Petitioner was prejudiced .................................................................. 77

      C.    Opening the Door to Third-Party Threats of Byron Price ....................... 78

            1.   Counsel's performance was deficient ................................................. 78

            2.   Petitioner was prejudiced .................................................................. 80

      D.    The State Court Opinion ............................................................................. 80

VII.  Petitioner Withdraws This Claim. ............................................................................. 82

VIII. Petitioner Was Denied His Right to a Fair and Impartial Jury in Violation of the
      Sixth, Eighth, and Fourteenth Amendments Where a Juror Failed to Inform the
      Court that Her Father Was a Police Officer. .............................................................. 82

IX.   Petitioner's Rights Were Violated Where the Prosecutor Made Improper Closing
      Remarks at the Guilt Phase, and Where Trial Counsel Failed to Object to the
      Improper Comments. .................................................................................................. 85

      A.    The State Court Opinion ............................................................................. 88

      B.    The State Court Opinion Violates AEDPA ................................................. 88

      C.    Post-Conviction Counsel Was Ineffective ................................................. 88

X.    Counsel Rendered Ineffective Assistance by Failing to Investigate and Present
      Readily Available Mitigating Evidence. .................................................................... 89

      A.    As Presented in the PCRA Proceedings, Counsel Failed to Properly Investigate
            and Present Mitigation. .............................................................................. 94

            1.   Evidence of good deeds ..................................................................... 94

            2.   Counsel failed to utilize records in hand, including juvenile placement
                 records ............................................................................................... 96

            3.   Counsel failed to provide his mental health expert with the necessary
                 records and background evidence from interviews of family and
                 neighbors ........................................................................................... 97

      B.    Petitioner Was Prejudiced by Counsel's Errors ........................................ 98

      C.    Evidence Presented in the Habeas Petition .............................................. 101

            1.   Failure to present Petitioner's social history ................................... 101

2. Failure to present available evidence of severe impairments and brain damage ............................................................................................... 104

D. The State Court Opinion ............................................................................ 105

E. The Decision of the Pennsylvania Supreme Court Violated AEDPA ................... 106

F. Post-Conviction Counsel Was Ineffective Under *Martinez* ................................. 110

G. Petitioner Was Prejudiced ......................................................................... 111

XI. The Commonwealth's Presentation of Victim Impact Evidence and Its Dilatory Notice of Victim Impact Evidence Violated Petitioner's Rights under the Sixth, Eighth, and Fourteenth Amendments. ...................................................... 113

A. Pennsylvania's Victim Impact Statute and the Trial Testimony ......................... 113

B. The Eighth Amendment Violation .............................................................. 116

C. Due Process and Sixth Amendment Violations .............................................. 117

D. The State Court Opinion ............................................................................ 119

E. The Decision of the Pennsylvania Supreme Court Violated AEDPA ................... 121

XII. Petitioner Is Entitled to a New Sentencing Hearing Where the Court Improperly Instructed the Jury on the Nature and Use of Aggravating and Mitigating Factors, and Where Trial Counsel Failed to Object or Request Appropriate Instructions. .......... 122

A. The Trial Court's Instructions Erected Unconstitutional Barriers around the Defense Presentation of Mitigating Evidence that Prevented the Jury from Giving the Mitigation Its Full Effect ................................................................ 123

1. The nature and purpose of aggravating and mitigating instructions ............. 123

2. The presumption of a death sentence ........................................................ 126

3. The preclusion from considering sympathy ................................................. 128

B. Trial Counsel Was Ineffective for Failing to Object to the Instructions ............... 128

C. The State Court Opinion ............................................................................ 129

1. The state court did not adjudicate Petitioner's constitutional arguments regarding the "more terrible/less terrible" instruction ................................... 130

2. The state court's holding regarding erroneously placing the burden of persuasion on Petitioner involved an unreasonable application of clearly established law and/or an unreasonable determination of the facts ............... 131

XIII. Petitioner Was Denied His Constitutional Rights to a Fair and Impartial Capital Jury Where the Trial Court and Trial Counsel Failed to Ensure that the Jurors Selected Would Consider the Possibility of a Life Sentence, in Violation of Petitioner's Rights under the Sixth, Eighth, and Fourteenth Amendments. .................. 134

A. Trial Counsel Ineffectively Failed to Life-Qualify the Jury ................................ 134

B. The State Court Opinion ............................................................................ 136

XIV. All Prior Counsel Were Ineffective for Failing to Raise Each and Every Issue Presented Herein. ............................................................................................. 138

For this claim, Petitioner refers the Court to the other claims, as briefed in this Memorandum of Law. ...................................................................................... 138

XV. Petitioner Is Entitled to Relief from His Conviction and Sentence Because of the Prejudicial Effects of the Cumulative Errors in This Case. ............................................ 138

    A.   Legal Standards .................................................................................... 138

    B.   The State Court Opinion ....................................................................... 141

XVI. Aggravating Circumstance, 42 Pa. C.S. § 9711(d)(9) (Significant History of Felony Convictions Involving the Use or Threat of Violence to the Person), Is Void for Vagueness, and Petitioner's Death Sentence Violates the Eighth and Fourteenth Amendments and Must Be Reversed. ........................................................................ 141

    A.   Post-*Johnson* Procedural History ........................................................... 142

        1.   State court proceedings ................................................................. 142

        2.   Federal habeas proceedings .......................................................... 143

    B.   *Johnson v. United States* and Its Progeny .............................................. 143

    C.   42 Pa. C.S. § 9711(d)(9) Is Unconstitutional under *Johnson* ................................. 145

        1.   *Johnson* applies to death penalty schemes ..................................... 145

        2.   As in the ACCA provision at issue in *Johnson*, Pennsylvania employs a categorical approach to determining whether a predicate offense applies .......................................................................................... 146

        3.   The clauses are materially indistinguishable ................................. 147

        4.   Petitioner is entitled to relief ........................................................ 149

    D.   The State Court Opinion ....................................................................... 150

CONCLUSION ................................................................................................... 152

# INTRODUCTION

Petitioner's case is a prime example of an unfair trial. The prosecutor's file contained undisclosed, signed statements from two individuals stating that someone else confessed to the crime for which Petitioner was convicted and sentenced to death. In a third suppressed statement, the accused individual, while denying culpability, admitted being at the scene and seeing the victim dead. But for this Court's Discovery Order dated August 19, 2011, Petitioner never would have obtained these exculpatory documents. Petitioner did not get them until 14 years after trial and not until after the Commonwealth protested to this Court over and over again that Mr. Natividad's requests for exculpatory materials were "unwarranted." The Commonwealth also failed to produce before trial contact information for an eyewitness, John McCullough, who saw the shooting and stated that Mr. Natividad was not the shooter.

The homicide case was unfairly joined with a carjacking, prejudicing Petitioner. The homicide case involves the shooting death of Robert Campbell at an Exxon station. The joinder was obtained on the basis that the car at the Exxon station was the same as a car that was carjacked and taken from another individual, Michael Havens. However, the trial testimony and the statement police took from eyewitness show the two cars were different – the stolen car was a two-door Lincoln and the one involved in the homicide was four-door. The carjacking victim did not identify Mr. Natividad until after he saw Petitioner on television.

The failure to obtain justice did not stop there. Twenty-four hours before the sentencing phase, Petitioner received a victim impact statement. He received it on a holiday, Veterans Day, and thus had no time to investigate it. Indeed, his counsel did not discover that the victim, who was carrying a gun, was not licensed to carry the gun – another piece of exculpatory information hidden in the prosecutor's files. The sentencing phase was a travesty. Counsel only had Petitioner's father and a psychologist testify. He did not obtain Petitioner's juvenile file until the

jury was deliberating the guilt/innocence case. Counsel did not talk with numerous family members, including Petitioner's half-brother and half-sister, who would have told a compelling story of the violence Petitioner was subjected to as a child. Despite signs of brain damage, counsel did not have Petitioner tested for brain damage and did not present available evidence that Petitioner had brain damage. As a result of these errors, Petitioner is entitled to a new trial and sentencing.

## PROCEDURAL HISTORY

On November 10, 1997, Petitioner was convicted of first-degree murder and related counts in this case in the Philadelphia County Court of Common Pleas. *Commonwealth v. Natividad*, Nos. 9704-0013, 9708-0312 (Phila. C.P., Crim. Div.). After a brief penalty-phase hearing, the jury sentenced Petitioner to death on November 12, 1997. The Pennsylvania Supreme Court affirmed Petitioner's convictions and death sentence on direct appeal on June 25, 2001. *Commonwealth v. Natividad*, 773 A.2d 167 (Pa. 2001) ("*Natividad-1*"). The United States Supreme Court denied his petition for writ of certiorari on May 28, 2002. *Natividad v. Pennsylvania*, 535 U.S. 1099 (2002). Petitioner was represented by attorney Donald Padova at trial and on direct appeal.

On November 25, 2002, Petitioner filed a *pro se* Motion for Post-Conviction Collateral Relief. Jules Epstein was appointed as counsel and filed an amended petition pursuant to the Post Conviction Relief Act ("PCRA"). After a hearing limited to penalty phase claims only, post-conviction relief was denied in an order dated December 30, 2005. On December 27, 2007 the Pennsylvania Supreme Court affirmed the judgment of the PCRA court. *Commonwealth v. Natividad*, 938 A.2d 310 (Pa. 2007) ("*Natividad-2*").

On January 30, 2008, Petitioner filed a motion in this Court requesting a stay of execution and appointment of counsel to assist in the preparation of a federal habeas petition

(ECF No.1). On January 31, 2008, this Court issued an order staying Petitioner's execution and appointing undersigned counsel to represent Mr. Natividad in habeas proceedings (ECF No. 3).

On June 27, 2008, Petitioner filed his *Petition for Writ of Habeas Corpus* ("*Petition*") in this Court (ECF No. 7). After a period of informal discovery between the parties, Petitioner filed a *Motion for Discovery* on September 28, 2010 (ECF No. 24). On August 19, 2011, this Court issued an order granting the motion in part (ECF No. 38).

The Commonwealth produced discovery on March 6, 2012, in response to the order, including a note mentioning a previously undisclosed eyewitness, John "Maculla." After counsel located John McCullough, he provided a statement that he saw the shooting and the shooter was not Petitioner. Based on this discovery and subsequent investigation, Petitioner filed a *Petition for Habeas Corpus Relief Pursuant to Article I, Section 14 of the Pennsylvania Constitution and for Statutory Post-Conviction Relief under 42 Pa. C.S. § 9542, et seq., and Consolidated Memorandum of Law* ("Successor PCRA Petition") on August 9, 2012, in the Philadelphia Court of Common Pleas, alleging that the Commonwealth violated *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny. Petitioner's motion to amend the pending *Petition* with this claim was granted on June 18, 2013 (ECF No. 51; ECF No. 54).

Pursuing indications that the Commonwealth's files contained more undisclosed, discoverable evidence, Petitioner filed a Supplemental Motion for Discovery on February 4, 2013 (ECF No. 46). In the Supplemental Motion, he renewed his request for the complete files of the Philadelphia Police Department and the District Attorney's Office. The Commonwealth first sought an extension of time to respond. In its request for an extension, the Commonwealth reiterated its representation that there was no *Brady* material in these files:

> As the Commonwealth reported in its response to Natividad's first Motion for
> Discovery in late 2010, respondents believe there is nothing in the file that
> constitutes "*Brady*" material that has not already been disclosed.

(ECF No. 48 at 2). *See also* ECF No. 29 at 35-36 (stating that after a search of the Commonwealth's

files "no document or information was located that should have been previously turned over to the

defense under *Brady*.")  These statements were not accurate.

Following argument on February 10, 2014, and subsequent litigation, this Court issued an

order on July 9, 2014, granting Petitioner access to the original investigative files of the

Philadelphia Police Department and the internal District Attorney's Office files (ECF No. 73),

which the Commonwealth made available on August 7, 2014.

A review of the Commonwealth's files revealed that the prosecution had failed to

previously disclose to trial and post-conviction counsel police reports that another person,

Rolston Ricardo Robinson, confessed to shooting Campbell, as well as reports corroborating

details of the confession. Based on this production, Petitioner filed a supplement to the Successor

PCRA Petition in the Philadelphia Court of Common Pleas on October 6, 2014, alleging

additional constitutional violations. In federal proceedings, Petitioner moved to supplement the

*Petition* and to excuse exhaustion on January 14, 2015 (ECF No. 74). This Court denied the

motion without prejudice and ordered the case to be placed in civil suspense until an amended

petition could be filed at the conclusion of state post-conviction proceedings (ECF No. 76).

On June 17, 2016, Petitioner filed another supplement to his Successor PCRA Petition in

state court, seeking relief from his sentence of death under *Johnson v. United States*, 135 S. Ct.

2551 (2015), which was made retroactive by the United State Supreme Court's decision in *Welch

v. United States*, 136 S. Ct. 1257 (2016). The claim asserted that the aggravating circumstance

invoked in support of Petitioner's death sentence, 42 Pa. C.S. § 9711(d)(9), is unconstitutionally

vague. While the federal case remained in civil suspense, Petitioner moved to lodge a

supplement to the *Petition* regarding this claim on April 14, 2017, which was granted by this Court on August 31, 2017 (ECF No. 85; ECF No. 91).

On April 28, 2016, May 20, 2016, and July 7, 2016, the PCRA court conducted a hearing on the McCullough claim. On July 15, 2016, the PCRA court issued an order dismissing the Successor PCRA Petition. However, because the supplemental *Johnson* claim had not been adjudicated, the PCRA court issued an order on July 27, 2016, vacating its prior order. Following argument on the *Johnson* claim, the PCRA court issued an order on December 21, 2016, denying relief on the *Brady* claims, granting relief on the *Johnson* claim, and vacating Petitioner's death sentence.

The Commonwealth filed a motion for reconsideration and, on January 13, 2017, the PCRA court vacated its grant of relief. The PCRA court then dismissed the Successor PCRA Petition in its entirety on February 14, 2017, and issued an opinion in support of its order on August 9, 2017.

On January 23, 2019, a divided Pennsylvania Supreme Court affirmed the judgment of the PCRA court denying post-conviction relief. *Commonwealth v. Natividad*, 200 A.3d 11 (Pa. 2019) ("*Natividad-3*"). Justices Wecht and Donahue would have granted a new trial because of the Commonwealth's failure to disclose the police reports relating to the Robinson confession.

Returning to this court, Petitioner moved to take this case out of civil suspense, and in response to this Court's order of February 5, 2019 (ECF No. 100), filed a supplement to the habeas petition on February 22, 2019 (ECF No. 101). The Court also ordered Petitioner to file a memorandum of law on or before June 22, 2019 (ECF No. 100). After requests for extensions of time, this Memorandum follows.

**STATEMENT OF THE CASE**

Mr. Natividad was convicted of the 1996 shooting death of Robert Campbell at an Exxon gas station in West Philadelphia. Petitioner was separately accused and convicted of being one of two persons to commit a carjacking, in which Michael Havens' Lincoln Continental was stolen the day before the Campbell shooting. The Commonwealth alleged that Petitioner drove to and from the gas station in the Lincoln taken during the carjacking.

In the early morning hours of November 9, 1996, Michael Havens was carjacked at gunpoint and his automobile, a dark blue, two-door Lincoln Continental was stolen. NT 11/5/97, 146-51. The car, abandoned and burned, was recovered about two days later. *Id.* at 137, 157. Six months later, Havens identified Petitioner as one of his assailants but only after he saw a TV news report about Petitioner's arrest. *Id.* at 184-88. By that time, the police had already informed Mr. Havens that Petitioner was a suspect in the Campbell homicide. *Id.* at 193-94.

Byron Price testified that about 7 p.m. on the evening of November 9, Petitioner picked him up in a dark blue Lincoln. Petitioner pulled into a gas station and exited the car. A short time later, Price heard a gunshot. Petitioner returned to the car holding a chrome revolver in his hand, Price alleged that, while driving away, Petitioner told him that he had shot the man because the man had drawn a weapon. NT 11/6/97, 8-15. Price denied any involvement in the carjacking of Havens. *Id.* at 8, 31.

Two people who lived near the gas station, Martin and Beth Johnson, saw the shooting but did not identify a perpetrator. They testified that the shooter left the Exxon station in a dark Lincoln. *Id.* at 78, 82, 94. In her statement to police, Beth Johnson described the car as a four-

door Lincoln, not a two-door like the one taken from Havens. *See* 11/12/96 Statement of Beth Johnson at 3, App. Exh. No. 13.[1]

The day after the murder, Petitioner was alleged to have made statements to several acquaintances taking credit for having shot the man at the gas station. NT 11/6/97, 156, 163, 182. The Commonwealth also presented evidence that sometime after the shooting, Petitioner gave a .357 Magnum to Keith Smith, who surrendered the weapon to the police through his attorney. *See* NT 11/7/97, 14-16, 20. Although the gun was similar in appearance and of the same type, ballistics and other forensic testing did not tie the weapon from Smith to the Campbell shooting. *See id.* at 41-43.

Defense counsel called one witness, Officer Brian James, who testified about discrepancies in Havens' statements to police – specifically, that in his initial statement on November 9th Havens did not indicate that the carjacker was wearing a jacket, but in his second statement to police on December 2nd, Havens described the man who pointed the gun at him as wearing a long, black leather jacket. NT 11/10/97, 9-16. Counsel did not present any affirmative evidence in response to the homicide charge. After closing arguments, the jury found Petitioner guilty on all counts on November 10, 1997.

At the capital sentencing hearing two days later, the Commonwealth presented victim impact testimony from the decedent's widow, Patricia Campbell. NT 11/12/97, 56-59. The Commonwealth had only put Petitioner on notice of the upcoming victim impact testimony two days earlier. Defense counsel presented the testimony of two witnesses—Benito Natividad, Sr., Petitioner's father, and Allan Tepper, a psychologist. The jury found two aggravating factors:

---

[1] Petitioner is filing with this Memorandum of Law an Appendix of Exhibits. Citations to the Appendix are set forth as:  App. Exh. No. ___.

that the victim was killed during the perpetration of a felony, 42 Pa. C.S. § 9711(d)(6), and that

Mr. Natividad had a significant history of felony convictions involving the use or threat of

violence, 42 Pa. C.S. § 9711(d)(9). The jury found one mitigating circumstance regarding Mr.

Natividad's character and record and the circumstances of the offense, 42 Pa. C.S. § 9711(e)(8),

and sentenced Petitioner to death. NT 11/12/97, 156.

## EXHAUSTION AND DEFAULT

Mr. Natividad's claims were fairly presented to the state courts, and thus exhausted on

direct, *Natividad-1*; and/or in state post-conviction proceedings, *Natividad-2* and *Natividad-3*. To

the extent any claims raised in the *Petition* were not fairly presented to the state courts, they are

exhausted by the doctrine of futility. *Castile v. Peoples*, 489 U.S. 346, 351 (1989); *Doctor v.

Walters*, 96 F.3d 675, 681 (3d Cir. 1996). Any further attempt to exhaust such claims would be

futile, since it would be foreclosed by 42 Pa. C.S. § 9545(b), as the Pennsylvania Supreme Court

has interpreted that provision. Because failure to exhaust is a defense that must be asserted by the

Respondents and can be waived, Petitioner reserves his right to respond to any exhaustion

argument that Respondents may assert.

None of Petitioner's claims are procedurally barred from federal merits review. Thus,

federal habeas review is appropriate. Moreover, procedural default—like exhaustion—is a

defense that must be asserted by Respondents and can be waived, and thus Petitioner reserves his

right to respond to any additional default and procedural bar arguments that Respondents may

assert.

## STANDARD OF REVIEW

This Court reviews the state court decisions under the Anti-Terrorism and Effective

Death Penalty Act of 1996 (AEDPA). Even under AEDPA, the writ of habeas corpus "stands as

a safeguard against imprisonment of those held in violation of the law," and this Court must be

"vigilant and independent" in reviewing Petitioner's petition. *Harrington v. Richter*, 562 U.S. 86, 91 (2011).

AEDPA's § 2254(d) applies where the state court adjudicated the merits of the federal claim. That requirement is not applied where the state court disposition of a claim fails either: (i) to address the petitioner's actual federal claim (as opposed, for example, to a related state law claim or a different federal claim); or (ii) to address the merits of the federal claim (as opposed to a decision on procedural or other grounds). Where the state court did not adjudicate a claim on the merits, habeas review is *de novo. See Johnson v. Williams*, 568 U.S. 290, 303 (2013) ("When the evidence leads very clearly to the conclusion that a federal claim was inadvertently overlooked in state court, § 2254(d) entitles the prisoner to an unencumbered opportunity to make his case before a federal judge."); *Cone v. Bell*, 556 U.S. 449, 472 (2009) (because the state courts did not reach merits of *Brady* claim, "federal habeas review is not subject to the deferential standard that applies under AEDPA to 'any claim that was adjudicated on the merits in State court proceedings.' 28 U.S.C. § 2254(d). Instead, the claim is reviewed *de novo*."). *Accord Breakiron v. Horn*, 642 F.3d 126, 131 (3d Cir. 2011); *Simmons v. Beard*, 590 F.3d 223, 231 (3d Cir. 2009); *Wilson v. Beard*, 589 F.3d 651, 658 (3d Cir. 2009).

By the same token, if a state court renders a decision on only part of a federal claim (for example, only on the deficient-performance prong of an ineffective-assistance-of-counsel claim), only that part of the claim addressed by the state court receives AEDPA review. *See Porter v. McCollum*, 558 U.S. 30, 39 (2009) (per curiam) ("Because the state court did not decide whether Porter's counsel was deficient, we review this element of Porter's *Strickland* claim *de novo*."); *Rompilla v. Beard*, 545 U.S. 374, 390 (2005) ("Because the state courts found [trial counsel's] representation adequate [under *Strickland*'s first prong], they never reached the issue of

prejudice, . . . and so we examine this element of the *Strickland* claim *de novo*."); *Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (same).

For those claims or parts of claims for which there is a state court adjudication on the merits, the standard of review is governed by § 2254(d). A petitioner satisfies § 2254(d) where the state court decision is "contrary to" or "an unreasonable application of" clearly established Supreme Court law, or where the state court decision involves an "unreasonable determination of the facts." 28 U.S.C. § 2254(d)(1)-(2); *Williams v. Taylor*, 529 U.S. 362 (2000).

If § 2254(d) applies, then AEDPA requires three separate inquires. First, a reviewing court must determine whether the state court decision was "contrary to" clearly established federal law; second, if it was not, a court must determine whether the state court adjudication involved an objectively unreasonable application of clearly established federal law; third, a reviewing court must assess whether the state-court adjudication was based on unreasonable determination of the facts. *See Blystone v. Horn*, 664 F.3d 397, 417 (3d Cir. 2011).

A state court decision is "contrary to . . . clearly established federal law" if it "applies a rule that contradicts" established Supreme Court precedent, or if it arrives at a result different from Supreme Court precedent on "materially indistinguishable" facts. *Williams*, 529 U.S. at 405-06. Relief should be granted under the "unreasonable application" clause "if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413 (opinion of O'Connor, J.). *Accord Rompilla*, 545 U.S. at 380 (same); *Wiggins*, 539 U.S. at 519-20 (same).

To assess the reasonableness of a state court's determination of the facts, a federal court must determine whether the state court factual findings are supported by sufficient evidence.

*Miller-El v. Cockrell*, 537 U.S. 322, 340-41 (2003). Habeas review is not a mere rubber stamp of the state court's decision. As the Supreme Court has held:

> Even in the context of federal habeas, deference does not imply abandonment or abdication of judicial review. Deference does not by definition preclude relief. A federal court can disagree with a state court's credibility determination and, when guided by AEDPA, conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence.

*Id.* at 340. Where the habeas court finds the state court's application of federal law objectively unreasonable, the habeas court has a duty to correct the error and grant relief. *See, e.g., Grant v. Lockett*, 709 F.3d 224, 232, 238 (3d Cir. 2013) (holding that although "[f]ederal habeas review of ineffective assistance of counsel claims is . . . 'doubly deferential,'" the state court's rejection of Grant's ineffectiveness claim "involved an unreasonable application of" *Strickland* under 2254(d)(1) (quoting *Cullen v. Pinholster*, 131 S. Ct. 1388, 1403 (2011))); *Breakiron*, 642 F.3d at 145 (applying "double deference" both to the reasonable strategic decisions of counsel as well as to the reasonableness of the state court decision and holding that the Pennsylvania Supreme Court's conclusion that trial counsel was not deficient under *Strickland* was objectively unreasonable); *Showers v. Beard*, 635 F.3d 625, 634 (3d Cir. 2011) (holding that defense counsel had provided ineffective assistance when he failed to present expert testimony to rebut the prosecution's theory, that petitioner was prejudiced as a result of counsel's failure, and that the state court decision rejecting petitioner's claim "is contrary to and an unreasonable application of clearly established federal law").

*Dennis v. Secretary, Pennsylvania Department of Corrections* provides additional guidance on the application of §2254(d). 834 F.3d 263 (3d Cir. 2017) (en banc). In *Dennis*, the Court affirmed the grant of habeas relief after concluding that the state court's opinion was either contrary to, or an unreasonable application of, clearly established federal law, in multiple respects, and that it relied on unreasonable determinations of fact. *Id.* Addressing §2254(d)(2),

11

the Third Circuit explained, "a state court decision is based on an 'unreasonable determination of the facts' if the state court's factual findings are 'objectively unreasonable in light of the evidence presented in the state-court proceeding,' which requires review of whether there was sufficient evidence to support the state court's factual findings." *Id.* at 281. Quoting *Miller-El*, 537 U.S. at 340, the Third Circuit recognized that habeas review is not meant to be a mere rubber stamp of the state court ruling, and that even state court credibility decisions will, in some instances, be found unreasonable. *Id.*

While the deference due to a state court adjudication is significant, it "does not imply abandonment or abdication of federal review." *McKennon v. Superintendent, Smithfield SCI*, 849 F.3d 557, 564 (3d Cir. 2017) (quoting *Brumfield v. Cain*, 135 S. Ct. 2269, 2277 (2015)). Neither AEDPA nor the decisions of the Supreme Court have vitiated habeas review or diminished this Court's obligation to review the claims of constitutional error with painstaking care and, where error is found, to correct it.

## SUPPLEMENTED CLAIM V[2]

**V.   PETITIONER WAS DENIED A FAIR TRIAL BECAUSE THE COMMONWEALTH VIOLATED THE DUE PROCESS CLAUSE WHEN IT DID NOT DISCLOSE EXCULPATORY INFORMATION MATERIAL TO PETITIONER'S ABILITY TO PRESENT A DEFENSE AT TRIAL.**

As set forth in the Petition and the First and Second Supplements thereto, the Commonwealth violated its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), when it suppressed exculpatory evidence at trial and continued to suppress this evidence for almost two

---

[2] Based on new facts and case law developed since the *Petition* was first filed, and on related state court proceedings, Petitioner filed supplements to Claim V, relating to violations of *Brady v. Maryland*. In this Memorandum, Petitioner will address the supplemented claims first, followed by the claims raised in the initial habeas in the order in which they were raised. A second supplemented claim, challenging the constitutionality of an aggravating circumstance based upon *Johnson* and *Welch* is addressed after the other habeas claims.

decades, through post-conviction and federal habeas proceedings. The Commonwealth withheld signed statements stating that another individual confessed to the crime for which Petitioner was convicted. The Commonwealth also withheld a note about an eyewitness who saw the shooting, knew Petitioner and would have testified that Petitioner was not one of the people involved. Individually, or in combination, these violations would have provided Petitioner with a persuasive defense that he was not the shooter, countered the Commonwealth's case, and undermined the reliability of the Commonwealth's entire investigation and prosecution.

A.      The Discovery of Suppressed Evidence

After the parties completed an informal discovery process, Petitioner filed a Motion for Discovery and Consolidated Memorandum of Law on September 28, 2010 (ECF No. 24). On August 19, 2011, this Court granted the motion in part, ordering the Commonwealth to produce, among other evidence, all police statements and interview notes of potential witnesses at the gas station or adjacent laundromat on the night of the murder" (ECF No. 38).[3]

Among the pages the Commonwealth produced was a note that included the names of a number of individuals and their contact information, including the name of a previously unidentified eyewitness—"John 'Maculla.'" As explained below, further investigation revealed that John "Maculla" was John McCullough. McCullough provided a declaration and testified in

---

[3] This Court also ordered the Commonwealth to produce: 1) all statements taken from Byron Price; 2) all records of identification procedures used by the Philadelphia Police Department during their investigation; 3) the terms of any deals or plea bargains entered into by Price in connection with this case; 4) any statements or notes from police interviews of potential witnesses questioned with regard to Petitioner's alleged admission to murder in front of Eugene Wilson and others; and 5) all evidence related to the search and seizure of a second dark-colored Lincoln automobile owned by Dorzaser Taylor. ECF No. 38. In addition to statements and notes from witnesses at the gas station/laundromat, the Commonwealth also produced documents in response to items #1, #2 and #4. With respect to items #3 and #5, the Commonwealth asserted in the cover letter to its production that "there were no . . . deals or plea bargains" with Price and "that no . . . 'evidence' . . . was uncovered" regarding the dark-colored Lincoln owned by Taylor. *See* ECF No. 46-2, Exh. 1 (March 6, 2012 Letter from ADA David Glebe).

post-conviction that he saw that shooting, knew Petitioner and Petitioner was not one of the people involved.

Further, the court-ordered review of the investigative files of the Philadelphia Police Department and the Philadelphia District Attorney's Office revealed additional exculpatory evidence (ECF No. 73), including the statements from two witnesses who told police that another person confessed to the crime for which Petitioner has been convicted and sentenced to death. Police reports, also disclosed during federal proceedings, confirmed that Rob (full name: Rolston Ricardo Robinson) was a neighborhood drug dealer who may have clashed with Campbell. While these statements are exculpatory in and of themselves, they also are consistent with McCullough's signed declaration that Petitioner was not the man who shot Campbell.

None of this evidence was produced at trial or during state court litigation. In fact, in this Court, the Commonwealth opposed Petitioner's request to review the homicide investigation files and repeatedly represented to Petitioner and this Court that, after searching all available files, "no document or information was located that should have been previously turned over to the defense under *Brady*." *See* ECF No. 74 at ¶¶12-16. In light of the Commonwealth's repeated misrepresentations, Petitioner asked this Court to excuse further exhaustion of the *Brady* claims, *id.* at ¶22, but his request was denied.

### B.    The Withheld Evidence

#### 1.    Someone else confessed to murdering Robert Campbell

The Commonwealth suppressed statements that Rolston Ricardo Robinson confessed to murdering Robert Campbell. In a signed statement to police, Joseph Rutherford stated that he frequented 929 Wynnewood Road, Philadelphia, PA where he met "Rob," a local crack dealer. When Rutherford refused to pay Rob what he wanted for drugs, Rob "told [Rutherford] that he

would do [him] like he did Bob down at the gas station." *See* 11/14/96 Statement of Joseph

Rutherford, App. Exh. No. 1.  Rutherford told the police he had seen Rob in a black Lincoln. *Id.*

      Cynthia Smith, who lived at 929 Wynnewood Road with her boyfriend, also provided a

signed statement to police that Rob confessed to her that he shot the victim.

> Q.      Did Rob ever say that he was involved in Campbell's death?
>
> A.      Yeah – he had been watching the news over & over again. He started to
> get real casual about the whole thing. Kenny was teasing him – So finally
> I said "Are you the one they're looking for – are you the one that shot
> him?" & he said "Yeah – I did it." He kept on talking about the guy being
> a snitch. When he said that he did it – everything just stopped. I got real
> nervous. I really didn't want to talk about it anymore.

*See* 11/14/96 Statement of Cynthia Smith, App. Exh. No. 2.

      The Town Watch group, of which Campbell was a member, had targeted 929

Wynnewood for surveillance because the group suspected that drug activity was taking place at

that address, as well as at other locations in neighborhood. In his signed statement to police,

Patrick Hoban described a confrontation between the Town Watch group and individuals from

6608 Lansdowne Avenue. *See* 11/12/96 Statement of Patrick Hoban, App. Exh. No. 3.

Rutherford also told police that there was a confrontation outside of the Lansdowne address and

that Rob was present. *See* App. Exh. No. 1.

      The police brought Rob, later identified as Rolston Ricardo Robinson, in for questioning.

In a signed statement, Rob admitted that he was at the scene of the Campbell homicide after the

shooting and saw the decedent's body. He claimed that as he drove down 63rd Street he "saw a

police car and a police van and a man lying on the ground" and describes the man as a "white

male, laying on [the] ground on his back, and blood near his shoulders, he had a jacket and a gun

in a holster on his waist." *See* 11/14/96 Statement of Rolston Robinson, App. Exh. No. 4. Rob

added that he "heard a female voice say[] that they left in a Black Lincoln." *Id.*

Previously unproduced activity sheets and statements further confirm that the police considered Rob to a suspect in the Campbell shooting. For example, Police Officer Shane Darden memorialized his conversations with Michael Cupaiuolo and Tracie Durham, both of whom placed Rob at the scene before and at the time of the homicide.

> . . . I was stopped on the highway by a white male who identified himself as Joe Rut[h]erford 26 who informed me that he was told by Homicide Division that if [he] had any information about the Homicide of Bill Campbell on 11-9-96. At this time Rut[h]erford directed me to 929 Wynnewood Rd. At that location were Mike Cupaiuolo . . . and Trac[ie] Durham. . . . I knew both of these people from prior contacts. They told me that [they] had information about who killed Bill Campbell. Michael Cupai[u]olo who owns [the address] and was in [the] living room with "Rob" who's [sic] rea[l] name is Rolston Robinson. Rob was tell[ing] him that people in that He (Rob) was there when Campbell was shot at 63rd and Vine St.
>
> Michael also said that "Rob" . . . had seen a gun and handcuffs in the belt of the dead man. Trac[ie] Durha[m] said to me that the night of the shooting she was on a pay phone [and] about 10 mins prior to [the] shooting she [had] seen "Rob" Rolston drive by the gas station twice in a gray sedan.

*See* 11/14/96 Statement of P/O Shane Darden, App. Exh. No. 5; *see also* 11/14/16 Statement of Tracie Durham, App. Exh. No. 6.

Richard Anderson also told the police that the person who killed Campbell lived at 929 Wynnewood Road. Anderson added that the shooter was connected to a group "call[ing] themselves the Junior Black Mafia" and had taken over the address. *See* 11/12/96 Statement of Richard Anderson, App. Exh. No. 7. An undisclosed statement from Tish Ann Ambrosine supports Anderson's allegations. Ambrosine told police that friend of hers told her that his relative was present at 929 Wynnewood Road and heard people there bragging about killing Campbell. *See* 11/12/96 Statement of Tish Ann Ambrosine, App. Exh. No. 8. Ambrosine's friend likewise reported that the house had been taken over by members of the JBM. *Id.*

A previously unproduced Activity Sheet shows that police considered Rob a suspect and conducted surveillance of 929 Wynnewood Road.

The assigned was contacted by a retired Detective who related that he had been contacted by an old informant who related that persons in 929 Wynnewood Rd., may have information as to the identity of the perpetrator and that he may be named ROB and was a Jamaican male. Det. DiBlasi & the assigned set up a surveillance of this location and noted that a B/M left the location and drove away in a 1988 Acura painted gray. The license tag was checked thru [D]MV and it was registered to a RUPERT ROBINSON at 132 N. 60th St. This male fit the general description of the male called ROB. It was also noted that adults aged 20 to 40 both white and black were coming and going from this location. The Detectives stopped one of these persons and learned that ROB does operate a gray Acura and several persons in the location were upset with him over drug matters.

*See* 11/13/96 Activity Sheet, App. Exh. No. 9.

None of this evidence was disclosed to the defense at trial or during state court proceedings. It was not until this Court ordered the Commonwealth to comply with Petitioner's discovery requests in federal habeas proceedings that this evidence was disclosed.

**2.      An eyewitness identified someone other than Petitioner as the shooter**

Pre-trial, the Commonwealth assured Petitioner it was providing the defense with the names and addresses of all eyewitnesses to the Campbell shooting. Letter from Charles Gallagher, Deputy Dist. Atty. to Donald Padova, Esq., dated April 17, 1997, App. Exh. No. 27 ("we are voluntarily turning over this discovery to you which includes the names and address of all eyewitnesses"). However, it failed to disclose a note identifying John "Maculla" as someone who "was on the lot and saw the incident." *See* App. Exh. No. 29. The handwritten note included the following information:

5635 Belmar Doers Left in SW and Got Tag #
727-8853       John 'Maculla' B/M 40's Stocky, Reddish Hair
Told Manager on Sunday          5'11" Lt Comp
That he was on lot + Saw incident

*See id.* Further investigation revealed that John "Maculla" was John McCullough, who provided a statement to Petitioner in post-conviction. *See* Declaration of John McCullough, App. Exh. No. 33.

17

At the post-conviction hearing, McCullough testified that he saw the shooting at the gas station. As he and his son, John McCullough III, were walking, he heard a gunshot, perhaps two. NT 4/28/16, 17-19. He saw three people—one tall man and two other men with dark complexions. The two men with dark complexions jumped into a black car and sped off. *Id.* at 20-22, 85; *see* McCullough Dec. at ¶2 ("One guy was tall and light skinned. He was the victim."), App. Exh. No. 33. McCullough knew Ricardo Natividad from work he did in the community, and Mr. Natividad was not there. *Id.* at 16-17, 22-23; *id.* at 86 ("I did not see him at the gas station and I did not see him running away from the gas station.").

After the police came to the scene, they took McCullough and several other people on the street West Detective Division at 55th and Pine Streets. *Id.* at 26-27. McCullough was with a woman he knew as "Bev," and a couple from across the street (likely the Johnsons based on his description). *Id.* at 27.[4] After the witnesses spoke with detectives at 55th and Pine, they went to the Police Administration Building at 8th and Race Streets. There, McCullough signed a statement and received a copy. *Id.* at 28-29, 32.

John McCullough III testified for the Commonwealth and claimed that he was not near 63rd and Vine on November 9, 1996, and did not witness a murder. NT 5/20/16, 4. After being arrested for stealing copper from an abandoned house, McCullough III gave a statement to Detective James Dougherty. *Id.* at 7, 9. He was then held on a parole violation for absconding and testing positive for drugs. *Id.* at 32-33, 39. After his April 2014 arrest, McCullough III wrote

---

[4] McCullough also testified that Bev had no front teeth. NT 4/28/16, 150. His testimony is consistent with a November 12, 1996 activity sheet, which reports McCullough told the police that "[a]dditional information about the incident at the Exon [sic] station was given to him by a female involved with drugs who he knew to associate with another female known to him as COOKIE. He described the first female as having no upper teeth and who could be found on 63rd St., from Market to Lansdowne." *See* Activity Sheet dated 11/12/96, App. Exh. No. 42; *see also* NT 5/20/16, 55-56.

his father from prison and told his father that detectives "showed me paperwork from the District

Attorney stating that it could be possible for you to be prosecuted if you continue to disrupt the

case." He continued:

> My advice to you is to let Detective Doughery [sic] know you were persuaded by
> the people who are backing Ricardo Nat\*\*\*vida[d] to say these things. If you back
> out of it now and let him know the truth, you'll be out of this situation for good.
> They kept me at 8th & Race for two days questioning me about a murder I don't
> know about.

*See* App. Exh. No. 10. He then asked his father to send him $100 under the name "Lorenz

Taylor." While McCullough III denied that the detectives wanted him to contact his father, NT

5/20/16, 31, Det. Dougherty admitted that the detectives asked McCullough III to talk with his

father about the shooting. NT 7/7/16, 5, 7.

Det. Dougherty also testified for the Commonwealth and claimed that no one was

transported to West Detectives to be interviewed about the homicide. NT 5/20/16, 40. Det.

Dougherty also claimed that McCullough told him he was not a witness to the shooting around

the time of the homicide, *id.* at 56, although Det. Dougherty admitted he made no record of this

statement. NT 7/7/16, 9-11. Before the post-conviction hearing, Det. Dougherty spoke to

McCullough at his home. NT 4/28/16, 120. Det. Dougherty prepared an eight page set of notes

which he claimed was a substantially verbatim record of a conversation he had with

McCullough. NT 5/20/16, 52. McCullough, however, testified that Det. Doughery did not write

anything down when they spoke and did not endorse the detective's notes. NT 4/28/16, 87, 122,

124-25.

### C.    Legal Standards

Due process imposes an "inescapable" duty on the prosecutor "to disclose known,

favorable evidence rising to a level of material importance." *Kyles v. Whitley*, 514 U.S. 419, 438

(1995); *accord Banks v. Dretke*, 540 U.S. 668, 690 (2004); *United States v. Bagley*, 473 U.S.

667, 676 (1985); *Giglio v. United States*, 405 U.S. 150, 153-56 (1972). To establish a *Brady* violation, a defendant must show that favorable evidence was suppressed by the government, either intentionally or inadvertently, and that the suppressed evidence was material. *Brady*, 373 U.S. at 87; *Simmons v. Beard*, 590 F.3d 223, 233 (3d Cir. 2009). The duty to enforce *Brady* "with painstaking care is never more exacting than it is in a capital case." *Kyles*, 514 U.S. 422.

In addition to exculpatory evidence, favorable evidence includes impeachment evidence. *Bagley*, 473 U.S. at 676 (*Brady*'s disclosure requirements apply to any materials that, whatever their other characteristics, can be used to develop impeachment of a prosecution witness); *Giglio v. United States*, 405 U.S. 150, 153-56 (1972); *see also Breakiron v. Horn*, 642 F.3d 126, 133 n.8 (3d Cir. 2001) (it is "so well-established" as to be "axiomatic that prosecutors must disclose impeachment evidence").

A prosecutor's failure to disclose *Brady* evidence requires a new trial where "'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Simmons*, 590 F.3d at 233 (quoting *Bagley*, 473 U.S. at 682); *see also Kyles*, 514 U.S. at 434; *Wearry v. Cain*, 136 S. Ct. 1002, 1006 (2015) (per curiam). In assessing materiality, "the reviewing court may consider directly any adverse effect . . . on the preparation or presentation of the defendant's case." *Bagley*, 473 U.S. at 683. Ultimately, the question is "not whether the defendant would more likely than not have received a different verdict with the [suppressed] evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434. Thus, *Brady* may be violated even when "the undisclosed information may not have affected the jury's verdict." *Wearry*, 136 S. Ct. at 1006 n.6.

Petitioner need not demonstrate that "in light of the undisclosed evidence, there would not have been enough left to convict . . . [because] sufficiency of [the remaining] evidence [is not] the touchstone" of materiality. *Kyles*, 434-35 & n.8. This standard is met where, for example, evidence "would have undercut the credibility of a key prosecution witness in a manner not duplicated by other challenges the defense was able to level at trial." *Dennis v. Sec'y, Pa. Dep't of Corr.*, 834 F.3d 263, 298 (3d Cir. 2016); *accord Wearry*, 136 S. Ct. at 1006-07. The materiality of suppressed evidence must be "considered collectively, not item by item." *Kyles*, 514 U.S. at 436.

> **D.     The Commonwealth Violated Petitioner's Due Process Rights**
>
> **1.     The Commonwealth suppressed evidence**

Petitioner alleged, and the Pennsylvania Supreme Court found, that the Commonwealth suppressed evidence until the federal discovery process despite the Commonwealth's duty to disclose and despite repeated inquiries from the defense.

In successor post-conviction proceedings, the Pennsylvania Supreme Court found that "[t]here is no dispute the Commonwealth failed to disclose these materials to the defense prior to trial," and "the trove of statements and investigatory paperwork revealed during the federal discovery process were suppressed by the government." *Natividad-3* at 32.[5]

> **2.     The suppressed evidence was favorable to the defense**

The suppressed evidence was exculpatory. As the Pennsylvania Supreme Court found, the Robinson materials "were plainly exculpatory on their face, as they identified an alternate suspect who allegedly claimed responsibility for the murder." *Natividad-3* at 32. "[E]vidence

---

[5] While this specific finding refers to the Robinson materials, the analysis is equally applicable to the McCullough evidence. As further explained in Section E.2, *infra*, the Pennsylvania Supreme Court did not dispute that McCullough's identity was not disclosed until federal discovery proceedings but rather determined that Petitioner's claim was not timely.

pertaining to other legitimate suspects . . . [is] unquestionably . . . favorable to the accused[.]" *Bies v. Sheldon*, 775 F.3d 386, 398 (6th Cir. 2014).

The withheld statements and investigatory paperwork establish that the limited police investigation of Robinson showed that he had motive and opportunity to kill Campbell. Robinson sold drugs in the neighborhood where Campbell worked with Town Watch, and Robinson knew Campbell and described him as a "snitch." The police reports corroborate the suspicions of Robinson's drug activity, show that Robinson possessed guns and would threaten people with them, and link Robinson to a black Lincoln—the same type of vehicle described by witnesses at the gas station.

Such evidence falls under the purview of *Brady* because it "would tend to" exculpate the defendant, *Brady*, 373 U.S. at 88, and would have "some value as exculpation," *Kyles*, 514 U.S. at 450; *see also Dennis*, 834 F.3d at 302 (*Brady* violation where prosecution did not disclose that evidence that "counsel could have . . . to mount an 'other suspect' defense at trial"); *United States v. Jernigan*, 492 F.3d 1050, 1054-55 (9th Cir. 2007) (*Brady* violation where government failed to disclose to defense evidence that another person was charged with committing similar crimes); *Jamison v. Collins*, 291 F.3d 380, 390-91 (6th Cir. 2002) (finding that evidence indicating that police had other suspects was *Brady* evidence, particularly when facts about other suspects coincided with facts known about the crime).

Similarly, evidence of additional eyewitnesses, like McCullough, was favorable evidence, bearing on the adequacy and credibility of the police investigation into the homicide. Moreover, disclosure of the note would have led competent counsel to investigate and learn that McCullough told the police that Petitioner was not the shooter, which, as the Pennsylvania Supreme Court recognized, "certainly was evidence favorable to [Petitioner]." *Natividad-3* at 29;

*see also Bagley*, 473 U.S. at 683 (*Brady* requires a court to consider the impact of non-disclosure on "the course that the defense" could have pursued if the material had been disclosed); *Kyles*, 514 U.S. at 441 (consider what "competent counsel" would have done with the suppressed evidence); *Wilson v. Beard*, 589 F.3d 651, 664-65 (3d Cir. 2009) (same).

Evidence that McCullough told the police that Petitioner was not the shooter also would have contradicted Price's testimony as the only eyewitness to identify Petitioner as the person who shot Campbell. Such evidence is favorable to the defense because "the defense might have used [it] to impeach the Government's witnesses," and it "might have been helpful in conducting the cross-examination." *Bagley*, 473 U.S. at 676, 678; *see also Cone v. Bell*, 556 U.S. 449, 471 n.17 (2009) (*Brady* is implicated where suppressed evidence places a witness' testimony "in a different light").

### 3.      The suppressed evidence was material

The suppressed evidence was material to the pre-trial proceedings, trial, sentencing and appeal. Courts routinely find that suppressed evidence is material when it indicates that another suspect may have been responsible for the crime; when it would have strengthened counsel's chosen defense and supported an alternative defense; or when it would have undermined the credibility and reliability of the police investigation. *Dennis*, 834 F.3d at 311 (police reports documenting another person's confession to the crime were material); *id.* at 299-300 (evidence that would have allowed the defense to contradict a key prosecution witness was material). Here, as in *Dennis*, all of these circumstances are present.

The suppressed evidence shows that Rob confessed to the killing to at least two other people, and those people promptly reported the confessions to the police and others. As the Supreme Court has noted, "[a] confession is like no other evidence." *Arizona v. Fulminante*, 499 U.S. 279, 296 (1991). Here, in addition to Rob's confession, the Commonwealth suppressed

evidence that Rob had motive to kill Campbell, had access to guns and the same type of vehicle described by witnesses at the gas station, and admitted to being at the scene of the crime. This evidence would have been more than sufficient to charge and convict Rob of Campbell's murder, and thus was material. *See Dennis*, 834 F.3d at 311 (suppression of evidence material where counsel "could have presented an 'other person' defense at trial"); *Smith v. Sec'y of N.M. Dep't of Corr.*, 50 F.3d 801, 829-30 (10th Cir. 1995) (police report was material for *Brady* purposes where it indicated that alternate suspect in double homicide investigation was "near the vicinity of the bodies on two separate occasions" and bloody clothes were found in his trunk during a traffic stop).

"While the State is not necessarily required to disclose every stray lead and anonymous tip, it must disclose the existence of 'legitimate suspect[s]', especially when such information has been specifically requested by the defendant, as it was in this case." *Bies*, 775 F.3d at 400 (citations omitted). "Withholding knowledge of a second suspect conflicts with the Supreme Court's directive that 'the criminal trial, as distinct from the prosecutor's private deliberations, [be preserved] as the chosen forum for ascertaining the truth about criminal accusations.'" *United States v. Jernigan*, 492 F.3d 1050, 1056-57 (9th Cir. 2007) (en banc) (quoting *Kyles*, 514 U.S. at 440). To the extent that there were questions about the reliability of Rob's confession, "it was the prerogative of the defendant and his counsel—and not of the prosecution—to exercise judgment in determining whether the defendant should make use of it." *DiSimone v. Phillips*, 461 F.3d 181, 195 (2d Cir. 2006). Instead, the prosecution in this case usurped the role of defense counsel and anointed itself the "architect" of the defense strategy in violation of Petitioner's due process rights. *See Brady*, 373 U.S. at 87-88. Had the prosecution disclosed the

withheld evidence, counsel could have presented a coherent "other suspect" strategy rather than a confusing and at times contradictory defense.

In opening statements, defense counsel simultaneously alleged that the evidence would show that the murder was "no higher than murder of the second degree," NT 11/5/97, 143, and that there was reasonable doubt that Petitioner was involved in the carjacking and murder. *Id.* at 144. In support of this argument, defense counsel called one witness—Officer Brian James— who testified about Havens' statements to police. Officer James testified that in his initial statement on November 9th Havens did not indicate that the carjacker was wearing a jacket, though there was space provided to give such a description. In a subsequent statement on December 2nd, Havens described the man who pointed a gun at him as wearing a long, black leather jacket. Officer James' testimony spanned eight (8) pages of transcript. NT 11/10/97, 9-16. Counsel offered no affirmative evidence in support of any defense to the Campbell robbery and murder.

In closing arguments, defense counsel argued that the Commonwealth had failed to prove that Petitioner committed either the carjacking or the murder, characterizing the Commonwealth's case as "neighborhood gossip that's dressed up as evidence[.]" *Id.* at 34; *see id.* at 39-42. Counsel also argued Price's testimony was inconsistent with the evidence and implied that Price had inculpated Petitioner in order to minimize his own involvement in the murder. *Id.* at 35-38. While counsel requested and received a jury instruction on self-defense based on Price's testimony, NT 11/7/97, 175, counsel only briefly mentioned this theory to the jury. NT 11/10/97, 25-26. In comparison, the prosecutor spent several pages reminding the jury of the weaknesses of this defense, including that Campbell's holster was snapped shut and that there was no bullet in the chamber of his gun. *Id.* at 43-47, 49-51, 53-54.

Trial counsel was never able to mount an "another suspect" defense because the prosecution withheld evidence of that other suspect's confession. This impact on the defense strategy renders the Robinson confession (and corroborative evidence) material.

The McCullough evidence was likewise material. First, the suppressed evidence was material because it suggested that someone other than Petitioner shot Robert Campbell. Evidence that McCullough saw the shooting and did not identify Petitioner would have contradicted the testimony of one of the Commonwealth's most important witnesses—Byron Price—and thus was material. *See Wearry*, 136 S. Ct. at 1006-07 (suppressed impeachment evidence was material where it would have undermined the testimony of key prosecution witness); *Kyles*, 514 U.S. at 441 (ruling that suppressed impeachment evidence was material where "the essence of the State's case was the testimony of eyewitnesses") (quotation omitted); *Simmons*, 590 F.3d at 234 (suppressed evidence material because it "calls into question" the credibility of witnesses who were "at the heart of the Commonwealth's case"). Indeed, "the effective impeachment of one eyewitness can call for a new trial *even though the attack does not extend directly to others*, as we have said before." *Kyles*, 514 U.S. at 445 (citation omitted).

Further, evidence that Campbell was shot by two men with dark complexions also would have corroborated Havens' initial description of his assailants and would have supported the defense argument that Havens' identification of Petitioner was unreliable. *See* Claim VI, *infra.* In *Washington v. Beard*, the prosecution withheld contemporaneous descriptions of the robbery suspects while disclosing others that supported its theory of the case. The identity of the shooter was a contested issue, and the withheld evidence was relevant to establishing identity. *Washington v. Beard*, No. 07-3462, 2015 WL 234719, at *22-23 (E.D. Pa. Jan. 16, 2015). While the prosecution argued that the withheld evidence was cumulative to evidence provided to the

defendant prior to trial, the court found that "the differences between the disclosed evidence and the non-disclosed descriptions are what make the non-disclosed evidence material." *Id.* at *24. Here, as in *Washington*, the Commonwealth presented witnesses who inculpated Petitioner while concealing the existence of a witness who would have contradicted this testimony. "Under these circumstances, counsel could have 'effectively attacked the Commonwealth's case' if the documents had been disclosed prior to trial." *Id.* at *25.

The prosecution's suppression of a credible alternate suspect—along with McCullough's affirmative non-identification of Petitioner—prevented counsel from mounting a credible defense to the Commonwealth's case. Alone, and in combination with the McCullough evidence, the suppressed evidence of Rob's confession would have allowed competent counsel to argue that Rob was the real killer. "Without the evidence suppressed by the prosecutor, however, the defense could not credibly proffer such a theory. Had this information been available to the defense before trial, it could have much more effectively attacked the Commonwealth's case on not just one, but two critical fronts." *Simmons*, 590 F.3d at 238.

Counsel also would have been able to challenge the adequacy of the police investigation, as there is no evidence that the police conducted any follow-up investigation other than to accept Rob's denial of involvement at face value. *See Dennis*, 834 F.3d at 302, 311 (counsel "could have used the information to challenge the adequacy of the police investigation" and "to challenge detectives at trial regarding their paltry investigation of th[e] [alternate suspect] lead"); *Bies*, 775 F.3d at 400 (finding it significant that the police did not exonerate an alternate suspect; "rather, they eliminated [him] . . . because they simply believed him when he denied any involvement in the crime").

Because trial counsel could have used the withheld material to effectuate the defense, *Brady* materiality is established. *See Bagley*, 473 U.S. at 683 (*Brady*'s materiality inquiry considers "any adverse effect that the [suppression] might have had on the preparation or presentation of the defendant's case" and "the course that the defense and the trial team would have taken had the defense not been misled by the prosecut[ion"); *Kyles*, 514 U.S. at 441 (materiality established because disclosure of suppressed evidence "would have resulted in . . . a markedly stronger [case] for the defense); *id.* at 449 n.19 (withheld statements of non-testifying witness that could have been used on cross-examination of prosecution witnesses "would have made the defense's case more plausible and reduced its vulnerability to credibility attack").

For almost two decades, the Commonwealth failed to disclose—indeed, denied the very existence of—evidence of an eyewitness who saw the shooting, knew Petitioner, and testified in post-conviction that Petitioner was not involved. The Commonwealth also withheld evidence that another individual had confessed to committing the crime for which Petitioner was convicted and sentenced to death. Even assuming that either of these errors does not establish materiality, their cumulative effect undoubtedly does. *See Kyles*, 514 U.S. at 441 (cumulative prejudice from state's failure to reveal multiple pieces of exculpatory evidence undermined fairness of trial and entitled to defendant to relief); *Simmons*, 590 F.3d at 234. Petitioner is entitled to a new trial.

### E.     The State Court Opinion

#### 1.     The Robinson evidence was material

The Pennsylvania Supreme Court reviewed the merits of Petitioner's claim that his due process rights were violated by the Commonwealth's suppression of Robinson's confession. The court held that *Brady*'s first two requirements were satisfied because "the Commonwealth failed to disclose the [Robinson] materials to the defense prior to trial, and some of them were plainly

exculpatory on their face, as they identified an alternate suspect who allegedly claimed responsibility for the murder." *Natividad-3* at 32. Over the vigorous dissent of Justices Donohue and Wecht, the majority determined that, though it was a "close call," the suppression of this evidence was not material because "the Commonwealth's evidence against [Petitioner] was so overwhelming there is no reasonable probability that if the Commonwealth had turned over the relevant evidence the result of the trial would have been different." *Id.* at 32-33.[6] The court's ruling was contrary to and an unreasonable application of clearly established federal law and an unreasonable determination of the facts.

Although the Pennsylvania Supreme Court recited the correct materiality standard, the court tied its analysis of the materiality of the Robinson evidence to a requirement that Petitioner show that the remaining evidence was not sufficient to support a conviction. *E.g.*, *Natividad-3* at 36 (noting that "the withheld material in no way calls into question any of the evidence proving [Petitioner] . . . carjacked Havens"); *id.* (stating that "also unaffected by the withheld material[] was Price's eyewitness testimony that [Petitioner] killed Campbell").

This analysis was contrary to and unreasonably applied longstanding Supreme Court law that squarely rejects sufficiency of the evidence as the proper standard for evaluating *Brady* claims. *See Kyles*, 514 U.S. at 434-35 & n.8 ("A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict. . . . This rule is clear, and none of the *Brady* cases has ever suggested that sufficiency of evidence (or insufficiency) is the touchstone."); *see also Dennis*,

---

[6] In contrast, Justice Wecht, writing in dissent, would have granted Petitioner a new trial under *Brady* based on the Commonwealth's failure to disclose the Robinson evidence at trial, stating: "[M]y evaluation of both the record and the principles under which *Brady* and its progeny are based leads me to conclude that this undisclosed evidence was material to Natividad's case." *Natividad-3* at 42.

834 F.3d at 298, 303 ("Although the court articulated the proper standard for materiality, . . . it applied *Kyles* in a manner inconsistent with Supreme Court precedent" by failing to weigh the impeachment value of suppressed evidence and "by using sufficiency of the evidence as a touchstone"); *Breakiron*, 642 F.3d at 140 ("The Pennsylvania Supreme Court's partial reliance on the sufficiency of the evidence . . . is both contrary to and an unreasonable application of *Strickland*.").

Further, the Pennsylvania Supreme Court unreasonably ignored the effect of the Commonwealth's withholding of exculpatory evidence on Petitioner's defense. While the court characterizes trial counsel's chosen defense as one of "self-defense," this is not entirely accurate. *Natividad-3 at* 36. As described above, counsel asked for, and received, a self-defense instruction, but counsel presented no evidence in support of that theory. Rather, the instruction was based solely on the testimony of Price, whose testimony counsel vigorously challenged in all other respects. Moreover, evidence that Campbell's holster was snapped shut also contradicted Price's testimony. NT 11/5/97, 206-07.

Trial counsel focused his cross-examination and closing argument on creating reasonable doubt that Petitioner was one of the people who carjacked Havens and killed Campbell. For example, counsel cross-examined Havens and presented testimony from a police officer regarding omissions in Havens' description of his assailant in his statements to the police. *See* NT 11/5/97, 180-83 (Havens); NT 11/10/97, 8-16 (Officer James). Similarly, counsel cross-examined Price on discrepancies between his testimony and prior statements to police. Counsel questioned Price about his alleged lack of knowledge that Petitioner was carrying a gun on the night of the murder until after the shooting and his failure to include distinctive black grips, like those on the gun recovered from Keith Smith's lawyer, in his description of the gun. NT 11/6/97,

24-25, 30, 66-67. Counsel challenged Price on his initial failure to admit his involvement in the crime, even after being warned that the police considered him a suspect. *Id.* at 39-47. In closing arguments, counsel argued that these inconsistencies and the lack of credible evidence tying Petitioner to the crimes created a reasonable doubt of guilt. NT 11/10/97, 29-42.

Contrary to the court's assertion, the proper analysis is not that the "withheld evidence may have opened the door to an otherwise unavailable defense theory." *Natividad-3* at 37 (citing *Turner v. United States*, 137 S. Ct. 1885 (2017)). It is that the withheld evidence would have supported and made stronger a defense that counsel attempted to present—reasonable doubt. Although there was no forensic evidence connecting Petitioner to the crime, and Petitioner made no inculpatory statements to police, counsel had no evidence to suggest that anyone other than Petitioner had committed the offense. Thus, counsel attempted to raise reasonable doubt through his cross-examination with the limited evidence on hand. Had the Commonwealth disclosed the suppressed evidence, trial counsel would have been able to challenge the Commonwealth's case with an eyewitness who would have testified that Petitioner was not the shooter and presented an alternate suspect who had motive, means, and opportunity to kill Campbell.

While the Pennsylvania Supreme Court described the withheld evidence as "too weak" and "too distant" to meet *Brady*'s standards, *Natividad-3*, 200 A.3d at 35, this determination was one for the jury to make at trial, not a court on appeal. *Dennis*, 834 F.3d at 301. In this case, as in *Kyles*, "not every item of the State's case would have been directly undercut if the *Brady* evidence had been disclosed." 514 U.S. at 451. However, "[e]ven if the jury—armed with all of this new evidence—could have voted to convict . . . [this Court should] have 'confidence that it would have done so.'" *Wearry*, 136 S. Ct. at 1007 (quoting *Smith v. Cain*, 132 S. Ct. 627, 630

(2012)). For these reasons, the Pennsylvania Supreme Court's determination that the Robinson evidence was not material was unreasonable.

### 2.    The McCullough claim was timely filed

The Pennsylvania Supreme Court did not consider Petitioner's claim that the Commonwealth violated *Brady* when it failed to disclose the McCullough note on the ground that it was untimely. *Natividad-3 at* 28. The court held that, although Mr. Natividad filed his petition within 60 days of obtaining McCullough's affidavit, he did not file within 60 days of receiving the note in the prosecutor's file. Since the court viewed the claim as deriving from the suppression of the McCullough note, the court held that the petition was untimely. *Id.* In reaching this conclusion, the court rejected Petitioner's claim that the note itself was not exculpatory but that it led to the discovery of exculpatory evidence. *Id.* at 28-29.

The court's ruling was not based on an adequate and independent state court procedural bar. Moreover, even if this claim is improperly deemed to be defaulted, the default is overcome because Petitioner can show cause and prejudice. "Because the [state] courts did not reach the merits of [Petitioner's] *Brady* claim, federal habeas review is not subject to the deferential standard that applies under AEDPA. . . . Instead, the claim is reviewed *de novo*." *See Cone*, 556 U.S. at 472 (citations omitted). Petitioner is entitled to relief on this claim.

### a.    The asserted bar is not adequate and independent

State court procedural bars that are not "firmly established and regularly followed" are inadequate to bar federal review. *Lee v. Kemna*, 534 U.S. 362, 389 (2002) (quoting *James v. Kentucky*, 466 U.S. 341, 348 (1984)); *see also Kindler v. Horn*, 642 F.3d 398, 404 (3d Cir. 2011); *Bronshtein v. Horn*, 404 F.3d 700, 707-10 (3d Cir. 2005).

Here, Petitioner alleged that his *Brady* claim was timely under § 9545(b)(1)(i) [governmental interference] and under § 9545(b)(1)(ii) [newly discovered evidence]. It appears,

however, the Pennsylvania Supreme Court only addressed timeliness under § 9545(b)(1)(i). *See Natividad-3 at* 29 n.13 ("We emphasize that our timeliness analysis with respect to this issue is limited by the nature of [Petitioner's] claim, *i.e.*, a due process violation under *Brady* pursuant to 42 Pa. C.S. § 9545(a)(2)(i)). In doing so, the court erroneously conflated the due diligence element of the statute's newly-discovered evidence prong with the statute's separate governmental interference prong. This contradicts the court's own precedent and the plain language of 42 Pa. C.S. § 9545(b)(1)(i-ii), which clearly separates these two prongs as alternatives to each other. *See Commonwealth v. Yarris*, 731 A.2d 581, 587-92 (Pa. 1999) (separating the discussion of the statute into three sections, one for each statutory exception to the PCRA's one-year timeliness bar).[7]

The Pennsylvania Supreme Court stated that Petitioner could not meet the 60-day requirement of 42 Pa. C.S. § 9545(b)(2) because his due process claim was "predicated on the Commonwealth's suppression of the "Maculla" note, not its failure to disclose the statement

---

[7] Indeed, the court's jurisprudence surrounding the timeliness following *Yarris* shows that—as in this case—the court has not "firmly established or regularly followed" a consistent interpretation of the timeliness bar. *See, e.g.*, *Commonwealth v. Beasley*, 741 A.2d 1258, 1261-62 (Pa. 1999) (in which the court discusses the credibility of the petitioner's *Brady* claims pursuant to § 9545(b)(1)(i) without mentioning the concept of due diligence); *Commonwealth v. Edmiston*, 851 A.2d 883, 887 & n.1 (Pa. 2004) (in which the court states that "the timeliness of appellant's PCRA petition is uncontested" before holding that the petitioner's *Brady* claim is barred on other grounds, none of which involve "due diligence"); *Commonwealth v. Chester*, 895 A.2d 520, 523-24 (Pa. 2006) (in which the court finds appellant's PCRA petition to be untimely after a discussion of appellant's *Brady* claims, during which there is no mention of "due diligence"); *contra Commonwealth v. Breakiron*, 781 A.2d 94, 98 (Pa. 2001) (in which the Court cites the after-discovered evidence section of *Yarris* in support of its complaint that the appellant "fails to offer a reasonable explanation as to why this [*Brady* material], with the exercise of due diligence, could not have been obtained earlier"); *Commonwealth v. Lambert*, 884 A.2d 848, 852 (Pa. 2005) (in which the court, while disagreeing with the Commonwealth's assertion that "in order for appellant's PCRA petition to fall within the cited timeliness exceptions, he must actually establish a meritorious *Brady* claim," nonetheless proceeds to evaluate the timeliness of appellant's *Brady* claim based on "[t]he newly discovered evidence exception, set forth in Section 9545(b)(1)(ii)" which includes a due diligence analysis).

McCullough gave to the defense 15 years later." *Natividad-3*, at 28 (emphasis in original). This is incorrect.

Petitioner's argument in post-conviction was the same as it is here—"Mr. McCullough's statement [that Petitioner was not the shooter] is material to the case and the defense." *See* App. Exh. No. 11 (Petitioner's Third PCRA Petition dated 8/9/12 at ¶21). Petitioner further alleged that the note states that McCullough "got [the] tag #," and the tag number and McCullough's original statement still had not been disclosed to Petitioner. *Id.* at ¶22. Contrary to the Pennsylvania Supreme Court's assertion, Petitioner has never alleged that the "Maculla" note, without more, was material evidence that the Commonwealth should have disclosed under *Brady. See Natividad-3 at* 29. This is because the note, which simply gives McCullough's (misspelled) name and phone number without any indication of what he witnessed, is not exculpatory.[8] Rather, it is a signal for "competent counsel" to investigate further. It was not until Petitioner investigated the note, located the witness and spoke to him that his exculpatory statement was revealed. It would defy reason to say that the bar applied here is "firmly established and regularly followed" when it relies on a misreading of the record. *See Cone*, 556 U.S. at 466 (state court's mistaken ruling that claim had been previously litigated was not a procedural default ruling requiring deference by habeas court).

Additionally, Mr. Natividad substantially complied with any rule by filing his petition within 60 days of obtaining McCullough's affidavit. *See Lee*, 534 U.S. at 366-67, 385 (no default where petitioner "substantially complied" with state rule); *Williams v. Coyle*, 260 F.3d 684, 693

---

[8] The "Maculla" note was produced to the defense on March 6, 2012. Petitioner investigated and raised his *Brady* claim on August 9, 2012, approximately five months later. In 2018, the PCRA was amended to extend the time to file a petition based on newly discovered evidence to one year, recognizing the difficulty in meeting the 60-day deadline for many petitioners.

(6th Cir. 2001) (in determining the applicability of procedural default, a federal court must determine "whether there is a state procedural rule that is applicable to petitioner's claim and whether the petitioner failed to comply with that rule"). The bar is inadequate and does not preclude merits review.

The bar is also not independent. A state court procedural waiver rule is not "independent," and therefore cannot create a federal court procedural default, if the state rule is "interwoven with federal law" or "substantially mirrors the requirements of federal constitutional law." *Coleman v. Thompson*, 501 U.S. 722, 725 (1991) (quoting *Michigan v. Long*, 463 U.S. 1032, 1040-41 (1984)); *Bronstein*, 404 F.3d at 722. The determination that Petitioner's *Brady* claim was based on the McCullough note, rather than on the information contained in the McCullough affidavit, required consideration of the merits of the claim. For this reason as well, merits review is not precluded.

Moreover, even the Pennsylvania Supreme Court recognized that the claim could be considered timely under (b)(1)(ii). "This is so because [Petitioner's] petition was filed within 60 days of the date McCullough provided his declaration, and the facts alleged within that declaration were previously unknown to [Petitioner] and could not have been ascertained sooner by the exercise of due diligence." *Natividad-3 at* 29 n.13. Under similar circumstances, the Pennsylvania Supreme Court held that information discovered during federal habeas proceedings "constitute[d] 'newly discovered' facts for purposes of the (b)(1)(ii) exception to the jurisdictional time bar." *Commonwealth v. Johnson*, 64 A.3d 621, 622 (Pa. 2013) (per curiam). The same is true here.

### b.      Petitioner has shown cause and prejudice

Even if the claim were defaulted, Petitioner can overcome default because he can demonstrate cause and prejudice. The showing for cause and prejudice parallels the components

of a *Brady* violation. *See Banks*, 540 U.S. at 691; *Breakiron*, 642 F.3d at 132. This Court determines cause and prejudice *de novo* as a matter of federal law. *Cristin v. Brennan*, 281 F. 3d 404, 412-19 (3d Cir. 2002).

Prior to trial, the Commonwealth produced discovery under cover of letter and enclosed several witness statements. *See* Letter to Donald Padova dated 4/17/97, App. Exh. No. 27. The Commonwealth assured counsel that it was disclosing the names and addresses of all eyewitnesses. Specifically, it represented, "Since we are voluntarily turning over this discovery to you, which includes the names and address [sic] of all eyewitnesses, we expect you to provide us with the names and addresses and statements of any witnesses you will call at trial." *Id*. However, not only was McCullough's name and address not disclosed, his existence was denied until this Court ordered discovery. *See* Section D.1, *supra*.

Petitioner had no further obligation to continue to seek what the Commonwealth averred did not exist. This establishes cause. *See Banks*, 540 U.S. at 696 ("A rule thus declaring 'prosecutor may hide, defendant must seek,' is not tenable in a system constitutionally bound to accord defendants due process."); *see also Amadeo v. Zant*, 486 U.S. 214, 222 (1988) ("If the District Attorney's memorandum was not reasonably discoverable because it was concealed . . . and if that concealment, rather than tactical considerations, was the reason for the failure of petitioner's lawyers to raise the jury challenge in the trial court, then petitioner established ample cause to excuse his procedural default[.]"); *Fisher v. Rozum*, 441 Fed. Appx. 115, 119-20 (3d Cir. 2011) (finding cause excusing default because defendant requested impeachment evidence regarding eyewitness and the state failed to disclose while continuing to assert it had complied with *Brady*).

36

"[P]rejudice within the compass of 'cause and prejudice' requirements exists when the suppressed evidence is 'material' for *Brady* purposes." *Banks*, 540 U.S. at 901. As demonstrated above, because the disclosure of McCullough's name would have led to evidence that "would have undercut the credibility of a key prosecution witness," *Dennis*, 834 F.3d at 298, Petitioner meets the materiality prong and can thus show prejudice. *See* Section D.3, *supra*.

### 3. The state courts did not consider the cumulative effect of the suppressed evidence on Petitioner's trial

The Pennsylvania Supreme Court also did not consider the merits of the cumulative prejudice resulting from the Commonwealth's violations of *Brady* because it "decline[d] to consider [the McCullough statement] in the analysis." *Natividad-3 at* 39. Accordingly, this Court's review is *de novo*, and there is no need to "defer to the Pennsylvania Supreme Court on the question of the cumulative materiality of the prosecutor's *Brady* violations because, finding only one of [Petitioner's] *Brady* claims not to be procedurally barred, the court did not reach the issue of the collective effect of multiple violations." *Simmons*, 590 F.3d at 232-33. Here, as in *Simmons*, because "the picture of what [Petitioner's] trial could have been like had these . . . *Brady* violations not occurred is vastly different from what actually happened," *id.* at 238, Petitioner is entitled to a new trial. *See* Section D.3, *supra*.

### CLAIMS FOR HABEAS RELIEF AS INITIALLY FILED

**I.      THERE WAS INSUFFICIENT EVIDENCE OF A ROBBERY OF ROBERT CAMPBELL SUCH THAT PETITIONER'S CONVICTION ON THAT CHARGE VIOLATED DUE PROCESS; AS THE ERRONEOUS ROBBERY CONVICTION WAS AN AGGRAVATOR, PETITIONER'S DEATH SENTENCE VIOLATES PENNSYLVANIA LAW AND THE EIGHTH AMENDMENT; FURTHERMORE, PETITIONER WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL; DIRECT APPEAL COUNSEL FAILED TO PROPERLY PRESENT HIS CLAIM OF EVIDENTIARY INSUFFICIENCY.**

Petitioner was convicted of robbery, allegedly occurring during the Campbell homicide, on a record where no evidence established such a crime beyond a reasonable doubt. Under

Pennsylvania law, "[a] robbery is committed where the perpetrator attempts to commit a theft by threatening another with serious bodily injury." *Natividad-1* at 176 (citing 18 Pa. C.S. § 3701(a)(1)(i)). Here, however, the evidentiary insufficiency was so great, and so clear, that the resulting conviction deprived Petitioner of due process of law. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (due process violated when evidence is insufficient to prove each element of the offense beyond a reasonable doubt).

Additionally, trial counsel was ineffective for failing to retain a forensic pathologist to provide expert testimony supporting the defense theory that the victim's arms involuntarily went in the air as a result of being shot. Post-conviction counsel was ineffective for failing to raise this claim of trial counsel ineffectiveness.

### A.      Background

The record contains the following, extremely limited evidence with regard to an alleged robbery during the homicide.

- Petitioner approached the deceased. NT 11/6/97, 9.

- A gunshot rang out. NT 11/6/97, 9, 77.

- *After* the gunshot, the decedent's arms were seen to be raised. NT 11/6/97, 78, 79, 88, 94.

There was no evidence presented that Petitioner took, or attempted to take, property of the deceased; he never expressed an intent to rob; and no one saw the deceased's hands raised before the shot was fired.[9]

---

[9] As described elsewhere, although the Commonwealth argued that the carjacking evidence was also relevant to the alleged attempt to rob during the homicide, this was an impermissible use of other acts evidence. Moreover, even if that evidence is considered, the factual differences between the Havens robbery and the Campbell shooting are so great that no inference of robbery, or intent to rob, in the Campbell shooting can reasonably be drawn. *See* Claim II, *infra*.

In assessing the sufficiency of evidence as a matter of the federal constitutional due process standard, the focus must be on whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson*, 443 U.S. at 319. This standard has been consistently applied by federal courts to reverse convictions where, as here, the evidence is both circumstantial and inadequate to sustain more than a speculative judgment.

To prove robbery, the Commonwealth must establish an attempt at a taking. Here, the apparent inferential reasoning is that Petitioner pointed a gun *demanding money or property*, the victim raised his hands *in response thereto*, and the defendant *then* shot. The proof, however, is as follows:

- A gun was fired by the Petitioner; and

- *Thereafter*, the deceased's hands were seen to be raised.

There was no showing that Campbell raised his hands *before* being shot. Eyewitness Beth Johnson testified:

> I noticed that both of them were standing there face to face and as I'm just checking the sidewalk and looking that direction I guess, I'm not really sure what I first noticed was that the appearance of the gentleman or did I notice a hand go up. I'm not really sure which I noticed first. But I did notice that the shooter was lifting his hand, I heard a gunshot. And the victim fell back, raised his hands up and fell back.
>
> Do you want me to describe anything else?

NT 11/6/97, 94.

Eyewitness Martin Johnson testified he saw the victim with his hands up *as he was falling*. Mr. Johnson testified:

> Q.  Would you tell the ladies and gentlemen of the jury from 9:40 p.m. on what it is that you observed, saw, heard, everything that you saw and heard that brings you here to court today.

A.      It was about 9:35, 9:40, my wife and I were on our way out the house. I was on my way to work. We come down the first flight of steps and there's a landing. We were walking along the landing and we heard a shot.

Q.      You were inside or outside?

A.      Outside. And immediately looked  towards the gas station because that's where the shot  came from. And the first thing you saw was a man falling backwards with his hands up like  this. And he hit the ground. . . .

Q.      Let me take you back a little bit.

        The male who you saw falling, you eventually – you said you saw his hands up before as he was going down?

A.      As he was going down, when I saw him he was on his way down.

NT 11/6/97, 77-79.

On cross-examination, Mr. Johnson agreed he did not tell the police during his interview

that he saw the victim's hands in the air:

Q.      D-3 I believe is an interview record.

        Could you – is that the interview that you gave, is that your signature down [at] the bottom?

A.      That's correct, yes.

Mr. Padova:  If I may direct – may I approach, Your Honor.

The Court:  Sure.

By Mr. Padova:

Q.      Second page. Start around here, I guess, somewhere.

A.      Do you want me to read it out loud?

Q.      Read it to yourself.

        Is it fair to say that there's nothing in there about the gentleman having his hands up when he fell?

A.      No. I mean it is fair to say.

*Id*. at 89.

There is no evidence that Campbell's hands were raised before the shooting. The evidence was insufficient to prove robbery beyond a reasonable doubt. *Piaskowski v. Bett*, 256 F.3d 687, 693 (7th Cir. 2001) ("Although a jury may infer facts from other facts that are established by inference, each link in the chain of inferences must be sufficiently strong to avoid a lapse into speculation."). Such is the case here, and in such circumstances no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. "Deference to a jury verdict, even under AEDPA's deferential standard, does not allow rank speculation to substitute for proof beyond a reasonable doubt." *Kamienski v. Hendricks*, 332 F. App'x 740, 749 (3d Cir. 2009).

*Coleman v. Johnson*, 566 U.S. 650 (2012) (per curiam), is readily distinguishable. In *Coleman*, the Supreme Court held that the evidence was sufficient to convict a defendant as an accomplice in a murder where the evidence showed that defendant and the shooter had argued about a debt owed by the deceased, the shooter became enraged after being beaten by the deceased, defendant walked with the shooter and the deceased to an alley where the deceased was shot, and defendant fled the scene with the shooter. The inferences arising from this evidence were sufficient to allow a juror to conclude that defendant shared the intent to kill. *Id.* at 656. Here, by contrast, the only evidence of robbery is that the deceased's hands were above his head after he was shot. Such sparse evidence from which to draw an inference robbery differs from the multiple circumstances that support the inference of guilt in *Coleman* and meet the high bar required by *Jackson*. *See Richards v. Coleman*, No. 13-7109, 2015 WL 6870084, at *5 (E.D. Pa. Nov. 6, 2015) (distinguishing *Coleman* and finding that inferences drawn from the evidence were insufficient to support the conviction).

As the evidence was insufficient to prove robbery, Petitioner is entitled to have his robbery conviction as to Campbell vacated. Moreover, because the evidence is likewise insufficient to support the aggravating circumstance that the killing was committed while in the perpetration of a felony, 42 Pa. C.S. §9711(d)(2), Petitioner is also entitled to a new sentencing hearing.

### B.    Ineffective Assistance of Counsel

At trial, counsel was ineffective for failing to retain a forensic pathologist to rebut the contention that Mr. Campbell was robbed. This claim was not previously raised in state court but, as discussed *infra*, Petitioner can show cause and prejudice for any default.

Because of the nature of the bullet wound to Mr. Campbell, the raising of his hands to which the eyewitnesses testified was not a voluntary movement. Dr. Richard Callery, Chief Medical Examiner for the State of Delaware, reviewed, among other things, the statements of the eyewitnesses and the autopsy report. He notes that the witnesses saw hands up after the gunshot was fired. Specifically, Mrs. Johnson said she heard a gunshot, the victim raised his hands, and fell back. Dr. Callery further points out that the time sequence was as follows: (1) the bullet passed through the pons and medulla of the victim's brain, cutting off communication between the brain and the rest of the body; (2) and then, after a brief interval, the eyewitnesses saw the victim's hands go up. As a consequence, the movement of the victim's hands up, after he was shot, was not a voluntary movement. Dr. Callery gives this conclusion based on medical and scientific principles generally known and applied in 1997 and to a reasonable degree of medical and scientific certainty. Declaration of Richard Callery, M.D., App. Exh. No. 12. Trial counsel was ineffective for failing to obtain the assistance of a forensic medical expert to defend against the robbery charge. *See Siehl v. Grace*, 561 F.3d 189, 197-98 (3d Cir. 2009) (counsel ineffective for failing to retain expert to support the theory of the defense). *See also Hinton v. Alabama*, 134

42

S. Ct. 1081, 1088 (2014) (counsel was deficient when he failed to retain an expert who was qualified for the task at hand).

The facts of the trial are indisputable: no witness saw the deceased's hands raised until *after* the shot was fired, making it impossible to determine why the hands were raised and, thus, the evidence was insufficient as a matter of state law and due process principles to prove a specific intent crime, robbery. An expert such as Dr. Callery would have assisted the jury's understanding that the raised hands did not support the Commonwealth's robbery theory. Had Petitioner received proper representation, the robbery conviction would have been set aside, and one of two aggravating circumstances would have been withdrawn. Hence, harm occurred at both the trial and penalty stages.

### C.      The State Court Opinions

On direct appeal, the Pennsylvania Supreme Court summarized the record. As stated, the court found that the eyewitnesses, the Johnsons, "each, independently, testified to the following observation: the victim raised his hands in the air and then fell backwards at the same time that a gunshot was heard." *Natividad-1* at 172-73. The court stated that "Mr. Campbell's arms were raised in the air as he was falling backwards." *Id*. at 176. It added, "As Mr. Campbell, was falling, the Johnsons heard a gunshot." *Id*. The court summarized Pennsylvania law and stated that, for a robbery conviction, there is no requirement that the crime be successful. Based on this slim record, the court held that "[t]he circumstantial evidence when viewed in the light most favorable to the Commonwealth as verdict winner, supports the inference that Mr. Campbell was the victim of a robbery at the time he was shot." *Id*.

The state court based its decision on a factual finding that "the victim raised his hands in the air and then fell backwards at the same time that a gunshot was heard." *Id.* at 173. This is an

43

unreasonable determination of fact because the evidence showed that the deceased's hands were raised *after* the shot was fired.

Factual determinations are unreasonable when reviewing courts do not analyze all the facts. *See Brumfield v. Cain*, 135 S. Ct. 2269, 2278-79, 2282 (2015) (holding that state court's fact-finding was unreasonable because it failed to consider the full context and meaning of the evidence adduced); *Miller-El v. Cockrell*, 537 U.S. 322, 340-41 (2003) (to assess the reasonableness of a state court's determination of the facts, a federal court must determine whether the state court factual findings are supported by sufficient evidence); *Beck v. Bowersox*, 257 F.3d 900, 901 (8th Cir. 2001) (stating that sections 2254(d)(2) and (e)(1) "require meaningful federal court review of the evidentiary record considered by the state courts"); *see Dennis v. Sec'y, Dep't of Corr.*, 834 F.3d 263, 288 (3d Cir. 2016) (en banc) ("The Pennsylvania Supreme Court made an unreasonable determination of the facts . . . in refusing to acknowledge the receipt's exculpatory and impeachment value.").

As set forth above, the trial record only shows that the victim's hands were raised after the shot was fired. NT 11/6/97, 94 (Beth Johnson: "I'm not really sure which I noticed first. But I did notice that the shooter was lifting his hand, I heard a gunshot. And the victim fell back, raised his hands up and fell back."); *id*. at 79 (Martin Johnson: "Q. Let me take you back a little bit. The male who you saw falling, you eventually – you said you saw his hands up before as he was going down? A. As he was going down, when I saw him he was on his way down."). The Pennsylvania Supreme Court's determination was unreasonable.

### D.  State Post-Conviction Counsel Was Ineffective Under *Martinez*

Here, trial counsel did not obtain available expert medical testimony explaining that the movement of the victim's hands up into the air was involuntary. Callery Declaration, App. Exh. No. 12. This evidence would have countered the prosecution's argument that the victim's hands

44

went up because he was being robbed. *Showers v. Beard*, 635 F.3d 625, 633 (3d Cir. 2011) (trial counsel unreasonable for failing to retain an expert when such assistance is "necessary or appropriate for preparation of the defense, adequate understanding of the prosecution's case and rebuttal of any portion of the prosecution's case at the guilt/innocence phase").

State post-conviction counsel did not obtain this available evidence from a forensic pathologist either. This Court should consider the expert medical evidence because state post-conviction counsel was ineffective for failing to litigate this evidence. Any procedural default should be excused under *Martinez v. Ryan*, 566 U.S. 1 (2012), because the claim of ineffective assistance of trial counsel is meritorious and state post-conviction counsel performed unreasonably. *Id.* at 17; *Trevino v. Thaler*, 569 U.S. 413, 423 (2013); *Workman v. Superintendent Albion SCI*, 915 F.3d 928, 937-38 (3d Cir. 2019).

## II.   PETITIONER WAS DENIED DUE PROCESS AND THE EFFECTIVE ASSISTANCE OF COUNSEL BY THE TRIAL COURT'S ADMISSION OF OTHER CRIMES EVIDENCE; BY THE PROSECUTOR'S USE OF THE EVIDENCE FOR IMPROPER PURPOSES; AND BY COUNSEL'S FAILURE TO SEEK APPROPRIATE LIMITING INSTRUCTIONS, OBJECT TO THE ABSENCE OF THOSE INSTRUCTIONS, AND OBJECT TO THE PROSECUTOR'S IMPROPER USE OF THE EVIDENCE.

Petitioner was initially charged in two different criminal episodes: the murder of Robert Campbell and the alleged robbery of an automobile from Michael Havens. The Commonwealth filed a motion to consolidate the carjacking and homicide cases. At the consolidation hearing before Judge Temin (the calendar judge), the prosecutor argued for consolidation to prove identity only:

> So, we have a tie-in, and my position is that anytime on the same day of the incident you can put a defendant in the actual getaway vehicle, it's certainly probative, relevant, admissible as to the identification. It corroborates this is the guy.

NT 8/28/97, 6.[10] Over defense objection, the trial court consolidated the charges arising out of the two incidents into a single trial. On direct appeal, the Pennsylvania Supreme Court likewise upheld consolidation because the Havens robbery was relevant to prove the identity of the Campbell shooter. *Natividad-1* at 174 ("The evidence from the robbery of Mr. Havens' vehicle was relevant to establish the identity of the person who shot Robert Campbell.").

When Judge Temin ruled that the charges are "eminently combinable," no mention was made of using the carjacking to prove intent. Trial counsel sought no clarification or limit on the use to which the carjacking evidence could be put. NT 8/28/97, 9. Trial counsel failed to confirm that the consolidation was for the limited purpose of proving identity *and for no other purpose*.

The prosecutor took full advantage of counsel's miscues. Rather than limit his use of the Havens robbery to evidence of identity – the justification for its admission – the prosecutor urged the jury to view the Havens robbery as evidence that Petitioner intended to rob Campbell. This was a highly improper expansion of the limited purpose underlying the decision to consolidate the charges.

The error was highly prejudicial. This issue, Petitioner's alleged intent to rob, was a contested fact regarding the homicide, as the prosecution theory was that Petitioner shot the victim as part of a robbery, not in self-defense. Furthermore, at sentencing, the intent to rob was found as an aggravating factor and a reason to impose death.

Defense counsel failed to object to the prosecutor's improper use of the evidence. Nor did he insure that the jury was properly instructed that, in relation to the Campbell shooting, they

---

[10] As set out in the Statement of the Case, and as discussed *infra*, the prosecutor's argument was in error, as the evidence showed that the car stolen from Havens (a two-door Lincoln Continental) was not the car used in the Campbell shooting (described by witness Beth Johnson as a four-door Lincoln).

could only consider the Havens robbery for the limited purpose of showing that Petitioner was the person who shot Campbell.

The consolidation of the charges to prove identity was unnecessary, highly prejudicial, and undermined the fairness of the trial, which violated Petitioner's due process rights. The prosecutor's improper use of the Havens robbery likewise denied Petitioner due process. Defense counsel was ineffective for failing to object to the improper use of the evidence, request appropriate instructions, object to the inappropriate instructions, and/or take any other steps necessary to mitigate the harm.

### A.     Legal Standards

The improper joinder of criminal charges rises to the level of a due process violation where the prejudicial effect of the joinder denies defendant a fair trial. *United States v. Lane*, 474 U.S. 438, 446 n.2 (1986). The prejudice from improper joinder is similar to the prejudice caused by the admission of other crimes evidence.

As a rule, evidence of other bad acts is inadmissible. *See, e.g., Old Chief v. United States*, 519 U.S. 172, 180-82 (1997). This evidence is usually excluded because of the danger that the jury will conclude that the defendant is a person of bad character who acted, at the time of the offense, in conformity with that bad character. *Michelson v. United States*, 335 U.S. 469, 475 (1948).

> The prohibition is required not because such evidence is irrelevant but, on the contrary, it is said to weigh too much with the jury and to so overpersuade them as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge. The overriding policy of excluding such evidence, despite its admitted probative value, is the practical experience that its disallowance tends to prevent confusion of issues, unfair surprise and undue prejudice.

*Id.* at 476. *Accord Lesko v. Owens*, 881 F.2d 44, 52 (3d Cir. 1989) (when such evidence is introduced at trial and its inflammatory nature exceeds its evidentiary worth it violates due

process); *McKinney v. Rees*, 93 F.2d 1378, 1380-82 (9th Cir. 1993) (tracing history of rule).[11] While the admission of such evidence does not *per se* violate the constitution, the trial court and the parties have a duty to minimize its prejudicial impact.[12]

In order to minimize the highly prejudicial effect of evidence of prior bad acts or criminal activity, due process requires the trial court to provide the jury with an appropriate limiting instruction. *Spencer v. Texas*, 385 U.S. 554, 561-62 (1967) (where evidence of prior crimes is admitted, defendant's interests are protected by a limiting instruction to mitigate the possibility of prejudice). In *Murray v. Superintendent*, 651 F.2d 451 (6th Cir. 1981), the Court explained:

> A key holding of *Spencer* was that a defendant's rights are deemed protected by limiting instructions. . . . The logical converse of this argument is that it is unfair and violative of due process if evidence of other crimes is admitted *without* a limiting instruction.

*Id.* at 453.

Pennsylvania law requires an appropriate instruction where bad acts evidence is admitted for a limited purpose.[13]  A defense lawyer who fails to request such a limiting instruction is

---

[11] *Accord Virgin Islands v. Harris*, 938 F.2d 401, 419 (3d Cir. 1991); *United States v. Scarfo*, 850 F.2d 1015, 1018-19 (3d Cir. 1988); *Virgin Islands v. Toto*, 529 F.2d 278, 283 (3d Cir. 1976); *see also Commonwealth v. Bordell*, 110 A.2d 193, 195 (Pa. 1955).

[12] *See, e.g., Old Chief*, 519 U.S. at 174 (in a prosecution for possession of a gun by a person with a prior felony conviction, the duty to mitigate the prejudice from the jury's knowledge of the defendant's prior conviction required the court to accept the defense offer to stipulate to the existence of the prior felony rather than allow the prosecution to introduce that evidence through testimony); *United States v. Morales*, 834 F.2d 35, 38-39 (2d Cir. 1987) (where the fact that defendant was an inmate in a federal prison was an essential element of the government's case, a cautionary instruction advising the jury that this fact could not be considered in any way in reaching their verdict "was necessary to ensure that the jurors would understand that they were not to consider the evidence of the prior conviction in determining [defendant's] guilt or innocence").

[13] *E.g., Commonwealth v. Claypool*, 496 A.2d 176 (Pa. 1985) ("[W]e are still mindful of the potential for misunderstanding on the part of the jury when this type of evidence is admitted. Therefore, such evidence must be accompanied by a cautionary instruction which fully and carefully explains to the jury the limited purpose for which that evidence has been admitted"); *Commonwealth v. Billa*, 555 A.2d 835 (Pa. 1989) (although evidence of prior criminal activity

constitutionally ineffective. *Dawson v. Cowan*, 531 F.2d 1374, 1377 (6th Cir. 1976);

*Commonwealth v. Billa*, 555 A.2d 835 (Pa. 1989).

### B.      Joinder Violated Due Process

Consolidation violated due process and was not proper to prove intent. Pennsylvania law

permits evidence of other crimes, wrongs or acts only if this evidence goes beyond proving

character (often termed "propensity") and instead establishes a discrete and relevant evidentiary

point such as identity, motive, opportunity, plan, or absence of mistake. The admission is limited

to the evidentiary point at hand.

In this case, evidence of the carjacking was inadmissible to prove intent to rob at the

homicide because there was no common "plan" to rob both the carjacking victim and the

decedent at the homicide. For evidence to constitute a common plan or scheme, the conduct

requires both congruence (the same details in both events) and uniqueness (the details common

to both events are uncommon to others).

In this case, the two offenses are markedly dissimilar, as illustrated below:

---

was admissible, "the court erred in failing to give an immediate and complete cautionary or
limiting instruction to the jury explicitly instructing the jury as to the limited purpose for which
the evidence was deemed admissible"); *Commonwealth v. Covil*, 378 A.2d 841 (Pa. 1977)
("When evidence is admissible for a limited purpose, a defendant is entitled to a limiting
instruction"); *Commonwealth v. Amos*, 284 A.2d 748, 750 (Pa. 1971) ("Of course, the potentially
prejudicial effect of the introduction of the defendant's record requires that the jury be made
aware of the limited purpose of such evidence").

| **Havens Carjacking** | **Campbell Homicide** |
|---|---|
| Havens was approached by two males. NT 11/5/97, 148-149. | Campbell was approached by one male NT 11/6/97, 11-12. |
| Havens was driven in his car, threatened, put out of his car, made to lay on the ground, and then had his car driven off by the two assailants. NT 11/5/97, 150-153. | Petitioner is alleged to have fired one shot and then immediately left. NT 11/6/97, 12-13; 15. |
| Havens was forcibly robbed of his belongings by two males. NT 11/5/97, 149. | Campbell's car was not taken. NT 11/6/97, 15. |

These two incidents do not show congruence and uniqueness. One incident involves a robbery but no shooting; the other involves a shooting but no robbery. There is no remarkable "signature" act being shared by the two offenses, and there is no unique *modus operandi* sufficient to establish a "plan." As such, the evidence of the Havens carjacking should have been inadmissible to prove an intent to rob at the Campbell homicide.

### C.     Counsel Was Ineffective

Trial counsel was ineffective for failing to insure that the jury was properly instructed as to the limited purpose of the Havens evidence. Under Pennsylvania law, where evidence is admitted for a limited purpose, the jury is to be instructed on the restriction imposed on its use. Without the instruction, jurors were free to use the evidence for an improper purpose. Here, trial counsel could have had no legitimate strategic reason for failing to request an appropriate instruction or object to its absence because an adequate cautionary instruction could only have furthered Mr. Natividad's interest. *See Albrecht v. Horn*, 485 F.3d 103, 127 (3d Cir. 2007) (finding counsel lacked "any valid strategic reason" for failing to request limiting instruction when Commonwealth's evidence of other criminal acts "was not briefly or fleetingly presented,

but instead was a substantial portion of the Commonwealth's case" and the Commonwealth's closing "harped" on the evidence).

At trial, when the carjacking evidence was presented, there was *no* limiting instruction given to the jury (and none sought by trial counsel). This omission cost Petitioner dearly, as it deprived his jury of critical guidance on how to use (and how *not* to use) this other acts evidence.

At the charge conference, the prosecutor[14] alleged that Judge Temin had explicitly ruled that the carjacking was admissible to prove intent to rob at the homicide. NT 11/7/97, 209-210. The prosecutor then made that explicit linkage in closing argument (again without objection). NT 11/10/97, 50-52, 88-89. In fact, Judge Temin made no such ruling. Trial counsel's failure to respond was ineffective and harmful. Trial counsel, who had been present when Judge Temin ruled, made no corrective statement; failed to secure the notes of testimony from the Judge Temin hearing; and failed to object to the prosecutor's closing argument.

Although Judge Temin had allowed the Havens charges to be considered in the Campbell case solely to prove identity, the trial court (Judge Savitt), without objection by trial counsel, authorized the jury to consider evidence of the Havens carjacking as proof of the intent to rob Campbell during the homicide:

> The evidence of both of those charges, both of these instances, these separate instances that occurred at different times came before you in this trial for a limited purpose, and that is to tend to show motive, plan, intent, and identity. And that's why it's admissible. The evidence must not be considered by you in any way other than the purpose I've just stated.

NT 11/10/97, 140. Counsel's failure to object rendered him ineffective. *See Everett*, 290 F.3d at 509 (counsel ineffective for failing to object, or seek appropriate jury instructions, on both state

---

[14] The trial prosecutor was not counsel for the Commonwealth at the hearing before Judge Temin.

law and constitutional grounds); *Whitney v. Horn*, 280 F.3d 240, 258 (3d Cir. 2002) (where counsel had failed to object to an erroneous intoxication instruction, "we cannot imagine any justification for a defense attorney not attempting to correct this type of error in an instruction").

**D.      The State Court Opinions**

On direct appeal, the Pennsylvania Supreme Court held that consolidation of the charges arising from the Havens robbery and the Campbell murder was relevant evidence at trial because the close evidentiary relationship between the crimes was relevant to prove the identity of the person who shot Campbell. *Natividad-1* at 174. On PCRA appeal, the court addressed the claim that trial counsel was ineffective for failing to object to the use of the carjacking as evidence of intent to rob Mr. Campbell. The court did not address the merits of the underlying claim or the prejudice caused by the misuse of the evidence and the prosecutor's closing argument. Instead, the court held that PCRA counsel had failed to make "any meaningful attempt" to demonstrate "whether there was any objectively reasonable basis for trial counsel's action or inaction." *Natividad-2* at 323.

The Pennsylvania Supreme Court's decision allowing the joinder of the cases for purposes of proving identity was an unreasonable application of *Lane, Old Chief,* and *Michaelson*. The supposed evidentiary connection between the two incidents was the allegation that the two-door Lincoln stolen from Havens was the car used in the Campbell killing. The evidence, however, showed that a different car was used. In her statement to police, Beth Johnson described the car as a four-door Lincoln, not a two-door like the one taken from Havens. *See* 11/12/96 Statement of Beth Johnson at 3, App. Exh. No. 13. Thus, because the two crimes had no evidentiary link, the carjacking evidence had little probative value compared to the prejudicial impact of allowing the prosecutor to argue Mr. Natividad's propensity to commit armed robbery.

The court's PCRA decision that Petitioner had failed to show that there was no reasonable strategy for counsel's failure to request a limiting instruction and object to the prosecutor's improper use of the carjacking evidence was a decision on the merits. *Holliday v. Varner*, 176 F. App'x 284, 287 (3d Cir. 2006) (state court ruling that boilerplate allegations of counsel's ineffectiveness were insufficient to prove the claim was a decision on the merits). But that decision was both contrary to, and an unreasonable application of, *Strickland*. Relying on state law, the court imposed a requirement beyond that required by *Strickland*. In order to prove ineffectiveness under *Strickland*, a defendant must show both deficient performance and prejudice. There is no requirement that he demonstrate that there was no objective reason for counsel's inaction, he need only show that counsel's performance fell below that of reasonably competent counsel. By imposing an additional element onto the *Strickland* test, the state court opinion is contrary to, and an unreasonable application of, *Strickland*. *See Howell v. Superintendent Rockview SCI*, 939 F.3d 260, 265 (3d Cir. 2019) (§ 2254(d) is satisfied when state court imposed a more stringent constitutional standard than that required by controlling Supreme Court case law).

Moreover, any reasonably competent defense counsel would have realized that using the carjacking to prove an intent to rob Campbell went beyond the limited purposes for which joinder was allowed and would have objected. *See Bey v. Superintendent Greene SCI*, 856 F.3d 230, 238-39 (3d Cir. 2017) ("any alert defense counsel should have immediately known that [the instruction] raised serious constitutional issues").

Here, on PCRA appeal, Petitioner asserted that trial counsel was ineffective for failing to object to the prosecutor's misuse of the carjacking evidence to prove intent to rob. Counsel noted that the cases had been joined solely to help prove the identity of the shooter, that the two crimes

lacked sufficient similarity to be used to prove intent, and that, without objection, the prosecutor

was successfully able to argue that the evidence showed Mr. Natividad's propensity to commit

armed robbery. Brief for Appellant, Pa. Supreme Ct., No. 497 CAP, filed April 23, 2007, at 21,

App. Exh. No. 26. Counsel also argued that the weakness of the evidence of robbery made the

issue especially prejudicial, as the intent to rob was not only a contested fact at trial, but was also

critical to the finding of an aggravating circumstance. *Id*. at 25. And counsel cited to

Pennsylvania cases that found counsel ineffective for similar errors. *Id.* ("Pennsylvania law is

clear and unequivocal: counsel is ineffective when evidence of prior crimes is presented and

counsel fails to seek a limiting instruction. *Commonwealth v. Buehl*, 658 A.2d 771, 777-778 (Pa.

1995)").

     In short, Mr. Natividad, through his counsel, presented the state court with a developed

ineffectiveness claim that addressed both deficient performance and prejudice. The state court's

reliance on the lack of specific argument regarding any objective reasons for the failure to object

is an unreasonable application of *Strickland*.

     To the extent Respondent might argue that the state court's ruling was based on an

application of a procedural rule that found the ineffective assistance claim waived, such an

argument would still not preclude merits review. At the time Petitioner litigated these claims,

there was no established rule finding waiver based on supposedly undeveloped claims on

ineffective assistance. *See Commonwealth v. Walker*, 36 A.2d 1, 8-9 (Pa. 2011) (noting

"continuing difficulties" in the requirements of pleading ineffectiveness claims and allowing

remand to allow amendment of improperly pled claims unless the underlying claim can be

decided on the merits). Moreover, any procedural default should be excused under *Martinez v.

Ryan*, 566 U.S. 1 (2012), because the claim of ineffective assistance of trial counsel is

meritorious and state post-conviction counsel performed unreasonably. *Id.* at 17; *Trevino v. Thaler*, 569 U.S. 413, 423 (2013); *Workman v. Superintendent Albion SCI*, 915 F.3d 928, 937-38 (3d Cir. 2019).

**III.    PETITIONER WAS DENIED DUE PROCESS AND THE EFFECTIVE ASSISTANCE OF COUNSEL WHERE THE TRIAL COURT'S INSTRUCTIONS UNCONSTITUTIONALLY DIMINISHED THE COMMONWEALTH'S BURDEN OF PROOF AND NEGATED THE PARTIAL DEFENSE OF IMPERFECT SELF-DEFENSE, AND WHERE TRIAL COUNSEL FAILED TO OBJECT OR REQUEST APPROPRIATE INSTRUCTIONS.**

As part of defense counsel's effort to raise a reasonable doubt defense, counsel argued in part that, based on Price's testimony, the shooting occurred in self-defense. Price had testified that Petitioner believed that Campbell was attempting to draw the gun he carried (illegally) in a holster on his hip, and in fear that Campbell intended to shoot him, Petitioner fired first. Consistent with this view of the evidence, the trial court instructed the jury on both a complete defense (self-defense) and a partial defense (voluntary manslaughter/imperfect self-defense).

However, the trial court's guilt phase instructions explaining the essential concepts of malice, the Commonwealth's burden of proof, and the partial defense of voluntary manslaughter/imperfect self-defense were fundamentally flawed in a number of significant ways. Individually and cumulatively, these errors diminished the Commonwealth's burden of proof and infringed upon the jury's ability to fairly consider imperfect self-defense. Trial counsel was ineffective for failing to object to these errors and/or request appropriate instructions. Petitioner addresses each error individually below, but, ultimately, the cumulative impact of these erroneous, conflicting, and confusing instructions must be viewed as a whole.[15]

---

[15] Petitioner also incorporates herein the errors committed by the trial court in its charge concerning the permissible use of the "other crimes" evidence, as explained in Claim II of this Memorandum.

A.    Legal Standards

1.    Instructional error

Due process prohibits the conviction of any person except upon proof beyond a

reasonable doubt. *In re Winship*, 397 U.S. 358, 364 (1970); *see also Bennett v. Superintendent*

*Graterford SCI,* 886 F.3d 268, 285 (3d Cir. 2018) ("Due process is violated when a jury

instruction relieves the government of its burden of proving every element beyond a reasonable

doubt."). For this reason, "trial courts must avoid defining reasonable doubt so as to lead the jury

to convict on a lesser showing than due process requires." *Victor v. Nebraska*, 511 U.S. 1, 22

(1994).

Jury instructions, taken as a whole, must "clearly articulate the relevant legal standards"

and "avoid confusing and misleading the jury." *United States v. Johnstone*, 107 F.3d 200, 204

(3d Cir. 1997). In reviewing a trial court's instructions, "[t]he constitutional question…is

whether there is a reasonable likelihood that the jury understood the instructions to allow

conviction based on proof insufficient to meet the [constitutional] standard." *Victor*, 511 U.S. at

6. *See Cupp v. Naughten*, 414 U.S. 141, 146-47 (1973). Due process is violated if "there is a

reasonable likelihood that the jury has applied the challenged instructions in a way" that lessens

the Commonwealth's burden. *Boyde v. California*, 494 U.S. 370, 380 (1990); *Smith v. Horn*, 120

F.3d 400, 411 (3d Cir. 1997).

A defect in an instruction may result in error where the other portions of the instruction,

although correct, do not explain or correct the defective language in the instruction. *Bey v.*

*Superintendent Greene SCI*, 856 F.3d 230, 241 (3d Cir. 2017); *Everett v. Beard*, 290 F.3d 500,

512 (3d Cir. 2002) ("The mere fact that the law was correctly stated in one part of the charge will

not automatically insulate the charge from a determination of error."). Where a set of instructions

is correct only in part, "[l]anguage that merely contradicts and does not explain a constitutionally

infirm instruction will not suffice to absolve the infirmity" because "[a] reviewing court has no way of knowing which of the two irreconcilable instructions the jurors applied in reaching their verdict." *Francis v. Franklin*, 471 U.S. 307, 322 (1985). *Accord Bennett,* 886 F.3d at 285.

Instructions that unfairly direct a jury to conclude that a particular element of the crime has been proven, or shift the burden of proof onto the defense, are constitutionally infirm. *Sandstrom v. Montana*, 442 U.S. 510 (1979); *Franklin,* 471 U.S. at 316-317. If the language of the instruction creates a reasonable likelihood that the jury interpreted the charge so as to create an unconstitutional presumption, the instructions are constitutionally deficient. *Rock v. Zimmerman*, 959 F.2d 1237, 1245 (3d Cir. 1992).

The denial of a defendant's right to a proper reasonable-doubt instruction constitutes structural error and is not subject to harmless error analysis. *Sullivan v. Louisiana*, 508 U.S. 275, 281-82 (1993).

### 2.    Ineffective assistance of counsel

The Sixth Amendment affords criminal defendants the right to the effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 684 (1984). To show a deprivation of that right, a petitioner must show that his counsel's performance was deficient, *i.e.*, that it "fell below an objective standard of reasonableness," and that the defendant was prejudiced as a result, *i.e.*, that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 687-88, 694. Thus, prejudice exists where there is a reasonable probability that, but for counsel's errors, a jury would likely have a reasonable doubt about the defendant's guilt. *Hinton v. Alabama*, 571 U.S. 263, 274 (2014); *accord Strickland*, 466 U.S. at 695.

### B.      Malice Instructions

As the evidence at trial supported self-defense and imperfect self-defense, the burden was on the Commonwealth to disprove these defenses beyond a reasonable doubt. *Commonwealth v. Christy*, 656 A.2d 877 (Pa. 1995). To disprove self-defense, the Commonwealth had to prove that Petitioner did not believe that he was in danger of death or serious bodily injury, or that the such a belief was unreasonable. *Commonwealth v. Fisher*, 493 A.2d 719, 722-723 (Pa. Super. Ct. 1985). To disprove imperfect self-defense, the Commonwealth had to prove that Petitioner did not believe that he was in danger of death or serious bodily injury. 18 Pa. C.S. § 2503; *see also Commonwealth v. Light*, 326 A.2d 288 (Pa. 1974)

Malice was an essential element of first degree murder. The trial court instructed jurors that malice may be inferred where there is "intentional use *without legal excuse or legal justification* of a deadly weapon on a vital part of another human body." NT 11/10/97, 101. This is error because Petitioner's defense as to the Campbell homicide was based in part on imperfect self-defense. Where self-defense is not completely proved, because the belief in self-defense is sincere but unreasonable, the proper verdict is that of voluntary manslaughter.

Imperfect self-defense does not excuse or justify an intentional killing, but it lessens the degree of culpability. The malice instruction allowed the jurors to find malice from the intentional use of a firearm regardless of whether the prosecution had met its burden to disprove imperfect self-defense. This left jurors in a position where, even if they believed Petitioner acted in unreasonable but sincere self-defense, they were permitted to find malice. This instruction impermissibly reduced the prosecution's burden of proof. *See Commonwealth v. McGuire,* 409 A.2d 313 (Pa. 1979); *Commonwealth v. Caye*, 348 A.2d 136 (Pa. 1975).

In this case, Petitioner was prejudiced by the trial court's instructions, as the issue of malice was hotly disputed. The error is illustrated in the table below:

| Instruction as Given | Proper Instruction | Resulting Harm / Unconstitutional Result |
|---|---|---|
| Jurors may infer malice from *any* intentional shooting unless the shooting is one with legal justification or legal excuse. | Jurors may infer malice from *any* intentional shooting unless the shooting is one with legal justification or legal excuse *or* is an unreasonable belief self-defense shooting. | If jury believes that the shooting was in "unreasonable belief" of self-defense, jurors may still infer malice; proper verdict is then First Degree Murder. |

The court's definition of malice only compounded the problems. The court defined malice as a "particular ill will against a particular person . . . recklessness of consequence . . . ." NT 11/10/97, 101. Neither of these alternative definitions correctly defined malice under Pennsylvania law and both substantially reduced the Commonwealth's burden of proof.

### C.       Instructions on the Interrelationship between Malice and Self-Defense

The trial court instruction as to the interrelationship between malice and self-defense was flawed, as the trial court failed to elucidate that evidence of self-defense, from whatever source, tends to negate the malice required for murder and that in order to meet its burden of proof on the element of malice, the prosecution must exclude self-defense beyond a reasonable doubt. NT 11/10/97, 101-110, 125-128.

Pennsylvania law requires a trial court to instruct the jury so as to convey the following concepts: (1) that in order to prove murder, the prosecution must prove beyond a reasonable doubt that the killing was malicious; (2) that evidence of self-defense, from whatever source, tends to negate the malice required for murder; (3) that in order to meet its burden of proof on the element of malice, the prosecution must exclude self-defense beyond a reasonable doubt. *Commonwealth v. Heatherington,* 385 A.2d 338, 341 (Pa. 1978).While a trial court is free to use its own language in instructing the jury, whatever language is used must explain accurately the

above-described relationship between evidence of self-defense and the essential element of malice in a murder prosecution. *Id.* In short, the jury must be fully aware that the finding of malice requires the exclusion of the defense of self-defense. *Id.*

In this case, those commands were not honored. No matter how the entirety of the closing charge is parsed, the trial court never explained these fundamental precepts. Without the mandated guidance, the interrelationship between malice and self-defense remained unexplained.

These same principles apply to voluntary manslaughter/imperfect self-defense. An honest, but unreasonable, belief that defendant was in danger of death or serious bodily injury negates malice and reduces the offense from murder to manslaughter, despite the fact that the accused acted with the specific intent to kill. The trial court, however, merely instructed the jury that voluntary manslaughter "is the intentional killing of a human being, but without malice." NT 11/10/97, 108. The court never explained how, under the law, a killing could be intentional, yet not malicious. Moreover, because the Commonwealth has the burden to prove malice beyond a reasonable doubt, it also has the burden to disprove imperfect self-defense. Yet, again, the trial court never explained this burden. Here, the trial court's instructions failed to explain these crucial interrelationships. The error was prejudicial.

> [B]ecause there was a factual dispute as to whether the victim actually throttled appellant from behind before the shooting, a dispute going to the reasonableness of appellant's asserted belief that his life was in danger, we cannot say that the trial judge's failure to instruct in accordance with *Cropper* could not have contributed to the verdict. Thus, the error is not harmless.

*Harrington*, 385 A.2d at 342. Here, because there was a "factual dispute" as to whether Mr. Campbell drew or reached for a gun, "a dispute going to the reasonableness of [Petitioner's] asserted belief that his life was in danger . . . the error is not harmless." This factual dispute went directly to the reasonableness of Petitioner's asserted belief that his life was in danger. Thus, the trial court's instructional errors went to the critical question before the jury.

60

### D.      Self-Defense Instructions

The trial court erred in defining self-defense by instructing jurors that Petitioner had to be free from fault in order to avail himself of that defense, NT 11/10/97, 126-127, an instruction in contravention of the statutory right of self-defense and Pennsylvania case law.

18 Pa. C.S. § 505(b)(2) provides that a person may not claim self-defense if

(i) the actor, *with the intent of causing death or serious bodily injury*, provoked the use of force against himself in the same encounter.

The intent component of §505(b)(2) was an essential requirement that the Commonwealth had to prove beyond a reasonable doubt in order to preclude Petitioner's right to act in self-defense. *See Commonwealth v. Samuel*, 590 A.2d 1245, 1248 (Pa. 1991). Because, in a self-defense case, the burden of disproving each element is on the Commonwealth, the jury must be instructed on each portion of the defense.

In this case, the trial court's instructions substituted a "free from fault" requirement for the legislatively-defined intent requirement. Thus, the jury was never instructed that the Commonwealth was required to prove, beyond a reasonable doubt, that Petitioner provoked the use of force with the intent of causing death or serious bodily injury to the deceased. This omission unconstitutionally diminished the Commonwealth's burden of proof.

Where a trial court erroneously instructs a jury on the theory of defense (particularly an affirmative defense) in a manner that reduces the Commonwealth's burden of proof, the accused is prejudiced. Petitioner was denied consideration of a defense guaranteed by the legislature and thus was severely prejudiced by this instruction.

### E.      Counsel Was Ineffective

Trial counsel was ineffective in failing to object to the erroneous charge or request an appropriate charge, as the court's instructions were in conflict with state law and violated

Petitioner's due process rights. There could be no reasonable strategy for failing to raise this meritorious claim, as the claim is well supported by constitutional law, and there was no benefit to Petitioner from instructions that diminished the Commonwealth's burden of proof and compromised his defense.

In *Everett v. Beard*, the trial court's jury instructions removed the burden of proof, as to one element, from the prosecution. The Court of Appeals concluded that "jury instructions that suggest a jury may convict without proving each element of a crime beyond a reasonable doubt violate the constitutional rights of the accused." 290 F .3d at 510. This same error occurred here. As the Third Circuit explained in a parallel context,

> Given our discussion of the nature of the defect in this charge, and the problems that arise from it, it follows a fortiori that unless counsel had a strategic reason for not objecting, Whitney will satisfy the first prong of *Strickland*. Whitney has not offered any testimony about trial counsel's reasons for not objecting, and Whitney has the burden of establishing ineffectiveness. However, we cannot imagine any justification for a defense attorney not attempting to correct this kind of error in an instruction on the only defense his/her client could possibly have to a charge of capital murder.

*Whitney v. Horn*, 280 F.3d 240, 258 (3d Cir. 2002).

Counsel's failure to object deprived Mr. Natividad of the effective assistance of counsel. *See Bey*, 856 F.3d at 238 ("Generally, trial counsel's stewardship is constitutionally deficient if he or she 'neglect[s] to suggest instructions that represent the law that would be favorable to his or her client supported by reasonably persuasive authority' unless the failure is a strategic choice" (quoting *Everett*, 290 F.3d at 514)); *see also id.* at 238-39 ("any alert counsel should have immediately known that [the instruction] raised serious constitutional issues").

### F.    The State Court Opinion

Petitioner raised a claim that counsel was ineffective for failing to object to these instructional errors during PCRA proceedings. On PCRA appeal, the Pennsylvania Supreme

Court addressed each claim of instructional error as a separate ineffectiveness claim. For differing reasons, the state court found that the individual ineffectiveness claims failed and denied relief. *Natividad-2* at 326-29.

These rulings did not adjudicate the claim actually raised. Petitioner raised a single claim of ineffective assistance, asserting multiple failures on counsel's part and asserting that the combined effect of these errors was prejudicial. The Pennsylvania Supreme Court's instruction-by-instruction rulings did not address the actual claim raised, and thus this court's review should be *de novo*.

Assuming arguendo, however, that the state court's ruling was an adjudication on the merits, Petitioner is still entitled to relief.

### 1.    Malice instructions

The Pennsylvania Supreme Court did not conduct a *Strickland* analysis. The court did not determine whether counsel's failure to object constituted deficient performance or whether the failure to object to the erroneous instructions was prejudicial. Instead, the state court found that counsel's assertions that no reasonable strategy could excuse the failure to object and that the failure to object was prejudicial was insufficient to establish the claim. *Id.* at 326.[16] The state court's failure to engage the two-part *Strickland* analysis was both contrary to, and an unreasonable application of, *Strickland. See Brooks v. Gilmore*, No. 15-5659, 2017 WL 3475475 at *8-*9 (E.D. Pa. Aug. 11, 2017) (despite the deference accorded to the state court's decision,

---

[16] To the extent this ruling might be considered a finding of waiver, any such rule would not be adequate and independent. Moreover, to the extent that PCRA counsel failed to properly plead an ineffective assistance of trial counsel claim, counsel's error rendered him ineffective and establish cause and prejudice under *Martinez* and *Trevino. Alvarado v. Wetzel*, No. 16-3586, 2019 WL 3037148, at *8-*9 (E.D. Pa. July 10, 2019). *See generally* Claim II.D.

its failure to grapple with the specific language of the instruction or the law governing the claim rendered its decision objectively unreasonable).

In a footnote, the Pennsylvania Supreme Court discussed the merits of the trial court's instructions as a matter of state law, without acknowledging or engaging in a due process analysis. The court conceded that the trial court's instructions did not clearly explain the malice requirement in light of the unreasonable self-defense theory offered by the defense but held that, when read as a whole, other portions of the instructions properly defined the elements of unreasonable self-defense and thus cured any error. The court explained that while "malice instruction may have indirectly allowed for the *possibility* of finding malice while also finding unreasonable but sincere self-defense, the voluntary manslaughter instruction *specifically* forbade the jury from making such a finding." *Natividad-2* at 326 n.9.

The court's analysis cannot survive habeas review. The correctly stated portions of the charge did nothing to correct or explain the constitutionally infirm portions. *See Francis*, 471 U.S. at 322 ("Language that merely contradicts and does not explain a constitutionally infirm instruction will not suffice to absolve the infirmity. A reviewing court has no way of knowing which of the two irreconcilable instructions the jurors applied in reaching their verdict."); *Whitney*, 280 F.3d at 256 ("[W]hile a single defect does not necessarily make an instruction erroneous, a defect in a charge may result in legal error if the rest of the instruction contains language that merely contradicts and does not explain the defective language in the instruction." (internal citations omitted)); *United States v. Hernandez*, 176 F.3d 719, 731 (3d Cir. 1999) ("[W]hen an erroneous instruction is given, a subsequent clarification must be sufficiently clear and compelling to allow a reviewing court to conclude that there was no reasonable likelihood that the initial inaccuracy affected the jury's deliberations."); *Humanik v. Beyer*, 871 F.2d 432,

442 (3d Cir. 1989) ("A charge that contradicts a constitutionally impermissible instruction does not cure the problem."). Thus, the state court's ruling was an unreasonable application of *Francis.*

### 2. Malice and self-defense

The Pennsylvania Supreme Court adopted a somewhat different approach to Petitioner's claim that the malice instructions failed to explain that self-defense negates malice and that it is the Commonwealth's burden to disprove the elements of self-defense beyond a reasonable doubt. The state court found that appellate counsel's argument was adequately developed. *Natividad-2* at 328.

The court acknowledged that the jury was never told that self-defense negates malice. Nevertheless, the court again looked to other portions of the instructions in which the jury was told that self-defense was a complete defense and that it was the Commonwealth's burden to prove beyond a reasonable doubt that Petitioner did not act in self-defense. *Id.* For the same reasons stated above, this analysis was contrary to and an unreasonable application of both *Franklin* and *Strickland.*

### 3. Self-defense "free from fault" instruction

The Pennsylvania Supreme Court held that post-conviction counsel's use of boilerplate language to argue that counsel had no reasonable strategy for failing to object and to also argue that Mr. Natividad was prejudiced as a result "fails to satisfy his burden of proving that counsel was ineffective." *Natividad-2* at 327. For the same reasons discussed, *supra*, this analysis was both contrary to, and an unreasonable application of, *Strickland* and *Franklin.*

### G. Conclusion

Counsel wanted the jury to consider either that Mr. Natividad acted in self-defense or that Mr. Natividad's unreasonable belief that he was in immediate danger of death or serious bodily

65

injury reduced his culpability to that associated with voluntary manslaughter. However, counsel

failed to ensure that the jury was properly instructed on the prosecution's burden of proof in light

of this defense as well as on all facets of these defenses. Thus, there is a reasonable possibility

that the jury would have not convicted Mr. Natividad of first degree murder had it been properly

instructed. Counsel was ineffective.

IV.   **PETITIONER WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL, DUE PROCESS, AND HIS RIGHTS UNDER THE EIGHTH AMENDMENT AND A FAIR AND RELIABLE GUILT-INNOCENCE AND PENALTY PROCEEDING BY TRIAL COUNSEL'S FAILURE TO OBTAIN EVIDENCE REGARDING THE HOMICIDE VICTIM'S FIREARM NON-LICENSURE (THE NON-DISCLOSURE OF WHICH VIOLATED *BRADY v. MARYLAND*).**

Robert Campbell, the deceased in this matter, had a firearm in his possession at the time

of the fatal shooting. Mr. Campbell was identified to the jury, throughout trial[17] and at the

penalty hearing[18], as a Town Watch member, in order to 'explain' his possession of the firearm.

As the Commonwealth acknowledged at the state post-conviction hearing, Campbell was not

licensed to carry that firearm. NT 10/31/05, 43.

Trial counsel did not investigate the background of the decedent, or the status of the

license for the concealed weapon he carried. NT 10/31/05, 43. Given Petitioner's alleged

admission to Byron Price that the decedent drew or reached for a gun, there is no reasonable

explanation for this failure to investigate. Nor did trial counsel investigate the legality of the

decedent's gun prior to the penalty phase of Petitioner's case. This is true even though trial

counsel was on notice, albeit short, that the Commonwealth planned to introduce victim impact

---

[17] In the opening statement, the Commonwealth contended that the shooting was malicious and without provocation *and* that the victim was an innocent Town Watch member (apparently carrying the firearm relative to that status). *See* NT 11/9/97, 134.

[18] The victim impact testimony described the decedent to the jury as "an active town watch member [who] was very involved in his community." NT 11/12/97, 57-58.

statements at the penalty hearing, and that the decedent's background would be relevant. NT 10/31/05, 41.

## A.  Impact on Petitioner's Defense

The Commonwealth countered trial counsel's arguments concerning self-defense by asserting that the shooting was malicious and without provocation *and* that the victim was an innocent Town Watch member (apparently carrying the firearm relative to that status). NT 11/9/97, 134, 138 (prosecution opening). Given the prosecution's case theory, the fact that Mr. Campbell was not licensed to carry the firearm was critical. This evidence would have countered the impression of good character conveyed by the depiction of the deceased as a Town Watch member and separately supported the defense contention of self-defense by establishing criminal conduct on the part of the deceased.[19]  At sentencing, both of these "circumstances of [the] offense" were critical penalty-trial mitigation concerns. 42 Pa. C.S. §9711(e)(8).

The evidence is legally significant. The Pennsylvania Supreme Court explained in another case that "non-licensure [of a firearm] suggests the stealth by which many criminal objectives are furthered and achieved." *Commonwealth v. Hall*, 830 A.2d 537, 549 (Pa. 2003). If such an inference can be drawn against a criminal defendant, then the due process right to present a defense allows a defendant to present the same evidence regarding the victim and seek a jury inference regarding that victim.

## B.  Prejudice at the Sentencing Phase

The lack of this information rendered the sentencing hearing unconstitutionally unreliable, as the Eighth Amendment requires in particular a heightened reliability in capital

---

[19] After the post-conviction hearing in this case, the trial judge acknowledged the relevance of this evidence. "[T]his was evidence which certainly could have been presented at trial . . . ." PCRA Op. 12/30/05, 9, App. Exh. No. 14.

sentencing proceedings. *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976). The Eighth

Amendment required that the jury be able to consider, and give weight to, *any* potentially

mitigating evidence arising from the defendant's background *or* from the circumstances of the

crime. *Mills v. Maryland*, 486 U.S. 367, 374-75 (1988); *Eddings v. Oklahoma*, 455 U.S. 104,

110-12 (1982).

The absence of evidence that Mr. Campbell was not licensed to carry a firearm resulted in

harm to Petitioner. The victim impact evidence described the decedent to the jury as "an active

town watch member [who] was very involved in his community." NT 11/12/97, 57-58. The

evidence of non-licensure would have been admissible to counter this evidence, and, as trial

counsel testified, the jury could have decided that there would have been no shooting if Mr.

Campbell did not have a weapon with him, since he was not licensed. NT 10/31/05, 93.

### C.     Trial Counsel's Deficient Performance

The duty of counsel to undertake a reasonable investigation is part of the Sixth

Amendment right to counsel. *Strickland v. Washington*, 466 U.S. 668, 691 (1984). Counsel also

has the duty to assure that his client's case is presented in the most favorable light.

*Commonwealth v. Saxton*, 532 A.2d 352, 354 (Pa. 1987).

Trial counsel failed to undertake the most rudimentary and fundamental investigation, a

failure that was both inexplicable and detrimental to his client. A simple subpoena *duces tecum*,

issued to the police department, or a discovery request to the prosecution, would have confirmed

that the gun was possessed *illegally*.

Trial counsel's failure to investigate the illegality of the gun held by the decedent

deprived Petitioner of effective assistance of counsel in violation of the Sixth Amendment.

Under the Sixth Amendment, counsel's penalty-phase investigation is unreasonable unless

counsel attempts to review and respond to reasonably available evidence that the prosecution is

likely to use in its penalty phase case. *Rompilla v. Beard*, 545 U.S. 374, 383-84 (2005). This did not occur here.

### D.    Due Process Violations

The Commonwealth violated the Due Process Clause of the Fourteenth Amendment depriving Petitioner of evidence material to guilt/innocence and his sentence by failing to disclose the fact of non-licensure. *See Brady v. Maryland*, 373 U.S. 83 (1963). Here, the prosecutor never disclosed the material in police hands relating directly to the issue of culpability. The Commonwealth relied on Mr. Campbell's status as a Town Watch member to explain possession of the firearm and, indirectly, assert the character of the deceased. Thus, Petitioner was deprived of critical material to support his claim of self-defense and to overcome the victim impact evidence regarding the deceased, both critical concerns at the penalty trial.[20]

Notice of the intent to present victim impact testimony was not provided by the Commonwealth until near the conclusion of trial, and the victim impact statement read by the decedent's wife was not turned over until at or near the end of trial. NT 11/12/97, 4-5. The fact of non-licensure shows how this untimely notice deprived Petitioner of due process of law and his rights under the Eighth Amendment, as Petitioner was not provided any opportunity to investigate and effectively respond to this particularly powerful proof.

---

[20] During the August 7, 2014 review of the prosecutor's and detectives' files ordered by this Court, the Commonwealth disclosed paperwork showing that the police had indeed determined that Mr. Campbell did not have a license to carry:

From Inspector:

Did Campbell have a license to carry for the fire arm he had on him. - Checked w/gun permit section - 6 -3112 They stated he had no permit to carry from Phila. P.D. or in any Penna. County – P/O Donlon.

App. Exh. No. 43 (Exh. 10 to PCRA Supplement filed on Oct. 6, 2014).

In sum, Petitioner's jury, trying to decide whether Petitioner was proved beyond a reasonable doubt to have *not* acted in self-defense, and thereafter weighing victim impact evidence in deciding whether aggravating circumstances outweighed mitigating circumstances, lacked a critical piece of information. While the Commonwealth portrayed the deceased as a Town Watch member who just happened to have his firearm with him (presumably as part of his Town Watch responsibilities), he was in fact breaking Pennsylvania law.

### E.      The State Court Opinion

The Pennsylvania Supreme Court rejected this claim and sought to distinguish *Hall*. The court said that *Hall* requires a case-by-case analysis and, here, there was "no other evidence that Mr. Campbell was about to engage in illegal conduct." *Natividad-2* at 330.

The state court rejected the claim that evidence of the lack of a permit would have supported the self-defense theory because the "unlicensed gun was snapped in Mr. Campbell's holster at the time of the shooting." *Id*. It added that the shooter did not know that the gun was not licensed and, therefore, that would not factor into a fear of death or serious bodily injury. *Id*. The court held there was no prejudice to Petitioner.

With respect to the claim related to sentencing, the court stated that the claim was denied for "many of the reasons" set forth in the guilt phase analysis. *Natividad-2* at 331. It added that Petitioner did not explain how the evidence of the lack of a licensure would have added to the mitigation presentation. The court stated that the lack of licensure "bears little relevance when placed in context with the evidence gathered at the crime scene." *Id*.

The state court denied Petitioner's due process/*Brady* claim, stating that the prosecution did not have to provide evidence if it was "readily obtainable by the defendant." *Natividad-2* at 331 n.15. With no analysis – simply citation to sections of the PCRA statute and parentheticals –

the state court asserted that the due process claim was waived, apparently because "petitioner

could have raised it in [a] prior proceeding." *Id*. (citing 42 Pa. C.S. §§ 9544(b) & 9543(a)(2)(ii)).

### F. The State Court's Decision Is Contrary to Federal Law and Based on Unreasonable Determinations of Fact

The state court's decision that the failure to present the lack of licensure did not prejudice

Petitioner's guilt phase defense is based on an unreasonable determination of fact. The court held

that the lack of licensure had "almost no probative value." *Natividad-2* at 330. However, when

staking out its rationale, the state court made an unreasonable determination of fact regarding

how the lack of licensure would have been useful to the defense. As trial counsel testified at the

PCRA hearing, the jury could have reasonably determined that there would have been no

shooting whatsoever if the victim had complied with the law and had not packed his handgun.

NT 10/31/05, 45. The holster was under the victim's jacket on his waist on the right side. It was

shiny and nickel-plated. NT 11/5/97, 207, 210; NT 11/6/97, 83. If there was no shiny gun on the

victim's waist, it is much less likely that the shooter would have felt threatened and would have

shot. *See* NT 11/6/97, 15 (Commonwealth witness Byron Price testified, after the shooting, that

Petitioner explained, "He drew on me.").

When denying relief as to the death sentence, the state court principally relied on its guilt

phase analysis. The non-licensure "had little relevance." *Natividad-2* at 331. Again, this is an

unreasonable determination of fact. The revelation of non-licensure would have impacted the

jury's impression of the victim impact statement Mrs. Campbell read that the victim "was an

active town watch member and was very involved in his community." NT 11/12/97, 57-58. It

would have rebutted the impression conveyed that he was a law-abiding citizen engaged in Town

Watch activities. Also, as trial counsel testified, the non-licensure would have presented the jury

with facts that could mitigate the shooting by reasonably concluding that it would not have occurred. NT 10/31/05, 45.

This is a case where the jury found aggravating and mitigating circumstances. *Natividad-1* at 171. It is reasonably likely that the fact that the victim was carrying the gun without a license would have impacted at least one juror's weighing of the mitigation against the aggravation. The Pennsylvania Supreme Court's analysis improperly diminished the impact the unheard evidence would likely have had and, in so doing, its decision was contrary to clearly established law. It did not consider whether there was a reasonable likelihood the unpresented evidence would have led one juror to vote for life. That is the proper constitutional standard, but the Pennsylvania Supreme Court did not use it. *Wiggins v. Smith*, 539 U.S. 510, 537 (2003) (sentencing relief is due in a capital case where "there is a reasonable probability that at least one juror would have struck a different balance" between the mitigating and aggravating factors).

Finally, the Pennsylvania Supreme Court's denial of the due process/*Brady* claim was contrary to and/or an unreasonable application of clearly established federal law. The state court held that the prosecution is not obligated to provide *Brady* material when the defendant can get it. That is contrary to and an unreasonable application of clearly established federal law. There is no prong in *Brady* and its progeny that requires a defendant to show that he could not have gotten the *Brady* material independent of the government, *i.e.*, with the exercise of due diligence. *Dennis v. Sec'y, Pa. Dep't of Corr.*, 834 F.3d 263, 293 (3d Cir. 2016) (en banc) ("Adding due diligence, whether framed as an affirmative requirement of defense counsel or as an exception from the prosecutor's duty, to the well-established three-pronged *Brady* inquiry would . . . be an unreasonable application of, and contrary to, *Brady* and its progeny.").

To the extent the state court relied on waiver, the bar is neither adequate nor independent. *Coleman v. Thompson*, 501 U.S. 722, 729 (1991). The state court seemed to assert that appellate counsel should have gotten the *Brady* material after trial to assert a *Brady* claim on appeal. However, the state court does not acknowledge in its analysis that trial counsel and appellate counsel were the same person. Trial counsel could not be expected to obtain the exculpatory material once he became appellate counsel. If counsel had done so, it would be tantamount to demonstrating his own ineffectiveness which Pennsylvania law does not permit or expect him to raise. *Commonwealth v. Kimball*, 724 A.2d 326, 332-33 (Pa. 1999) ("it is unrealistic to expect trial counsel on direct appeal to raise his own ineffectiveness"); *Commonwealth v. Wallace*, 724 A.2d 916, 921 (Pa. 1999) (when trial counsel is also direct appeal counsel, claims of trial counsel's ineffectiveness are raised in the PCRA); *see also Commonwealth v. Ciptak*, 665 A.2d 1161, 1161-62 (Pa. 1995) ("As a general rule, a public defender may not argue the ineffectiveness of another member of the same public defender's office since appellate counsel, in essence, is deemed to have asserted a claim of her or her own ineffectiveness.").

In addition, the asserted waiver is not independent because it contravenes the rule in *Dennis* – set forth above – that there is no due diligence requirement (placed upon a petitioner) that excuses a *Brady* violation. To the contrary, there is an ongoing duty on behalf of the prosecution to produce *Brady* material. *Pennsylvania v. Ritchie*, 480 U.S. 39, 60 (1987) ("the duty to disclose is ongoing"); *Imbler v. Pachtman*, 424 U.S. 409, 427 n.25 (1976) ("after a conviction the prosecutor . . . is bound by the ethics of his office to inform the appropriate authority of after-acquired or other information that casts doubt upon the correctness of the conviction"); *accord Commonwealth v. Williams*, 732 A.2d 1167, 1175-76 (Pa. 1999) (holding that the Commonwealth's duty to disclose continues through all stages of the judicial process).

V.     **PETITIONER WAS DENIED A FAIR TRIAL BECAUSE THE COMMONWEALTH VIOLATED THE DUE PROCESS CLAUSE WHEN IT DID NOT DISCLOSE EXCULPATORY INFORMATION MATERIAL TO PETITIONER'S ABILITY TO PRESENT A DEFENSE AT TRIAL.**

This claim, as supplemented, has already been addressed.

VI.    **PETITIONER WAS DENIED HIS RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL WHERE TRIAL COUNSEL FAILED TO IMPEACH MICHAEL HAVENS WITH HIS PRIOR STATEMENTS AND WHERE TRIAL COUNSEL OPENED THE DOOR TO THIRD-PARTY THREATS OF A WITNESS.**

As demonstrated in Claim V, the Commonwealth suppressed material exculpatory and impeachment evidence. In addition, counsel was ineffective for failing to develop the impeachment evidence he had in his possession, including the prior inconsistent statements of Michael Havens, and for opening the door to otherwise inadmissible testimony that Byron Price was threatened by Petitioner's relative. Although Petitioner is entitled to relief due to the cumulative effect of these errors, each of the claims discussed below individually entitles Petitioner to relief.

### A.     *Strickland* and the Duties of Capital Counsel

Under *Strickland v. Washington*, 466 U.S. 668 (1984), a petitioner seeking to establish the ineffective assistance of trial counsel must show: (1) that counsel's performance was deficient because it fell below "an objective standard of reasonableness," *id*. at 688; and (2) that the deficient performance prejudiced the defense because there is a reasonable probability that, but for counsel's errors, the outcome would have been different. *Id*. at 695; *see Hinton v. Alabama*, 134 S. Ct. 1081, 1089 (2014) The question is not whether the jury would have credited the evidence developed in the post-conviction proceedings, but whether the nature and quality of that evidence would have created a reasonable probability that a juror would have had a reasonable doubt. *See Strickland*, 466 U.S. at 695; *Hinton*, 134 S. Ct. at 1089.

In assessing prejudice, a reviewing court considers the effects of more than one deficiency cumulatively. A cumulative-error analysis "aggregates all the errors that individually have been found to be harmless, and therefore not reversible, and it analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless." *Albrecht v. Horn*, 485 F.3d 103, 139 (3d Cir. 2007). *See also Marshall v. Hendricks, 307 F.3d 36, 94* (3d Cir. 2002) (evaluating prejudice in light of cumulative errors)*; Berryman v. Morton*, 100 F.3d 1089, 1097-1102 (3d Cir. 1996) (same)*.*

**B.      Failure to Impeach Michael Havens**

Because of counsel's ineffectiveness, the jury never learned that, when initially interviewed by the police, Havens' description of the individual who carjacked him did not match Petitioner in critical respects. Although Havens later identified Petitioner, he only did so after seeing Petitioner's picture on the news, making his identification of Petitioner unreliable. Had the jury also heard the full scope of how Havens' description of his assailant changed, it would not have credited his testimony.

**1.      Counsel's performance was deficient**

At trial, Havens testified with certainty that Petitioner was the person who approached him with a gun and threatened to shoot him. NT 11/5/97, 149. However, Havens' identification of Petitioner was tainted by circumstances prior to trial when he saw Petitioner's photo on television. *Id.* at 184-86. Moreover, there was impeachment evidence that was available to counsel that he did not use.

Counsel had in his possession two prior statements by Havens taken close in time to the incident where Havens described his assailant as having a "dark complexion" and "a [sic] earring in his left ear." When initially questioned by about his robbery, Havens described his assailants as both being approximately 5'9 inches tall with dark complexions and wearing sweatshirts and

jeans. *See* App. Exh. No. 16 (75-49 dated 11/9/96). In a subsequent statement to police, Havens added that the person who held the gun on him was wearing a black, three-quarters length leather jacket and perhaps had an earring in his left ear. *See* App. Exh. No. 17 (75-483A dated 12/2/96). In neither statement did Havens describe his assailant as missing his two front teeth. Petitioner, however, has a light complexion and at the time of the crime did not have an earring and was missing his two front teeth.

There is no reasonable strategic basis for not impeaching Havens with his prior statements. Petitioner's defense to the carjacking was simple—he maintained his innocence of the crime and challenged the identification testimony. Counsel questioned Havens about his failure to mention the leather jacket and earring in his first statement to police, NT 11/5/97, 180-81, and his failure to mention the assailant's missing teeth at all. *Id.* 182-83. And counsel argued in closing that these discrepancies in Havens' statements showed that his subsequent identification of Petitioner was tainted by his exposure to news accounts of Petitioner's arrest. NT 11/10/97, 29-31. Under these circumstances, counsel could have no reasonable strategic basis for not also impeaching Havens on the change in the perpetrator's complexion between his initial interview with police and his testimony at trial.

Counsel's omission was not inadvertent but was symptomatic of his failures to impeach critical witnesses. For example, when cross examining Price, counsel never asked him if he was involved in the Havens carjacking. Counsel had in his possession the statement of a witness who claimed that "Byron told me that they [Price and Petitioner] had carjacked a guy at a gas station in Yeadon . . . [and] torched [the car] in [G]ermantown." App. Exh. No. 18 (Statement of

Dwayne Davis). Counsel asked Price if he "torch[ed]" the car, NT 11/6/97, 68, but failed to impeach him with this statement when Price claimed that he had not.[21]

### 2.    Petitioner was prejudiced

Counsel argued that Havens' identification of Petitioner was unreliable because he only identified Petitioner after seeing his photograph on television when Petitioner was arrested in connection with the Campbell homicide. Counsel made limited argument with regard to the discrepancies between the descriptions provided by Havens at the time of the carjacking and his testimony at trial. His argument could have been much stronger had he presented additional evidence that showed material changes in Havens' description of his assailant. This alone could have created reasonable doubt. Prejudice to Petitioner is further supported by the fact that Havens' testimony was the only direct link to the carjacking, which was used in to prove identity and intent in the Campbell homicide. *See* Claim II, *supra*.

For this reason, any evidence that cast doubt upon the accuracy of Havens' identification was also critical to Petitioner's defense to the homicide charges. Where the "reliability of [the] victim's uncorroborated identification of [Petitioner] cuts directly to the heart of the only evidence" against him, counsel's failure to impeach the identification in all respects is prejudicial. *Berryman*, 100 F.3d at 1098; *see also Simmons v. Beard*, 590 F.3d 223, 236 (3d Cir. 2009) ("where the government's case 'depended almost entirely on' one witness's testimony, the credibility of that witness 'was therefore an important issue in the case, and . . . the jury was entitled to know of [any issue bearing on his credibility]" (quoting *Giglio v. United States*, 405 U.S. 150, 154-55 (1972)).

---

[21] When the Commonwealth produced Davis's statement in pre-trial discovery, Davis's last name and address were redacted. *See* Exh. App. No. 44.

### C.      Opening the Door to Third-Party Threats of Byron Price

Defense counsel did not intend to elicit testimony about the arrest of Petitioner's relative for assaulting Price, but counsel's ineffective examination of Detective Charles Permint opened the door for the Commonwealth to make inquiries into this area. After opening the door, counsel tried to prevent this testimony by objecting to the Commonwealth's redirect, but it was too late. Counsel's failure to ensure that the Commonwealth could not elicit testimony about the threats to Price—which were otherwise ruled inadmissible—was ineffective.

### 1.      Counsel's performance was deficient

Counsel was aware that Price contended that he was assaulted by a member of Petitioner's family. In fact, counsel moved in limine prior to the start of trial to preclude allegations of witness intimidation. *See generally*, NT 11/5/97, 94-103. The prosecutor argued that there were two reasons why testimony on allegations of witness intimidation were admissible, including that he was "allowed to anticipate that . . . the reason why [Price] didn't come forward right away is because he was scared to death that he would be beaten." *Id.* at 98.

The trial court ruled that this testimony would be inadmissible "unless the door is open[ed] on cross-examination and then it will relate to the state of mind of the witness only and I'll so state to the jury." *Id.* at 100; *see id.* ("[T]he witness certainly would have the right to explain his state of mind in not coming forward[.]"). At the time, defense counsel noted that it would be "extremely prejudicial" for evidence that Price was assaulted by Petitioner's relative to be admitted, especially because the alleged assault occurred six months after Price first spoke with the police. *Id.* at 102.

In light of the warning from the court, counsel questioned Price at length concerning the nature and timing of his contacts with the police but refrained from asking why he delayed in speaking with the police. NT 11/6/97, 39-71. However, when questioning Detective Permint,

counsel asked him whether members of Petitioner's family were questioned at Homicide. NT 11/7/97, 93 ("At least the two other times you said you brought three people in for further questioning."). As a result of this questioning, the prosecutor was permitted to elicit testimony from Detective Permit on redirect examination that Petitioner's uncle, Genardo McIlwain, was arrested and charged with intimidation of a witness, Byron Price. *Id.* at 95-98. Although counsel objected, the trial court ruled that counsel had "opened the door on . . . cross-examination." *Id.* at 96. Inexplicably, counsel asked Detective Permit on re-cross examination whose complaint led to the arrest, even though this question had already been asked and answered on redirect. *Id.* at 97-98. To which Detective Permit again replied, "Byron Price." *Id.* at 98.

Trial counsel's performance when examining Detective Permit was deficient. *See Strickland*, 466 U.S. at 686. Counsel had successfully argued that testimony regarding the allegations of witness intimidation of Price would be inadmissible because the Commonwealth had been unable to link those threats to Petitioner. *See* NT 11/5/97, 100 ("My ruling is it's not admissible unless, tied to the defendant[.]"). Counsel could and should have avoided questions that opened the door to this otherwise inadmissible evidence.

In *White v. Taylor*, 601 F.3d 890 (5th Cir. 2010), the Fifth Circuit found counsel's performance deficient when he questioned the defendant about his post-arrest silence because the questioning "opened the door to the prosecutor's cross-examination . . . and subsequent remarks in the prosecutor's closing argument." Here, by asking Detective Permit whether Petitioner's family members were questioned by police, counsel opened the door to further questioning by the prosecutor as to the nature of their contacts with police and allowed evidence of witness intimidation to be admitted. Under the circumstances of this case, there is no reasonable tactic for counsel's actions.

### 2. Petitioner was prejudiced

Had counsel not opened the door to testimony that Price was assaulted by one of Petitioner's relatives, there is a reasonable probability that the jury would have reached a different result. Like Havens, Price was a critical witness for the Commonwealth. He was the only witness to identify Petitioner as the person who shot Campbell. The Commonwealth used Price's willingness to come forward, despite the assault, as suggestive of his good character and believability. NT 11/10/97, 67 ("I would suggest to you that Byron Price has something that Ricardo Natividad will never have. And doesn't have to this day, and that's a conscience."). This error also operated in conjunction with impermissible "other acts" evidence arising from the use of the Havens robbery to prove intent, *see* Claim II, to paint Petitioner as violent and to undermine his defense. Because the testimony simultaneously weakened Petitioner's credibility before the jury as it bolstered the credibility of Price, there is a reasonable probably that absent the error at least one juror would have had a reasonable doubt of guilt. *See White*, 610 F.3d at 906 (counsel's performance was prejudicial where the defendant's "credibility was the key to his defense"); *see also Berryman*, 100 F.3d at 1099 (counsel's cross-examination, which "opened the door" to testimony that defendant's codefendant was being investigated for an unrelated homicide and robbery, was "a striking instance of ineffective assistance of counsel").

### D. The State Court Opinion

Petitioner raised this claim in post-conviction proceedings. *See* Brief for Appellant at 28-31, App. Exh. No. 26. In denying relief on these claims, the Pennsylvania Supreme Court did not conduct an analysis under *Strickland*. Rather, the court ruled that counsel's assertions that no reasonable strategic basis could excuse trial counsel's failure to object were insufficient to establish the claim under *Commonwealth v. Pierce*, 527 A.2d 973, 975-76 (Pa. 1987). *See Natividad-2* at 323 ("noticeably absent is any meaningful attempt to invoke the second *Pierce*

prong); *see id.* at 324 ("[W]e cannot consider this one-sentence argument to constitute a sufficient development of his claim."). The state court's failure to engage in the two part *Strickland* analysis was both contrary to, and an unreasonable application of, *Strickland. See Brooks v. Gilmore*, No. 15-5659, 2017 WL 3475475 at *8-9 (E.D. Pa. Aug. 11, 2017) (despite the deference accorded to the state court's decision, its failure to grapple with the specific language of the instruction or the law governing the claim rendered its decision objectively unreasonable).[22]

Further, because the Pennsylvania Supreme Court did not address whether trial counsel's inaction prejudiced Petitioner, review of this aspect of the claim is *de novo*, and relief is appropriate for the reasons stated above. *See Porter v. McCollum*, 558 U.S. 30, 39 (2009) (per curiam) ("Because the state court did not decide whether Porter's counsel was deficient, we review this element of Porter's *Strickland* claim *de novo*.").

With regards to Petitioner's claim that counsel ineffectively opened the door to evidence of third-party threats, the Pennsylvania Supreme Court also stated: "Moreover, we agree with the Commonwealth that Mr. Price's accusation of witness intimidation by [Petitioner's] cousin did not prejudice [Petitioner] defense." *Id.* at 324. To the extent that this statement constitutes a merits determination on whether or not counsel's deficient performance prejudiced Petitioner, it also is contrary to, and an unreasonable application of, *Strickland*.

The Pennsylvania Supreme Court seems to suggest that the error is not prejudicial because it did not relate to one of the defense's theories at trial, self-defense. First, the court

---

[22] To the extent this ruling might be considered a finding of waiver, any such rule would not be adequate and independent. Moreover, to the extent, if any, that PCRA counsel failed to properly plead an ineffective assistance of trial counsel claim, counsel's error rendered him ineffective and establish cause and prejudice under *Martinez* and *Trevino. Alvarado v. Wetzel*, No. 16-3586, 2019 WL 3037148, at *8-*9 (E.D. Pa. July 10, 2019). *See generally* Claim II.D, *supra*.

unreasonably failed to consider that ensuring that the jury was not exposed to otherwise inadmissible evidence is entirely consistent with Petitioner's defense of reasonable doubt/self-defense. Second, the court unreasonably failed to consider that because Price was the only witness to identify Petitioner as the person who shot Campbell, his testimony squarely contradicted the defense theory and his identification of Petitioner was made more credible by evidence that he was assaulted by one of Petitioner's relatives. Finally, because the *Strickland* prejudice inquiry assesses the impact on the overall outcome of the case, the effect of all of counsel's deficient performance should be considered cumulatively. *Strickland*, 466 U.S. at 695 (a reviewing court must "consider the totality of the evidence before the judge or jury"). The state court disregarded the impact on the trial of both the evidence that counsel failed to elicit and the evidence that was improperly introduced. The failure to undertake this analysis is contrary to, and an unreasonable application of, *Strickland*, in particular because the Commonwealth's case rested almost entirely on the testimony of Havens and Price. Given the importance of Havens and Price to this case, it is reasonably likely that but for counsel's failures, the jury "would have had a reasonable doubt respecting guilt." *Id.*

## VII.    PETITIONER WITHDRAWS THIS CLAIM.

## VIII.    PETITIONER WAS DENIED HIS RIGHT TO A FAIR AND IMPARTIAL JURY IN VIOLATION OF THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS WHERE A JUROR FAILED TO INFORM THE COURT THAT HER FATHER WAS A POLICE OFFICER.

"In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury." U.S. Const. amend. VI. An "impartial jury" is one "capable and willing to decide the case solely on the evidence before it." *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 554 (1984). The right to an impartial jury is nowhere as precious as when a defendant is on trial for his life. *See Ross v. Oklahoma*, 487 U.S. 81, 85 (1988). "It is

vital in capital cases that the jury should pass upon the case free from external causes tending to disturb the exercise of deliberate and unbiased judgment. Nor can any ground of suspicion that the administration of justice has been interfered with be tolerated." *Mattox v. United States*, 46 U.S. 140 (1892).

In this case, Lillian Anderson served on the jury that convicted and sentenced Petitioner to death. However, Juror Anderson inexplicably failed to inform the trial court and counsel that she had a close relative who was a member of law enforcement. Had this critical information been properly and truthfully disclosed, Petitioner could have challenged Juror Anderson for cause and excluded her from jury service.

During voir dire, Juror Anderson, along with all other prospective jurors, were asked to fill out a juror questionnaire that asked whether they, or members of their immediate families, had "ever worked as a police officer or in other law enforcement jobs." They also were asked whether they would be more or less likely to believe the testimony of a police officer. *E.g.*, NT 11/3/97, 17.

Juror Anderson did not answer either question affirmatively, though she did reveal that she belonged to a Town Watch group in Northeast Philadelphia. *Id.* at 193. As a result of Juror Anderson's silence, neither the trial court nor defense counsel inquired into her relationship with members of law enforcement or any bias on their behalf. Juror Anderson was selected as Juror Number 12. *Id.* at 196. Contrary to her questionnaire answer, Juror Anderson's father was a police officer. *See* App. Exh. No. 19 (Declaration of John Anderson).[23]

---

[23] Juror Anderson died in 2010. Her husband, John Anderson, confirms that she served on a Philadelphia jury in 1997 and that her father was a police officer.

Petitioner is entitled to a new trial where even a single juror failed to disclose material information in response to a question asked during voir dire if he "first demonstrate[s] that a juror failed to answer honestly a material question on *voir dire*, and then further show[s] that a correct response would have provided a valid basis for a challenge for cause." *McDonough*, 464 U.S. at 556.

Here, Petitioner has established that a seated juror failed to answer a material question honestly during voir dire. In view of the circumstances of the crimes of which Petitioner has been convicted, namely the killing of a Town Watch member, Juror Anderson's close familial relationship with a police officer, combined with her membership in a Town Watch group, undermined her ability to deliberate in a fair and impartial manner. Under the circumstances of this case, bias must be presumed.

Indeed, Juror Anderson's misrepresentation when answering the jury questionnaire of itself is evidence of bias. *See United States v. Columbo*, 869 F.2d 149, 166-67 (2d Cir. 1989). It is highly improbable that Juror Anderson could have forgotten that her father is a police officer. Had Juror Anderson not intentionally withheld information material to the question of her impartiality, her responses to these questions, along with her admitted participation in a town watch group, would have provided a basis to challenge her for cause. The trial court excused several prospective jurors for cause who stated that they would be more likely to believe the testimony of a police officer. *E.g.*, NT 11/3/97, 113-14 (Donn Gustafson); *id.* at 160-66 (Joanne Hayes). Moreover, defense counsel struck several prospective jurors who were related to or were friends/co-workers of police officers. *E.g.*, NT 10/31/97, 151-54 (Jodi Banks); NT 11/3/97, 142-47 (Alan Mumber); *id.* at 176-81 (Shelby Yim).

Juror Anderson deliberately concealed a close familial relationship with a police officer, and her deliberate concealment is evidence of her bias. In light of this misconduct, Petitioner is entitled to a new trial.

## IX.  PETITIONER'S RIGHTS WERE VIOLATED WHERE THE PROSECUTOR MADE IMPROPER CLOSING REMARKS AT THE GUILT PHASE, AND WHERE TRIAL COUNSEL FAILED TO OBJECT TO THE IMPROPER COMMENTS.

A prosecutor's duty is not merely to win, but to seek justice. *Berger v. United States*, 295 U.S. 78, 88 (1935). As part of that duty, a prosecutor has a special obligation to avoid improper conduct. Because of the prosecutor's prominent courtroom role as representative of the Commonwealth – and the mantle of respect and authority this creates in the eyes of the jury – jurors are predisposed to give great deference to the prosecutor's words and actions, and improper prosecutorial arguments have a heightened impact on the jury. *Id.*; *accord Drake v. Kemp*, 762 F.2d 1449, 1459 (11th Cir. 1985) ("Arguments delivered while wrapped in the cloak of state authority have a heightened impact on the jury.").

While a prosecutor "may strike hard blows, he is not at liberty to strike foul ones." *Berger*, 295 U.S. at 88. When a prosecutor's argument infects the trial with unfairness, due process is violated. *Moore v. Morton*, 255 F.3d 95, 105-06 (3d Cir. 2001); *Lesko v. Lehman*, 925 F.2d 1527, 1546 (3d Cir. 1991). Even where individual remarks by themselves do not create a due process violation, their cumulative effect may. *Id.; cf. Donnelly v. DeChristoforo*, 416 U.S. 637, 645 (1974) (setting out the standard and finding no due process violation where a prosecutor made an isolated, ambiguous comment which was followed by specific disapproving instructions). On habeas review of a prosecutor's argument, under established United States Supreme Court precedent, a reviewing court must examine the prosecutor's offensive actions in the context of the entire trial, assessing the severity of the conduct, the effect of the curative

instructions and the quantum of evidence against the defendant. *Moore*, 255 F.3d at 107. Here, the prosecutor ignored this constitutional admonition in his guilt-phase closing argument, making comments that undermined the jury's objectivity and impartiality and infected the trial with unfairness in violation of due process.

The prosecutor began his closing argument by insinuating to the jury that defense counsel's actions during trial were designed to conceal the truth:

> Now, is that [questioning by defense counsel] designed to get you to the truth?  Or is that designed to make you forget that he, Mr. Havens, has unambiguously consistently without any pause, without any hesitation, since the beginning, since she's [sic] had the opportunity, unsuggestively . . . said . . . this is right here is the man who carjacked me, Ricardo Natividad . . . .

> Is asking him about maybe he had an earring designed to make you forget all the other aspects of the description that he hit right on . . . .

> Is that question like a [sic] earlobe question and the earring question designed to get you to the truth or to make you forget . . . .

NT 11/10/97, 61-63. Such an argument is highly improper and only serves to denigrate defense counsel's proper role in advocating for his client and to prejudice the jury against him.

The argument was particularly harmful in this case where the prosecutor improperly emphasized to the jury that his own role as prosecutor was that of the seeker of truth and justice. *Id*. at 44. Thus, the jury had before it assertions from the prosecutor that his oath required him to seek justice, contrasted with the role of Petitioner's counsel – which was to do or say anything on behalf of his client regardless of its truth.

The prosecutor followed up this attack on defense counsel with an attack on Petitioner while improper vouching for Commonwealth witnesses:

> I would suggest to you that Byron Price has something that Ricardo Natividad will never have. And doesn't have to this day, and that's a conscience.

*Id*. at 67. The prosecutor's assurance to the jury that Price had a conscience conveyed the

impression, based on evidence not presented to the jury but known to the prosecutor, that Price's

testimony was truthful. This jeopardized Petitioner's right to be tried solely on the basis of the

evidence presented to jury and induced the jury to trust the Commonwealth's judgment rather

than its own view of the evidence.

Finally, the prosecutor concluded his emotional and inflammatory argument to the jury

by incorporating biblical references into his appeal, which he used to urge the jury to convict:

> More important than any inference [concerning specific intent to kill] and as
> important, I suggest to you, as the law that the court gives to you is the evidence
> of his meanness and his viciousness and his hard heartedness and his cruelty and
> his words from the night before. . . .

> My best friend who had this case for the preliminary hearing, we talked about a
> lot of different things and, you know, it's not as the judge has told you to decide
> this based on sympathy or certainly no sympathy for Ricardo Natividad . . . . Not
> because there is a God who would when we're all going to sleep at night and
> when we're batting down the hatches you go out and look to make sure hopefully
> He would prevent another car window from getting smashed.

*Id*. at 89-90.

This enlistment of religious authority was clearly improper. Such arguments introduce

matters that are irrelevant to any of the charged crimes and invite the jury to convict based on

religious beliefs that have nothing to do with the evidence presented at trial and that cannot be

rebutted or questioned by the defendant. *Commonwealth v. Chambers*, 599 A.2d 630, 644 (Pa.

1991).

These improper prosecutorial comments, individually and collectively, deprived

Petitioner of his constitutional rights. Even though trial counsel objected to parts of the

prosecutor's closing argument, including the references to the Bible, he failed to ask for a

curative instruction or for a mistrial. *Id*. at 67-68, 89-90. To the extent that counsel failed to

object to the improper argument and to seek corrective instructions and/or a mistrial, Petitioner

was deprived of the effective assistance of counsel. There is no conceivable tactic for these errors of counsel, and Petitioner was prejudiced, as set forth above. The trial court's failure to correct any of the above errors, even when objected to, or to instruct the jury as to their impropriety, contributed to and enhanced the constitutional violation. These errors deprived Petitioner of his rights under the Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

### A.     The State Court Opinion

On the merits, the Pennsylvania Supreme Court held that the first set of comments responded to defense counsel's attack on Havens' credibility and that they were not "obvious offers of opinion or of the type that would unavoidably prejudice the jury into forming a mindset of fixed bias and hostility toward [Petitioner]." *Natividad-2* at 324. With respect to the religious references, the court opined that religious references encouraging a jury to impose the death penalty urge them to consider factors outside the permissible statutory factors. The court stated that that was not the situation in this case and that Petitioner cannot reasonably argue "that the statements prejudicially impacted his convictions." *Id*. at 325.

### B.     The State Court Opinion Violates AEDPA

The decision of the Pennsylvania Supreme Court is contrary to and/or an unreasonable application of *Donnelly* and *Berger*. Here, the prosecutor was not seeking to seek justice, but to disparage the important role that defense counsel has. Also, by invoking the protection of God, the prosecutor was seeking to align his own position with that of the Almighty, which was improper. Petitioner is entitled to relief.

### C.     Post-Conviction Counsel Was Ineffective

State post-conviction counsel's conduct was ineffective because he did not include in the PCRA petition the comment the prosecutor made about Byron Price having a conscience. *Floyd v. Meachum*, 907 F.2d 347, 355 (2d Cir. 1990) (cumulative effect of prosecutor's improper

remarks in closing argument, including vouching for the credibility of a witness and disparaging the defense, violated due process where the only curative instruction was the standard instruction that counsel's arguments are not evidence). Any procedural default should be excused under *Martinez v. Ryan*, 566 U.S. 1 (2012), because the claim of ineffective assistance of trial counsel is meritorious and state post-conviction counsel performed unreasonably. *Id.* at 17; *Trevino v. Thaler*, 569 U.S. 413, 423 (2013); *Workman v. Superintendent Albion SCI*, 915 F.3d 928, 937-38 (3d Cir. 2019). The Court should consider the combined prejudicial effect of all of the improper prosecutorial argument.

The state court also held that state post-conviction counsel raised boilerplate claims that did not sufficiently plead either that trial counsel had no reasonable basis for his lack of  action or that state post-conviction counsel did not properly plead prejudice. To the extent this is a decision on the merits, it is contrary to, and an unreasonable application of, *Strickland*, for the reasons stated in Claim II, *supra*. If viewed as a procedural default, the asserted failure to properly assert the prongs of an ineffective assistance claim under Pennsylvania law should not prevent this Court from hearing this claim, as Petitioner can establish cause and prejudice. *See Martinez*, *Trevino*, *supra*.

## X.   COUNSEL RENDERED INEFFECTIVE ASSISTANCE BY FAILING TO INVESTIGATE AND PRESENT READILY AVAILABLE MITIGATING EVIDENCE.

Trial counsel violated Petitioner's right to the effective assistance of counsel as guaranteed by the Sixth, Eighth and Fourteenth Amendments to the United States Constitution by failing to properly prepare for a sentencing hearing. The evidence adduced at the PCRA proceeding showed this serious constitutional violation. Additional evidence put forward by habeas counsel (and not presented in the PCRA proceedings) confirms that trial counsel was constitutionally ineffective.

The touchstone of effective representation at a capital sentencing proceeding is the thorough investigation and preparation necessary in order for counsel to develop and present mitigating evidence. The failure of defense counsel to adequately prepare, particularly in a capital case, is simply an abdication of the minimum performance required. The Sixth Amendment requires that capital defense counsel fulfil their obligation to conduct a thorough investigation of the defendant's background. *Porter v. McCollum*, 558 U.S. 30, 39 (2009); *Rompilla, v. Beard*, 545 U.S. 374, 380-83 (2005); *Wiggins v. Smith*, 539 U.S. 510, 524 (2003); *Williams v. Taylor*, 529 U.S. 362, 396 (2000). *Accord Abdul-Salaam v. Sec'y of Pa. Dep't of Corr.*, 895 F.3d 254, 267 (3d Cir. 2018) (trial counsel's investigation that was limited to speaking with only three family members was deficient, and, thus, strategy concerning the presentation of mitigation evidence was unreasonable); *Saranchak v. Sec'y, Pa. Dep't of Corr.*, 802 F.3d 579, 596 (3d Cir. 2015) (counsel's failure to follow up on evidence known to him about defendant's dysfunctional family and mental health problems was deficient); *Bond v. Beard*, No. 02-08592, 2006 WL 1117862, at *8-9 (E.D. Pa. Apr. 24, 2006) (finding counsel ineffective in a case where counsel retained Dr. Tepper, but did not supply him with school records or relevant hospital records to consider in an evaluation of the defendant), *aff'd*, 539 F.3d 256 (3d Cir. 2008).

As part of a thorough investigation for all reasonably available mitigation, counsel should, well before trial, seek out and thoroughly interview family members and others familiar with the client's life history and background; obtain records pertaining to the client's life history; and obtain appropriate mitigation evaluations by mental health experts. *Porter*, 558 U.S. at 39-41; *Wiggins*, 539 U.S. at 516; *Williams*, 529 U.S. at 395-96. Capital counsel also have the duty to ensure that the client receives full and meaningful expert assistance on mitigation issues. *Porter*,

559 U.S. at 39-41 (trial counsel ineffective for failing to investigate and present evidence of brain damage); *Rompilla*, *supra* (same); *Sears v. Upton*, 561 U.S. 945, 949 (2010) (same).

Counsel presented only two witnesses at sentencing, Benito Natividad, Sr. and Allan Tepper, Psy.D. As an example of trial counsel's lack of preparation, the record shows that he did not know which family members were in the courtroom. During the sentencing phase he asked Petitioner's father whether two of Petitioner's brothers and a sister were in the courtroom. Instead of, yes, the answers were, no. NT 11/12/97, 64, 73.

Furthermore, trial counsel was uninformed about the standards required by Pennsylvania's death penalty law. In closing argument, counsel misstated the standards for sentencing Petitioner to life:

> If one of you thinks that the weight of any mitigation evidence that you have
> found outweighs the aggravation that was presented, if one of you finds that, then
> my client will be sentenced to life in prison.

NT 11/12/97, 136. Under Pennsylvania law, mitigation need not outweigh aggravation. The opposite is true. Indeed, a sentence of life is required even where mitigation is of *equal* weight with aggravating factors. 42 Pa. C.S. § 9711(c)(iv). But that is not what counsel argued to the jury.

**The PCRA proceeding.** The PCRA proceeding showed that trial counsel conducted an inadequate mitigation investigation, one with no substance, and conducted with complete disregard for constitutional obligations and responsibilities attendant to a capital case. Counsel's lack of effort was exemplified by the fact that he met with his client only twice in the first month or two of representation *and then not again until trial.*

Trial counsel limited his attempt to secure mitigation witnesses to telephone contact with persons whose names were provided by Petitioner. He never wrote to Petitioner to request additional mitigation evidence, or to explain that some of the witnesses *identified by Petitioner*

*(and not by counsel's efforts)* had not provided beneficial information. He neither hired an investigator to personally visit with potential witnesses, nor conducted such visits himself, with the sole exception being when one or two members of Petitioner's immediate family came to counsel's office. Even then, he did not talk with them about their family's background, and he missed substantial aspects of Petitioner's background.

Counsel failed to use mitigation evidence in his hands. He never introduced a presentence report that confirmed the expert's assessment that Petitioner had serious substance abuse problems. When the prosecutor impeached the defense mental health expert with proof that Petitioner had problems while attending Sleighton School, a juvenile institution, trial counsel failed to use substantial evidence to show a positive and successful adjustment to a subsequent placement, Youth Forestry Camp. Additionally, counsel did not present evidence *in hand* that a psychiatric evaluation of Petitioner showed a full scale IQ of 75 and a less-than-6th grade reading level at 16 years old. Counsel did not use Petitioner's Sleighton School records demonstrating a significantly diminished reading and math capacity prior to admission, and a marked academic and vocational improvement in a structured setting. Counsel also did not present evidence that Petitioner had previously been diagnosed with serious and significant mental health impairments – mixed personality disorder with histrionic, paranoid, and schizoid features. Counsel did not present testimony from a myriad of witnesses who could have testified about the many tasks neighbors performed to help family members and neighbors.

This case involved victim impact testimony and a claim that there was no robbery. Yet counsel never investigated, and the prosecution never disclosed, that the victim was not licensed to carry the firearm in his possession, mitigation proof of the "circumstances of [the] offense." 42 Pa. C.S. §9711(e)(8).

**Evidence presented in the habeas.** The habeas petition presents additional evidence of mitigation that trial counsel did not present. Despite the fact that Petitioner had a history of drug abuse, had been in automobile, motorcycle and sledding accidents in which he lost consciousness, and had been shot in the face, trial counsel did not have Mr. Natividad examined for brain damage. A neuropsychological examination has revealed that, at the time of trial, counsel could have presented expert testimony that Mr. Natividad suffered from a set of severe impairments and brain dysfunction in the area of executive functioning. Petitioner's brain dysfunction qualifies as an extreme mental or emotional disturbance under 42 Pa. C.S. § 9711(e)(2).

Trial counsel did not interview Mr. Natividad's brothers and sister about Petitioner's background and did not provide the jury with a compelling story of his family background that included, among other things, family drinking and drug abuse; the injuries that Petitioner suffered; and the verbal and physical violence in the Natividad household. The jury did not hear how Benito, Sr., the only family member to testify during the penalty phase, created turmoil, violence, chaos and heartache in his own family. He was an open philanderer, ran a speakeasy, recruited a young Petitioner into the illicit drug business and culture, and was arrested and later convicted for sexual molestation of his grand-daughter who was Petitioner's niece and like a daughter to him.

Trial counsel's performance and investigation failed to meet reasonable professional standards, and deprived the jury of critical mitigation evidence. Petitioner was prejudiced as a result.

A.     **As Presented in the PCRA Proceedings, Counsel Failed to Properly Investigate and Present Mitigation.**

1.     **Evidence of good deeds**

Trial counsel failed to investigate and present readily available evidence of Petitioner's many good deeds in his community. The jury had been presented with a one-sided picture of Petitioner's character. Following the offense for which they had just convicted him, the sentencing jury learned that Petitioner had a long history of prior criminal convictions, juvenile delinquency placements, and adult imprisonment. Yet, trial counsel failed to present Youth Forestry records from Petitioner's juvenile placement showing that Mr. Natividad had "benefited from his placement at camp and has met all treatment goals." App. Exh. No. 30 (PCRA Exh. C-1, Documents from Petitioner's Juvenile File).[24]

Trial counsel maintained that he made brief (five or ten-minute) phone calls to some potential witnesses, and that he did not develop this mitigation evidence for every witness, except Petitioner's father, because "either [counsel was] not able to get ahold of someone or [counsel was] and [he] didn't deem them to be helpful to the case." NT 10/31/05, 85. This explanation cannot cure the constitutional defect. *Abdul-Salaam*, 895 F.3d at 269 ("counsel contacted so few of Abdul-Salaam's family members due to a lack of preparation and not for any strategic reason"). Counsel cannot expect to conduct meaningful mitigation interviews in five to ten minute phone calls. He had an obligation to follow up on reasonable leads during the course of investigation, including his trial expert's suggestions. In this case, trial counsel had evidence that Petitioner had a history of drug abuse, his mother was a heavy drinker, suffered after his

---

[24] The "D" designation identifies exhibits from the October and November, 2005 PCRA evidentiary hearings. The "C" designation refers to Commonwealth exhibits from the same proceedings. For the lay mitigation witnesses, their affidavits formed the basis of their direct examinations in the PCRA hearings. *See, e.g.*, NT 10/31/05, 147.

mother's death and was abused by his father. Yet, trial counsel completely failed to follow up with family members and others to find out more, either on his own or through an investigator. Counsel performed deficiently.

The jury never knew about Petitioner's positive attributes. In post-conviction proceedings, Petitioner produced affidavits from 10 witnesses who were readily available at the time of the penalty phase to testify about Petitioner's life history and helpfulness in the neighborhood. Trial counsel failed to interview any of these people, and thus deprived the jury of valuable information.

Family and neighbors who knew Petitioner's history and background were available to testify at the trial: Bill Abrams, Garland Barber, April M. Brown, Richard Burley, Bruce Hunter, Benito Natividad, Jr., Grace Reavis, Lisa Sherman, Anthony Silver, Harvey Linwood Vaughan, Jr., and Sadie Satterhwaite.

Counsel failed to interview family members and neighbors, who would have testified that Petitioner cared for sick family members and neighbors, in addition to his mother, including Petitioner's aunt who was sick from cancer; his uncle who was sick with AIDS; and a neighbor who was paralyzed. App. Exh. Nos. 32, 37, 40 (PCRA Exhs. D-7, D-12, D-15).

Counsel failed to interview family members and neighbors, who would have testified that Petitioner helped out people in his neighborhood, particularly the elderly, by shoveling snow, carrying groceries, going shopping, moving furniture, helping with parking, taking out the trash, and mowing lawns. App. Exh. Nos. 31, 35, 36, 38, 39 (PCRA Exhs. D-6, D-9, D-11, D-13 and D-14).

Counsel failed to interview family members and neighbors, who would have testified that Petitioner helped care for his children and niece; and that Petitioner reached out to other young

people in his neighborhood, spent time with them, and encouraged them to live a proper life.

App. Exh. Nos. 32, 34-41 (PCRA Exhs. D-7, D-8, D-9, D-11, D-12, D-13, D-14, D-15, D-16).

### 2. Counsel failed to utilize records in hand, including juvenile placement records

Not only was counsel's mitigation witness investigation lacking, but he did not conduct

an adequate investigation to obtain important records. *See Williams*, 529 U.S. at 396-99 (counsel

were ineffective as they had only began preparing for the mitigation proceeding "a week before

the trial," thus not having enough time to uncover records of the defendant's "nightmarish

childhood").

Counsel did not present evidence that Petitioner made a positive and successful

adjustment at a secure, juvenile institution, the Youth Forestry Camp. App. Exh. No. 30. While

those records were available at trial, incredibly it was not trial counsel who obtained them.

Instead, it was the prosecutor who, on November 10, 1997, brought the Youth Forestry Camp

records to the trial, as part of Petitioner's juvenile file (or J-File). That was the day the case went

to the jury in the guilt/innocence phase and two days before the penalty phase. *See* NT 10/31/05,

25. The records were provided to Dr. Tepper on or after that date. *See* NT 11/12/97, 118

(testimony of Dr. Tepper during sentencing phase:  the reports "were only recently provided);

NT 10/31/05, 125-26 (the J-File contained the Youth Forestry records). Trial counsel had no

recollection of reviewing the J-File. *Id*. at 62. There is no indication he reviewed it at all.

The Youth Forestry records were beneficial to Petitioner. By letter dated February 11,

1987, the Camp informed the County of Philadelphia Juvenile Probation Office that Petitioner's

"adjustment remains consistently positive. He has gained self-esteem and is on the Camper's

Committee. He has benefited from his placement at camp and has met all treatment goals set for

him." App. Exh. No. 30, first page.

This error was particularly prejudicial, as counsel could have used these records to counter the prosecution's evidence that Petitioner had some behavioral or discipline problems at the Sleighton School, NT 11/12/97, 113-18. As Dr. Tepper explained, presenting the Forestry Camp records "would have been a way to show that, with certain kind of guidance or structure, Mr. Natividad had certain either resources or ability to respond" positively to a secure environment. NT 10/31/05, 118.

Counsel also did not present evidence that Petitioner had previously been diagnosed with serious and significant mental health impairments – mixed personality disorder with histrionic, paranoid, and schizoid features, and had been described as showing the signs of an immature individual. App. Exh. No. 45 (Mental Health Evaluation, Adult Probation and Parole Department). Records contained a psychiatric evaluation of Petitioner shows a full scale IQ of 75 and a less-than-6th grade reading level at 16 years old, but showed a marked academic and vocational improvement in a structured setting. App. Exh. No. 46 (Pre-Sentence Report, 7/20/89). Relevant records were available to counsel to present this evidence at the penalty phase, but he inexplicably failed to do so.

> **3.** **Counsel failed to provide his mental health expert with the necessary records and background evidence from interviews of family and neighbors**

Trial counsel hired Dr. Tepper as an expert in psychology but failed to timely provide him with significant mitigation records and other information. Among other lapses, counsel failed to investigate and provide Dr. Tepper with the following information, which would have altered Dr. Tepper's findings.

Counsel failed to investigate or present Dr. Tepper with readily available mitigation evidence that Petitioner's father abused drugs and used cocaine on a daily basis. This evidence would have been "a very important piece of information" in Dr. Tepper's psychological

evaluation. NT 10/31/05, 113-115. Counsel did not present Dr. Tepper with mitigation records of Petitioner's significant history of drug abuse, until after Dr. Tepper interviewed Petitioner, although this information would have supported Dr. Tepper's evaluation of Petitioner's background. NT 10/31/05, 111.

Counsel did not investigate or present Dr. Tepper with evidence from neighbors and members of the family who observed Petitioner's involvement in caring for his mother during her battle with cancer. Had Dr. Tepper had this information, it would have led him, potentially, to re-interview Petitioner and to raise the issue that the event "might have been a little more serious or more time consuming than [Petitioner] first represented." NT 10/31/05, 116-17.

### B.     Petitioner Was Prejudiced by Counsel's Errors

Trial counsel's failure to investigate mitigating evidence deprived the jury of essential mitigating evidence concerning Petitioner's mental health, his family history, his successful adjustment in a correctional facility, his aid to family and neighbors, and other positive aspects of his character. The actual presentation was incomplete, and prejudicial.

In the capital penalty context, Petitioner need only show that had the jury heard all of the relevant evidence, there is a reasonable probability that at least one juror would have considered additional mitigation and struck a different balance in weighing the aggravating and mitigating circumstances. *Wiggins*, 539 U.S. at 536 (prejudice established because reasonably likely that "at least one juror would have struck a different balance"); *Jermyn v. Horn*, 266 F.3d 257, 309 (3d Cir. 2001); *Commonwealth v. Collins*, 888 A.2d 564, 584 (Pa. 2005) ("had the jury heard all of the relevant evidence, there is a reasonable probability that at least one juror would have found an additional mitigating circumstance and struck a different balance in weighing the aggravating and mitigating circumstances"). This inquiry requires a reviewing court to consider *all* of the available mitigating evidence, including the evidence which the jury would have heard if counsel

had conducted a reasonable investigation. *Abdul-Salaam*, 895 F.3d at 269. Here, trial counsel's

failure to investigate and present mitigating evidence deprived the jury of the following

evidence, which would have allowed the jury to find, additional mitigating factors or assign

greater weight to, the statutory mitigating circumstances. *Id.* ("Prejudice may exist even if the

defendant could not have established additional mitigating factors if he can show that but for

counsel's errors he could have 'presented evidence of an entirely different weight and quality'

going to the same mitigating factor established at trial." (citation omitted)).

Counsel failed to fully investigate Petitioner's father, including his constant drug abuse.

Counsel failed to investigate positive deeds performed by Petitioner in the neighborhood,

and failed to present the records of Petitioner's success in his juvenile court commitment,

depriving Petitioner of a specific category of (e)(8) mitigation evidence, i.e., evidence of positive

adjustment in a secure environment. Counsel failed to present records, showing positive

adjustment to commitment, a significantly diminished reading and math capacity prior to

admission, and marked improvement in a structured setting  Counsel failed to present the 1989

PSI of Petitioner, which shows, inter alia, a full scale IQ of 75 and a less-than-6th grade reading

level (from when Petitioner was 16). Counsel also failed to present the 1989 court Mental Health

Evaluation, in which Petitioner was diagnosed with a mixed personality disorder with histrionic,

paranoid and schizoid features, and which describes him as showing signs of an immature

individual.

All of the above, both individually and cumulatively, deprived the jury of pertinent

evidence relating to the (e)(2), (e)(3) and (e)(8) statutory mitigating factors. *Collins*, 888 A.2d at

584 (finding prejudice because PCRA testimony from two experts and Dr. Tepper supported

(e)(2) and (e)(3) mitigating factors); *accord Commonwealth v. Smith*, 995 A.2d 1143, 1167-70

(Pa. 2010) (finding prejudice when two defense post-conviction experts gave testimony supporting (e)(2) and (e)(3) mitigators).

Counsel failed to obtain and present proof of the deceased's unlawful possession of the firearm he was carrying, evidence relevant at the penalty trial to the consideration of victim-impact testimony and the evaluation of the self-defense and robbery claims as they impacted on the existence of one aggravating factor and may have supported mitigation arising from the "circumstances of his crime."

The harm analysis is not undercut by counsel's having presented "some" mitigation evidence. Trial counsel asked minimal questions about Petitioner's drug use and about the impact of his mother's death. Much greater detail of the former was contained in the PSI that counsel had; much greater detail on the latter was in Dr. Tepper's report. Counsel never elicited the details, and never showed the jury that an official court report corroborated the claim of severe drug dependence.

In sum, trial counsel's omissions and ineffectiveness deprived the jury of consideration of important mitigating factors as well as substantial additional (e)(8) evidence. The unpresented mitigation evidence would have personalized Petitioner, added to the jury's understanding of Petitioner's tumultuous upbringing, informed the jury about Petitioner's severe mental impairments, and helped counter and explain the one-sided presentation by the prosecution about Petitioner's criminal history. There is, at a minimum, a reasonable probability that this additional mitigating evidence would have changed the sentencing decision of at least one juror.

In a close case like this one at trial, where some mitigation was found by one or more jurors, there is a reasonable probability a more comprehensive mitigation investigation and

presentation would have led at least one juror to vote for a life sentence. *Abdul-Salaam*, 895 F.3d at 272; *Saranchak*, 802 F.3d at 600.

### C. Evidence Presented in the Habeas Petition

Trial counsel failed to present additional evidence set forth in the habeas petition.

#### 1. Failure to present Petitioner's social history

Counsel failed to conduct a reasonable mitigation investigation of Mr. Natividad's family. He failed to obtain Petitioner's compelling social history. While trial counsel spoke in his office with Petitioner's brother, Benito, Jr. ("Tony"), and sister, Juanita Rouse, he did not interview them about their family history. He simply discussed the status of Petitioner's case. Declaration/Affidavit of Benito Natividad, Jr., ¶ 15, App. Exh. No. 20. Despite a letter from Dr. Tepper reporting that Petitioner's brothers and sisters would be able to offer information on his family, trial counsel did not conduct any mitigation interviews with them.

Counsel's failure to conduct an adequate investigation of Mr. Natividad's background left him ignorant of the family dysfunction that characterized his childhood. As a result, counsel missed substantial mitigation. Petitioner's mother, Delores Vaughan, was thirteen years old (1945) when she became pregnant with her first child, Harvey. A year later, she gave birth to her second child, Juanita. Declaration/Affidavit of Harvey L. Vaughan, Sr., ¶ 2, App. Exh. No. 21. Delores's mother, Addie, raised these children as Delores grew up.

Delores drank to excess and smoked when she was pregnant with Petitioner. As a little boy, Rick's legs were bowed out and he wore a leg brace which made him look strange. Declaration/Affidavit of Juanita Rouse, ¶ 8, App. Exh. No. 22. To Rick's distress, everyone favored his younger brother, Satario, who was very handsome. For love and affection, Rick went to his mother's best friend and drinking companion, Florence Gregory, whom he called, Aunt Flo. Rouse Aff. ¶9.

As a boy, Rick was frequently injured, including a sledding accident where he was knocked unconscious. Benito Jr. Dec., ¶ 9. Later, he was injured in car and motorcycle accidents. Declaration/Affidavit of Genardo McIlwain, ¶ 9, App. Exh. No. 23.

Benito, Sr., whom the family called Benny, was an unfaithful hustler, running around with many women, including Harvey's wife, and much later, his son Satario's teenage girlfriend. He ran a speakeasy, an illegal bar, where he sold not only alcohol, but also drugs. Rick's parents got into fights frequently about money and Benny's running around. Rick cried when his parents fought. He would get so angry he would not listen to anyone. If Aunt Flo was there when there was a fight, she would talk real soft to him, hug him and calm him down. Vaughan Dec., ¶ 12; Rouse Dec. ¶ 5; Benito Jr. Dec.., ¶¶ 6, 11.

Harvey, Rick's oldest brother, gave his phone number to Rick's brother and sister, Tony and Janine (called "Nene" by the family) so they would call him when their parents were fighting. Harvey came over and broke up fights. He kicked Benny out of the house twice. During one confrontation, Benny pulled a Beretta out of a boot and Harvey pulled a .45 out of his back waist band and there was a stand off after which Benny retreated to his room and cried. Vaughan Dec. ¶ 10.

Benny drove a truck and was frequently away from home. When he was home, Benny beat his children with a wooden slat, raising welts. He beat them when he was drunk and Rick's mom called Harvey because she was afraid he would miss and hit the children's spines and paralyze them. Vaughan Dec. ¶ 15.

Rick's parents did not make school a priority. His mother let Rick and his siblings choose not go to school if they did not want to go. McIlwain Dec., ¶ 6.

Rick was his father's "pick." His father kept picking on him until he became the son he wanted. Because Rick was quiet and stand-offish, his father thought he was tough. When Rick got out of juvenile placement, Rick's father groomed him to sell drugs out of the speakeasy. Rick's father introduced him to the fast life of the drug culture. Rouse Dec. ¶¶ 10-11.

Before Rick's mother died, his Aunt Flo died and Rick took it hard. After she died, he started drinking more and Flo's death made it harder for him to see his Mom lay dying in 1995. Rouse Dec., ¶ 12.

Shortly after Flo's death, his sister Nene, was shot and killed. Rick had a special relationship with her. When they were young, Rick and Nene were playmates and companions. He took her death hard, along with the rest of his family. Benito Jr. Dec., ¶ 12. After Nene was shot and killed, Rick's mother would cry in her kitchen, "My Nene, my Nene." Vaughan Dec., ¶ 21.

After Rick's mother passed away and before the shooting of Mr. Campbell, Benny was arrested for molesting his granddaughter (Tony's daughter and Rick's niece), Benita. Benita was like a daughter to Rick. The molestation tore Rick up and it seemed like he was trying to kill himself with booze and pills. He was high all the time after that. Vaughan Aff. ¶ 13; Rouse Aff. ¶ 13; Benito Jr. Aff. ¶ 14.

Counsel never presented this compelling story at trial because counsel had failed to conduct an adequate investigation. The failure in *scope* of investigation was compounded by the *manner* in which the mitigation witness investigation was conducted. Telephone and letter interviews of witnesses are discouraged; they neither impress on the witness the full importance of disclosure nor secure detailed and often difficult-to-reveal information.

### 2.      Failure to present available evidence of severe impairments and brain damage

Counsel failed to investigate Mr. Natividad's mental health problems. Even though counsel knew that Petitioner had a history of accidents and injuries, abused drugs and alcohol, that his mother was a heavy drinker and that he grew up in an abusive home, counsel did not have a neuropsychologist examine Petitioner. Children's Hospital records of Petitioner as a child show that Petitioner lost consciousness in a sledding accident. App. Exh. No. 24, at p.35.

Neuropsychologist Carol Armstrong, Ph.D. reports to a reasonable degree of neuropsychological certainty that Petitioner has a set of severe impairments and brain dysfunction in the area of executive functioning located in the frontal lobes. He is severely impaired in basic logical and deductive reasoning, and has difficulty developing a logical sequence. His divided attention, perceptual organization and control of impulsivity are all severely impaired. He has a history of chronic asthma and head injuries severe enough to cause these injuries. Also, Delores' heaving binge drinking put Petitioner at risk for fetal alcohol effects. His brain injuries cause him to decompensate under stress, becoming less adaptive and more dysfunctional. They affect his ability to make reasoned judgments and to control his behavior when he is under stress. These neuropsychological results could have been found and presented at the time of trial. Report of Carol L. Armstrong, Ph.D., App. Exh. No. 25.

Petitioner's brain dysfunction existed at the time of these offenses and is an extreme mental disturbance under 42 Pa. C.S. §9711(e)(2) ("The defendant was under the influence of extreme mental or emotional disturbance."). Petitioner's history contained red flags for brain damage, *e.g.*, accidents where he was knocked unconscious, low IQ scores, counsel did not have him examined for brain damage and missed this compelling evidence.

### D. The State Court Opinion

The Pennsylvania Supreme Court denied relief on the ineffectiveness claim raised by post-conviction counsel. The court said that Petitioner's claim that Dr. Tepper was not informed about Petitioner's father's drug abuse affected Petitioner did not prove that Petitioner was prejudiced. The court asserted that Dr. Tepper testified during the sentencing phase of the trial that Petitioner's father was not present during Petitioner's formative years. *Natividad-2* at 332. The state court added that it concluded there was no prejudice because Dr. Tepper did not state that the additional information would have changed his diagnosis. *Id.* at 333.

The state court added that the numerous affidavits about Petitioner taking care of family members did not lead Dr. Tepper to any additional diagnosis. Accordingly, the court said Petitioner was not prejudiced. *Id.*

With respect to unpresented mitigation witnesses, the state court said that trial counsel was only asked about one of them, April Brown, whom he said was "extremely hostile." The court said counsel had a reasonable basis for not presenting her. It would not grant relief on the basis of the other witnesses because counsel was not asked about them, it said. *Id.*

With respect to the unpresented Youth Forestry records, the court stated that trial counsel *was* unreasonable for not using them at trial. *Id.* at 335. The court held that counsel was unreasonable when he said he did not use them because they showed that Petitioner could not be rehabilitated. *Id.* The court stated that the Youth Forestry report "clearly details that Appellant had complied with all of the camp's goals." The court added, "Thus, the camp did not, as the Commonwealth implies, give up on Appellant, but rather suggested that Appellant had adequately satisfied the requirements for leaving camp." *Id.* In other words, the records showed that Petitioner *could* be rehabilitated.

105

The court acknowledged that, at the PCRA hearing, Dr. Tepper testified that the Youth Forestry records "would have been a way to show that, with certain kind of guidance or structure, [Appellant] had certain either resources or ability to respond." *Id*.

The state court went on to claim, however, that Petitioner was not prejudiced. He had accumulated a significant history of drug abuse and criminal activity soon after he left the camp. The court speculated that this history, although not explored at the PCRA hearing, may have lead counsel not to use the records. It also stated that there was no prejudice because Dr. Tepper had the opportunity to reference the records during cross-examination but did not. *Id*. & n.21.

### E.      The Decision of the Pennsylvania Supreme Court Violated AEDPA

The decision in *Natividad-2* violated AEDPA. First, the state court was unreasonable when it held that Petitioner was not affected by his father's drug use because his father was not present during Petitioner's "formative years." That determination is an unreasonable determination of fact. Petitioner's father was present during years when Petitioner was impressionable. Dr. Tepper testified that Petitioner had little contact with his father until Petitioner was 12 years old. NT 10/31/05, 133. Petitioner had contact with his father at age 12 which is young enough for his father's behaviors to influence Petitioner.

Second, the state court's decision was based on an unreasonable determination of fact and was contrary to and/or an unreasonable determination of federal law when the court excused counsel from conducting a competent mitigation investigation. The court said that it would not grant relief on this claim because counsel was not asked about a number of the mitigation witnesses who were presented in the PCRA proceedings. However, almost all of these witnesses were not named in counsel's notes. NT 10/31/05, 81-84. Where counsel has not conducted an adequate investigation in preparation for sentencing, he cannot make reasonable decisions about what evidence to present at sentencing. *Abdul-Salaam*, 895 F.3d at 268; *Blystone v. Horn,* 664

F.3d 397, 420 (3d Cir. 2011). Here, counsel did not conduct the constitutionally-required, thorough investigation in this capital case. *Porter*, 558 U.S. at 39; *Rompilla*, 545 U.S. at 380-83; *Wiggins*, 539 U.S. at 524; *Williams*, 529 U.S. at 396. Counsel only had an investigator for the "fact part of the case." NT 10/31/05, 86. Trial counsel never asked the investigator to help with mitigation witnesses. *Id*. Since counsel failed to adequately investigate Petitioner's background, it was unreasonable for the court to determine that counsel should have been asked about witnesses for which he had no notes.

Third, the state court's conclusion that prejudice was not shown because any new information would not have changed Dr. Tepper's diagnosis was an unreasonable application of the *Strickland* prejudice standard. There is not requirement that a diagnosis must change, or a new diagnosis must emerge, as a result of counsel's deficient investigation. Rather, Supreme Court case law requires a reviewing court to examine prejudice in light of all of the evidence presented at trial and in post-conviction proceedings. Here, the evidence counsel failed to present would have strengthened and corroborated Dr. Tepper's testimony and would have provided the jury with reasons to give Dr. Tepper's testimony additional weight. One or more jurors could have relied on that evidence to weigh the evidence in favor of a life sentence. The Pennsylvania Supreme Court's determination that there was no prejudice because there was no change in diagnosis failed to apply the correct standards and was, thus, contrary to, and an unreasonable application of, *Strickland, Williams,* and *Sears.*

Fourth, the state court decided – favorably to Petitioner – that trial counsel was unreasonable for failing to use the Youth Forestry Records to show that Petitioner responded positively with "guidance or structure." In other words, counsel performed deficiently. However,

the state court's decision that Petitioner was not prejudiced by counsel's failure to use the Youth Forestry records was contrary to or an unreasonable determination of federal law.

The state court reasoned that there was no prejudice because Petitioner engaged in significant drug abuse and criminal activity following his period of time in the Youth Forestry Camp. However, the court failed to distinguish between the time Petitioner spent in a structured environment and time he spent in an unstructured environment – on the street. The Youth Forestry experience, as Dr. Tepper noted, was structured. The subsequent time period, when Petitioner abused drugs and was involved in criminal activity – was not structured. Petitioner's time in the Youth Forestry Camp was directly relevant how he would conduct himself when incarcerated, if sentenced to life.

The Pennsylvania Supreme Court's decision is contrary to and/or an unreasonable application of United States Supreme Court precedent that time in prison or a structured environment is mitigating. The United States Supreme Court has held that "there is no question but that . . . inferences [that a life sentenced defendant would not pose a future danger to society] would be 'mitigating' in the sense that they might serve 'as a basis for a sentence less than death.'"  *Skipper v. South Carolina*, 476 U.S. 1, 4-5 (1986) (quoting *Lockett v Ohio*, 438 U.S. 586, 604 (1978)). Therefore, "evidence that the defendant would not pose a danger if spared (but incarcerated) must be considered potentially mitigating." *Id*. at 4; *accord Simmons v. South Carolina*, 514 U.S. 154, 163-64 (1994) ("there may be no greater assurance of a defendant's future nondangerousness to the public than the fact that he never will be released on parole"). *Skipper* and *Simmons* hold that the jury can properly consider as important mitigation how a defendant acts in a structured prison environment. The Pennsylvania Supreme Court's refusal to

recognize that Petitioner's good reviews from Youth Forestry were based on his time in a structured environment was contrary to *Skipper* and *Simmons*.

The state court asserted there was no prejudice because Dr. Tepper had opportunities to discuss the Youth Forestry records on cross-examination, but did not make use of those opportunities. *Natividad-2* at 335. However, it was counsel's responsibility to ask questions and the expert's job to answer. Under *Strickland v. Washington*, 466 U.S. 668 (1984), counsel has the obligation to make sure the adversarial process works. *Id*. at 687; *see Commonwealth v. Basemore*, 744 A.2d 717, 735 (Pa. 2000) ("different light falls upon counsel's performance depending upon whether he asked and was not told, or he did not ask and therefore was not told"). *Strickland* does not state that it is the expert's role to make sure the adversarial process works. Here, counsel was permitted to ask questions of Dr. Tepper on redirect. However, he did not ask about the Youth Forestry records. Since counsel had no recollection of reviewing those records and since the records were obtained – by the prosecution – when the jury was deliberating the guilt-innocence phase evidence, it is reasonable to conclude that counsel simply turned the Youth Forestry records over to Dr. Tepper and did not review them personally. He testified he had no recollection of reviewing them. Because counsel did not ask the relevant question about whether Petitioner was successful in the Youth Forestry program, counsel did not "ensure that the adversarial testing process work[ed]." The Pennsylvania Supreme Court's placement of the burden on the expert to ensure that the adversarial process worked was contrary to and/or an unreasonable application of *Strickland*.

Finally, the state court asserted that Petitioner had failed to develop claims concerning his diagnosis of a mixed personality disorder and low 75 IQ *Natividad-2* at 333. *See* Brief for Appellant at 16, 68, 72, App. Exh. No. 26. However, with respect to the low IQ score, Petitioner

109

cited *Tennard v. Dretke*, 542 U.S. 274, 288 (2004), for the proposition that "[e]vidence of significantly impaired intellectual functioning is obviously evidence that might serve as a basis for a sentence less than death[.]" Brief for Appellant at 68-69, App. Exh. No. 26. Based on the explanation of the relevance of the IQ score in Petitioner's brief, the Pennsylvania Supreme Court's analysis that Petitioner failed to develop the mitigating relevance of the 75 IQ is contrary to or an unreasonable application of *Tennard*. In addition, *Tennard* also holds that mitigating evidence may be considered even if it does not have a nexus to the crime. *Id.* at 284. Thus, the Pennsylvania Supreme Court's failure to consider the diagnosis of personality disorder – as well as, the low IQ score – are contrary to *Tennard*'s holding that mitigating evidence does not have to have a nexus to the crime.

## F. Post-Conviction Counsel Was Ineffective Under *Martinez*

Neither trial counsel nor state post-conviction counsel presented a social history of the Petitioner or the available evidence that Petitioner tested positive for extreme brain dysfunction. This evidence is so significant that it fundamentally alters the ineffective assistance claim raised in post-conviction and, thus, constitutes a separate claim of ineffective assistance. Although this new claim was not raised in state court, and is therefore defaulted, merits review is not precluded because state post-conviction counsel was ineffective for failing to properly investigate and raise this claim.

At Petitioner's trial, his counsel was ineffective for failing to present Petitioner's brothers, Harvey Vaughan Sr. and Benito Natividad, Jr.; sister, Juanita Rouse; and uncle, Genardo McIlwain. These witnesses provided otherwise unpresented evidence concerning Petitioner's upbringing and the chaotic and violent environment in which he was raised. Without these witnesses, trial counsel could not present a complete picture of Petitioner's life.

In addition, counsel performed deficiently when he did not have Petitioner evaluated for brain damage. Petitioner had been in accidents, had abused drugs and had learning difficulties – all things trial counsel knew. For example, Children's Hospital records report that Petitioner lost consciousness in a sledding accident. Despite these red flags, trial counsel did not have Mr. Natividad evaluated by a neuropsychologist who tests for brain damage.

State post-conviction counsel did not present Vaughan, Sr., Rouse, or McIlwain. Post-conviction counsel did not conduct a competent interview of Petitioner's brother, Benito, Jr. Plus, post-conviction counsel did not present evidence of Petitioner's brain damage as found by Dr. Armstrong. State post-conviction counsel was ineffective in failing to complete a thorough mitigation investigation that would yield a social history.

Post-conviction counsel retained a neuropsychologist, Dr. Russell Woessner, who found Petitioner to have some severe impairments in executive functioning. To confirm these results, the expert recommended further evaluation and retesting. However, post-conviction counsel did not do so and instead did not pursue brain damage as mitigation at all. *See* Declaration of Jules Epstein, App. Exh. No. 28. Any failure to exhaust the claims based on these witnesses' declarations and the neuropsychological report of brain damage is excused under *Martinez v. Ryan*, 566 U.S. 1 (2012). The claim of ineffective assistance of trial counsel is meritorious and state post-conviction counsel performed unreasonably.

### G.   Petitioner Was Prejudiced

This is a case where the jury found mitigation. The one juror prejudice standard is not onerous. If the jury had been presented with the additional information of Petitioner's chaotic and violent upbringing and the scientific evidence of his severe executive dysfunction, there is a reasonable probability that at least one juror would have voted for life. *See, e.g., Jefferson v. Upton*, 560 U.S. 284, 285 (2010) (finding "permanent brain damage" that "causes abnormal

behavior," resulting from head injury); *Sears*, 561 U.S. at 946 ("frontal lobe brain damage");

*Porter*, 558 U.S. at 41; *Rompilla*, 545 U.S. at 392; *California v. Brown*, 479 U.S. 538, 545

(1987) (O'Connor, J., concurring) ("evidence about the defendant's background and character is

relevant because of the belief, long held by this society, that defendants who commit criminal

acts that are attributable to a disadvantaged background, or to emotional and mental problems,

may be less culpable than defendants who have no such excuse."); *see also Abdul-Kabir v.*

*Quarterman*, 550 U.S. 233, 256 (2007) (even "possible neurological damage" is mitigating);

*Bond v. Beard*, 539 F.3d 256, 291 (3d Cir. 2008) ("*Strickland* permits relief where, as here, trial

counsel presented some mitigation evidence but could have introduced evidence that was

upgraded dramatically in quality and quantity"); *Outten v. Kearney*, 464 F.3d 401, 421 (3d Cir.

2006) ("Simply because some mitigating evidence regarding Outten's abusive childhood was

introduced to the jury . . . it does not follow that the jury was provided with a comprehensive

understanding of Outten's abusive relationship with his father or other aspects of his troubled

childhood.").

   Moreover, the Pennsylvania Supreme Court's analysis of the claim that post-conviction

counsel presented does not survive AEDPA analysis. As a consequence, this Court should

consider the mitigation presented in post-conviction.

   Under *Strickland*, to determine prejudice resulting from trial counsel's failures, this Court

cumulates the evidence presented at trial, the evidence presented in post-conviction, and the

evidence presented in the federal habeas petition. *Wiggins*, 539 U.S. at 536 (to assess prejudice,

the Court "evaluate[s] the totality of the evidence – 'both that adduced at trial, and the evidence

adduced in the habeas proceeding[s].'"); *Williams*, 529 U.S. at 397-98 (court must consider

cumulative effect of all mitigating evidence). As a consequence, this Court considers the

mitigating effect of all of the following:  Petitioner's violent and chaotic upbringing, Petitioner's

severe brain dysfunction, his extreme mental disturbance under (e)(2), the evidence of

Petitioner's positive adjustment in Youth Forestry Camp, his numerous good deeds in the

community, having – as a role model – a father who was a drug abuser who groomed Petitioner

to sell drugs, and, as the jury learned at trial, the impact of his mother's death on Petitioner. The

jury already found some mitigation. There is a high probability that, had the jury known all the

mitigating facts, at least one juror would have voted for life.

Petitioner is entitled to relief.

## XI. THE COMMONWEALTH'S PRESENTATION OF VICTIM IMPACT EVIDENCE AND ITS DILATORY NOTICE OF VICTIM IMPACT EVIDENCE VIOLATED PETITIONER'S RIGHTS UNDER THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS.

### A. Pennsylvania's Victim Impact Statute and the Trial Testimony

Pursuant to 42 Pa. C.S. § 9711(a)(2) and (c)(2), the Commonwealth presented victim

impact evidence in this case. The statute provides:

**§ 9711. Sentencing procedure for murder of the first degree**

**(a) Procedure in jury trials.**

(2) In the sentencing hearing, evidence concerning the victim and the impact that
the death of the victim has had on the family of the victim is admissible.
Additionally, evidence may be presented as to any matter that the court deems
relevant and admissible on the question of the sentence to be imposed. Evidence
shall include matters relating to any of the aggravating or mitigating
circumstances specified in subsections (d) and (e), and information concerning the
victim and the impact that the death of the victim has had on the family of the
victim. Evidence of aggravating circumstances shall be limited to those
circumstance specified in subsection (d).

\* \* \*

**(c) Instructions to jury.--**

(2) The court shall instruct the jury that if it finds at least one aggravating
circumstance and at least one mitigating circumstance, it shall consider, in

weighing the aggravating and mitigating circumstances, any evidence presented about the victim and about the impact of the murder on the victim's family. The court shall also instruct the jury on any other matter that may be just and proper under the circumstances.

As amended, 1995, October 11, P.L. 1064, No. 22 (Special Session No. 1), § 1.

In this case, on November 10, 1997 at 3:00 p.m., the Commonwealth notified Petitioner that it intended to present victim impact testimony in the sentencing phase. On the next day, Veteran's Day (November 11, 1997), the Commonwealth provided Petitioner's counsel with a copy of the victim impact statement. The sentencing phase, with the victim impact testimony, was conducted on the following day, November 12, 1997.

The testimony of the victim's widow, Patricia Campbell, proceeded as follows:

BY MR. SAX:

Q.      Mrs. Campbell, Bob Campbell was your Husband?

A.      Yes.

Q.      Did you prepare a so-called victim impact statement for the jury?

A.      Yes, I did.

Q.      Would you please read it to the ladies and gentlemen of the jury if you have a copy of it in front of you?

A.      Yes, I do.

Q.      Please read it.

A.      Bob Campbell was born in the Overbrook Section of Philadelphia on July 12, 1947. He was the only son of Stan and Rose Campbell. He served in the United States Army and was stationed in Korea. After his honorable discharge he started his career as an ironworker for Local 401 which lasted 24 years. In 1996 he started a new occupation as a security guard. I married Bob on June 24, 1978 and we made our home in the Overbrook section of Philadelphia.

Q.      Slow down a little bit.

The Court: Go Ahead. That's all right. Go ahead. Take your time.

The Witness: We have four children and two grandchildren whom he adored. Bob was a loving husband, father, grandfather and son. Bob never hesitated to come to the aid of anyone who needed help. Bob was a fun loving guy who loved and respected life. Bob coached and organized little league baseball for the Overbrook AA for many years. He also coached for Our Lady of Lourdes Football and Basketball teams. Bob was an active town watch member and was very involved in his community. Since the death of my husband our family has been devastated. I have now become the sole provider for my family, something I have never had to do before. Our grandson Andrew who will be seven years old remembers when Grandpop taught him to hit his first baseball but Bob never had a chance to see his Grandson play in his first game. Our Granddaughter Samantha who turned two on the 4th of July will only remember her Pop Pop by the pictures we have to show her. Our youngest daughter Amanda will not have her father present at her high school graduation or have him give her away at her wedding like he did our oldest daughter Michelle. Our sons John and Ken will no longer be able to ask their father for advice or share their day-to-day experiences with Bob.

We lost a loving husband, father, grandfather and son who was always there when we needed him. We are living with a huge void in our lives. Life has not been the same without him. Gone are the big arms he would put around me and the times we would walk the dog together holding hands. Gone are the holiday barbecues, the backgammon games, pitching horseshoes and his help when a strong hand was needed.

We are thankful for Bob Campbell's life, his courage, and diligence in the face of all odds, and for his loving of family and friends. Rest assured that Big Bob Campbell will always remain in our hearts.

Mr. Sax: Thank you. Thank you.

The Court: Any Questions?

Thank you, Mrs. Campbell, you may step down.

NT 11/12/97, 56-59.

At the close of the sentencing phase, the trial court instructed the jury as follows:

Now, members of the jury, you have heard testimony about the victim and about the impact of the killing on the victim's family.

Victim impact is not an aggravating circumstance, may not be so considered and is not a reason to impose the death penalty. Should you find at least one aggravating circumstance and at least one mitigating circumstance, only then may you even consider this testimony and only for the very limited purpose of helping you to determine whether or not the aggravating circumstance outweigh the mitigating circumstance.

> The sentence you impose must be in accordance with the law as I instruct you and not based on sympathy, prejudice, emotion, or public opinion and not based on victim impact.

NT 11/12/97, 146-47.

In its deliberations, the jury found two aggravating factors: the defendant committed a killing while in the perpetration of a felony, and he had a significant history of felony convictions involving the use or threat of violence to the person. It found one mitigating circumstance: Petitioner's life history. NT 11/12/97, 156.

**B.      The Eighth Amendment Violation**

Pennsylvania's victim impact statute violates the Eighth Amendment. The statute does not provide proper guidance for consideration of victim impact evidence, so it disrupts the careful weighing process required in deliberations concerning capital sentences. *Tuilaepa v. California,* 512 U.S. 967, 972-73 (1994) ("The State must ensure that the process is neutral and principled so as to guard against bias or caprice in the sentencing decision."). The victim impact statute introduces an arbitrary factor into the jury's sentencing decision. The statute violates the hallmark Eighth Amendment requirement that a capital sentencing jury must be permitted to consider and give full effect to all relevant mitigating evidence. *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982) ("[T]he sentencer in capital cases must be permitted to consider any relevant mitigating factor"); *Lockett v. Ohio*, 438 U.S. 586, 605 (1978). The absence of a provision for pre-trial notice in the statute adversely impacts the adversarial process, the integrity of which provides the capital sentencing hearing with the heightened reliability required by the Eighth Amendment. *Lankford v. Idaho,* 500 U.S. 110, 127 (1991) (citing *Strickland*, "[i]f notice is not given, and the adversary process is not permitted to function properly, there is an increased chance of error, and with that, the possibility of an incorrect result" (citations omitted)).

116

C.      **Due Process and Sixth Amendment Violations**

The victim impact statute also violates the Due Process Clause of the Fourteenth

Amendment. It makes no provision for adequate notice. Given "the potential victim impact

testimony carries to inflame the passions of the jury," *Natividad-1* at 180 n.4, adequate notice is

important. *Rock v. Arkansas*, 483 U.S. 44, 51 (1987) ("The necessary ingredients of the

Fourteenth Amendment's guarantee that no one shall be deprived of liberty without due process

of law include a right to be heard and to offer testimony . . . a person's right to reasonable notice

of a charge against him, and an opportunity to be heard in his defense – a right to his day in court

– are basic in our system of jurisprudence"); *see Commonwealth v. Thompson*, 281 A.2d 856,

858 (Pa. 1971) ("While not capable of exact definition, the basic elements of procedural due

process are adequate notice, opportunity to be heard, and the chance to defend oneself before a

fair and impartial tribunal having jurisdiction of the case."). Due process (and the Sixth

Amendment) require that, because a defendant has a right to an impartial jury, counsel be

permitted to voir dire the jury concerning their consideration of victim impact evidence. *Ristaino*

*v. Ross*, 424 U.S. 589, 595 n.6 (1976) (a criminal defendant in a state court is guaranteed an

impartial jury by the Sixth Amendment); *Duncan v. Louisiana*, 391 U.S. 145 (1968); *Irwin v.*

*Dowd*, 366 U.S. 717, 722 (1961) (principles of due process guarantee a defendant an impartial

jury).

In this case, the Pennsylvania Supreme Court dictated the following rule about when and

how the Commonwealth should provide *pre-trial* notice of victim impact evidence:

> Adequate notice is one of the essential elements of procedural due process.
> *Commonwealth v. Thompson*, 444 Pa. 312, 281 A.2d 856, 858 (1971). We agree
> that the better practice is to require notice of the intent to introduce victim impact
> testimony prior to trial. A requirement of notice prior to trial enables the
> defendant to investigate the background of the decedent, and *prepare for potential*
> *victim impact testimony **prior to jury selection***. Nor is it a burden for the

Commonwealth to provide pretrial notice limited to a list of potential witnesses and a brief outline of their proffered testimony.

*Natividad-1* at 178.

Here, the Commonwealth did not abide by these dictates. The prosecutor tendered the notice at the conclusion of the guilt/innocence phase at approximately 3:00 p.m. on November 10, 1997. The Commonwealth provided Petitioner with a copy of the proposed testimony the next day, November 11, 1997, which was a holiday, Veterans Day. As a result of the holiday, the sentencing phase commenced on the following day, November 12, 1997. It was simply and profoundly inadequate notice. There was not adequate time to investigate the statement or consider how to respond to it.

As a result, Petitioner had to shift his concentration from preparing and presenting mitigating circumstances and rebutting aggravating circumstances to considering how to rebut victim impact evidence.

Because Petitioner did not learn of the victim impact until after jury selection, he had no chance to ask potential jurors about whether they would be unduly swayed by victim impact testimony. He had no chance to ask potential jurors if they would be unable to weigh the mitigating factors presented at the sentencing phase. He had no chance to exercise challenges for cause or peremptory challenges based on the venire members' responses to questions about victim impact testimony. The Commonwealth's delinquent notice deprived Petitioner of his right to proceed as other capital defense attorneys "commonly" proceed.

In addition, the delinquent notice in this case violated Petitioner's Sixth Amendment rights to a fair trial and effective assistance of counsel. Here, the Commonwealth's delinquent notice gave Petitioner less than 48 hours to investigate, corroborate or refute and prepare for the victim impact testimony the Commonwealth said it would offer. Accordingly, the

Commonwealth created a situation where it denied Petitioner his constitutional right to effective counsel.

Counsel was deprived of additional time – and any meaningful time after the notice – to find out that Mr. Campbell, the victim, did not have a license to carry the gun he had on his person at the time he was shot. Such evidence, stipulated to at the post-conviction evidentiary hearing, would have rebutted the victim impact testimony the Commonwealth presented. Trial counsel testified that it would have been useful that the jury might have found that the shooting would not have happened if Mr. Campbell had not been carrying a gun, as he should not have been. NT 10/31/05, 93-94; *see generally* Claim IV.

### D.      The State Court Opinion

By a slim 4-3 margin, the Pennsylvania Supreme Court rejected Petitioner's argument that the victim impact testimony was unconstitutional. The majority declared that Petitioner "had more than twenty-four hours to discover information relevant to [the witness'] credibility and to investigate the specific information about [the victim's] life prior to the statement being presented to the jury." *Natividad-1* at 179-80. The court stated it could find no prejudice suffered by Petitioner. It "reject[ed] appellant's specific error, [but] reaffirm[ed its] position that in all future cases, notice must be provided prior to trial." *Id.* at 180.

In a vigorous dissent, Justice Nigro found it "inexplicable" that the majority would not grant Petitioner the very same pretrial notice it now required the Commonwealth to grant all future capital defendants:

> [P]rior notice is not just a better practice, but a constitutional due process requirement. . . . Contrary to the majority, I do not believe that giving Appellant little more than one day's notice that the Commonwealth would be introducing victim impact testimony satisfies due process requirements, particularly in a capital sentencing proceeding where the life of the defendant hangs in the balance.

*Id*. at 182 (Nigro, J., dissenting).

The court further rejected Petitioner's federal constitutional challenges to the victim impact evidence by referring to its reasoning set forth in another case that the court decided on the same day, *Commonwealth v. Means,* 773 A.2d 143 (Pa. 2001). *Natividad-1* at 177 ("for the reasons stated in *Means*, we deny appellant's constitutional challenges to the introduction of victim impact testimony during the penalty phase of his capital case."). The *Means* court, also in a 4-3 decision, reversed a trial court's decision that the victim impact statute provided "insufficient guidance to the jury on how to weigh the testimony of victim impact in the deliberative process" and, thus, was not "structured to eliminate arbitrary and capricious actions by the jury." *Means*, 773 A.2d at 146.

The court in *Means* stated that "[t]he absence of directions on what weight should attach to victim impact testimony does not affect the constitutional balance as there is no constitutional requirement that the jury be advised on this point." *Id*. at 154. The *Means* court added, "Although *Payne* did not address the need for specific instructions to the jury on victim impact testimony, the opinion presupposes that by application of the general rules regarding admissibility and relevancy, fundamental fairness can be maintained." *Id*. at 152 *(*citing *Payne v. Tennessee*, 501 U.S. 808, 825, 831 (1991)). The court did not address Means' argument that *Tuilaepa*, requires courts to guide juries in weighing states through the selection phase to ensure aggravating factors do not infringe upon the constitutional right to a sentencing decision free from bias and caprice. *Id*. at 973 (there remains a limiting factor that governs deliberations: "[t]he state must ensure that the process is neutral and principled so as to guard against bias or caprice in the sentencing decision").

In dissent, Justice Nigro disagreed with the majority's interpretation of *Payne*:

Unlike the majority, I believe, that the admission of victim impact evidence in such an unguided fashion, to be used by the jury without any direction whatsoever in balancing aggravating and mitigating factors, violates the fundamental fairness required by the Due Process Clause of the Fourteen Amendment. . . . With so little direction on how the victim impact evidence is to be applied, the jury's discretion is, in effect, left totally unchecked. The amended statute thereby injects the very kind of arbitrary and impermissible factor into the jury's sentencing decision that this Court prohibited in [*Commonwealth v.*] *Fisher*[, 681 A.2d 150 (Pa. 1996)].

*Means*, 773 A.2d at 162-164 (Nigro, J.).

In a separate dissent, Justice Zappala, joined by Chief Justice Flaherty, agreed:

At a minimum, the introduction of such evidence is incompatible with precedent of our Court providing that "victim impact evidence," unaccompanied by restrictions as to its presentation or guidelines as to its evaluation, unconstitutionally interjects arbitrariness into the capital sentencing scheme. Because the Opinion Announcing the Judgment of the Court has flagrantly disregarded this rule of law and upheld the victim impact provisions of the capital sentencing statute, I vigorously dissent.

*Id*. at 161.

### E.    The Decision of the Pennsylvania Supreme Court Violated AEDPA

The Pennsylvania Supreme Court's decision in this case is contrary to and/or an unreasonable application of a number of United States Supreme Court cases cited above.

First, it is contrary to and/or an unreasonable application of *Tuilaepa*, which held that "[t]he State must ensure that the [death penalty sentencing] process is neutral and principled so as to guard against bias or caprice in the sentencing decision." 512 U.S. at 972-73 (1994). Here, the trial court's limited instructions to the jury were not accurate or sufficient to "guard against bias or caprice."

Second, the decision is contrary to and/or an unreasonable application of the decisions requiring adequate notice to respond to the prosecution's case. *Lankford,* 500 U.S. at 127 (citing *Strickland*, "If notice is not given, and the adversary process is not permitted to function properly, there is an increased chance of error, and with that, the possibility of an incorrect

result."); *accord Payne*, 501 U.S. at 827 (if the conduct of the sentencing "so infects the sentencing proceeding as to render it fundamentally unfair, the defendant may see appropriate relief under the Due Process Clause of the Fourteenth Amendment"); *see Rock*, 483 U.S. at 51 ("The necessary ingredients of the Fourteenth Amendment's guarantee that no one shall be deprived of liberty without due process of law include a right to be heard and to offer testimony . . . a person's right to reasonable notice of a charge against him, and *an opportunity to be heard in his defense* – a right to his day in court – are basic in our system of jurisprudence[.]" (quotation omitted) (alternation in original)).

Third, the delinquent notice violated Petitioner's Sixth Amendment rights to a fair trial and effective assistance of counsel. In *Williams v. Taylor*, 529 U.S. 362, 395 (2000), the United States Supreme Court held that counsel's performance was deficient at sentencing where "[t]he record establishes that counsel did not begin to prepare for that phase of the proceeding until a week before the trial." Here, the Commonwealth's delinquent notice gave Petitioner less than 48 hours to investigate, corroborate or refute and prepare for the victim impact testimony the Commonwealth said it would offer. These circumstances are even more compelling than the deficient performance found in *Williams*. As a result, the Commonwealth created a situation where it denied Petitioner his constitutional right to effective counsel and the Pennsylvania Supreme Court's decision was contrary to and/or an unreasonable application of *Williams*.

Petitioner requests that the Court grant the writ and vacate his death sentence.

## XII.   PETITIONER IS ENTITLED TO A NEW SENTENCING HEARING WHERE THE COURT IMPROPERLY INSTRUCTED THE JURY ON THE NATURE AND USE OF AGGRAVATING AND MITIGATING FACTORS, AND WHERE TRIAL COUNSEL FAILED TO OBJECT OR REQUEST APPROPRIATE INSTRUCTIONS.

Petitioner is entitled to a new sentencing hearing because the trial court's uncorrected misstatements of law in jury instructions substantially impaired the ability of the empaneled

jurors to follow the law and render a verdict consistent with the Sixth, Eighth and Fourteenth Amendments. The trial court failed to provide instructions necessary to give full effect to mitigating evidence, and provided instructions that affirmatively misstated the nature and use of mitigating evidence and impaired the jury's ability to give mitigating effect to the evidence that was presented. Trial counsel was ineffective for failing to object to the trial court's instructions.

**A.     The Trial Court's Instructions Erected Unconstitutional Barriers around the Defense Presentation of Mitigating Evidence that Prevented the Jury from Giving the Mitigation Its Full Effect**

**1.     The nature and purpose of aggravating and mitigating instructions**

The trial court erred when it instructed the jury that aggravating circumstances are things "which make a first degree murder case more terrible and deserving of the death penalty, while mitigating circumstances are those things which make the case less terrible and less deserving of the death penalty." NT 11/12/97, 49. The trial court repeated these erroneous instructions in its final charge to the jury, stating:

> The sentencing code defines aggravating and mitigating circumstances and as I previously told you, they are things that make a first degree murder case either more or less terrible.

*Id.* at 139.

This definition of aggravating and mitigating circumstances is constitutionally flawed. Mitigating evidence need not have any relationship to the crime or the case and must not be limited to evidence that makes the crime "less terrible." The trial court's instruction erroneously placed the focus of mitigating evidence on the circumstances of the offense at the expense of those aspects of the defendant's character, background, or record that make him a "uniquely individual human bein[g]," *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976), and that would otherwise justify sparing his life.

One of the most fundamental requirements of capital sentencing is that the jury must undertake an exhaustive review of both the criminal offense and the offender. The jury must be able to consider and give effect to the character, background, and record of the defendant himself. *See Tennard v. Dretke*, 542 U.S. 274, 287 (2004); *Penry v. Lynaugh*, 492 U.S. 302, 322, 324 (1989) (*Penry I*). At its essence, the Eighth Amendment constitutionally mandates individualized capital sentencing. *Woodson*, 428 U.S. at 304; *Sumner v. Shuman*, 483 U.S. 66, 75-76 (1987). This requires a reasoned moral response to the personal culpability and the unique personal circumstances of the defendant. *See Woodson*, 428 U.S. at 304.

While the circumstances of the offense are an important consideration in determining whether a defendant should live or be sentenced to die, mitigating evidence need not have any causal connection to the crime for it to be mitigating, and exclusion of such evidence violates the Eighth Amendment. *See*, *e.g.*, *Tennard*, 542 U.S. at 287 (rejecting the Fifth Circuit's requirement that in order to be constitutionally relevant mitigation evidence, defendant's low IQ must have contributed to the criminal act); *Hitchcock v. Dugger*, 481 U.S. 393, 397-98 (1987) (mitigation includes, among other things, defendant's being "one of seven children in a poor family", "innocence of significant prior criminal activity or violent behavior", and "potential for rehabilitation"); *Skipper v. South Carolina*, 476 U.S. 1, 4-5 (1986) (defendant's post-arrest conduct in prison "would not relate specifically to petitioner's culpability for the crime he committed" but "there is no question but that such inferences would be 'mitigating'"); *Eddings v. Oklahoma*, 455 U.S. 104 (1982) (evidence of defendant's turbulent family history is mitigating); *Lockett v. Ohio*, 438 U.S. 586, 607-08 (1978) (capital sentencing statute unconstitutional when it limits mental health mitigation to impairments that had causal role in offense).

The instructional requirement that mitigation evidence make "the case less terrible" is nothing more than a requirement that mitigating evidence have a factual nexus to the time and circumstances of the offense. Indeed, the Pennsylvania Supreme Court has recognized as much in explaining former Pennsylvania Suggested Standard Criminal Jury Instructions, Pattern Instruction 15.2502F, which states:

> Members of the jury, you must now decide whether to sentence the defendant to death or to life imprisonment. Your sentence will depend upon what you find about aggravating and mitigating circumstances. They are things that make a first degree murder *case* either more terrible or else less terrible.

In *Commonwealth v. Saranchak*, 675 A.2d 268, 278 (Pa. 1996), the Pennsylvania Supreme Court held that the "less terrible" Pattern Instruction "appropriately informed [the jury] that in order to find mitigating circumstances [it] must determine that evidence existed showing [defendant's] character was impaired in some way so as to diminish his capacity to appreciate his criminal behavior." This explanation strongly suggests that the Pattern Instruction, as followed here, may violate *Tennard*, which reaffirmed that such a nexus requirement "has no basis in our precedents and, indeed, is inconsistent with the standard we have adopted for relevance in the capital sentencing context." *Tennard*, 542 U.S. at 287.

Moreover, the concept that mitigation must make the killing "less terrible" involves not just the subject matter of what constitutes mitigating evidence but how the jury was to evaluate whether and to what extent the evidence is to be considered mitigating. Thus, when the jury was later told that it may consider other evidence concerning defendant's character and record, the jury's view of Petitioner's character was limited by the court's instruction as to the terribleness of the crime. Consequently, where the jury rejected Petitioner's mitigating evidence that was distinct from the crime itself, its "ability to consider and give effect to [Petitioner's] mitigating evidence . . . was 'shackled and confined,'" *Penry v. Johnson*, 532 U.S. 782, 798 (2001) (*Penry*

II),  by the instruction that the mitigating value of evidence was dependent upon whether it made the murder "less terrible."

Under this instruction, "'[a] reasonable juror could well have believed that there was no vehicle for expressing the view that [Petitioner] did not deserve to be sentenced to death based upon his mitigating evidence.'" *Id*. at 804 (quoting *Penry I*, 492 U.S. at 326). So even though the court generally instructed that the defendant's character and record could constitute mitigating evidence, "the mechanism it purported to create for the jurors to give effect to that evidence was ineffective." *Id*.

### 2.    The presumption of a death sentence

In Pennsylvania, a jury may impose death only if it unanimously finds at least one aggravating circumstance and no mitigating circumstances, or where the aggravating circumstances outweigh the mitigating circumstances. 42 Pa. C.S. § 9711(c)(iv). If the jury is in equipoise (i.e., the aggravating and mitigating circumstances are of equal weight), or if any juror believes a life sentence is appropriate, a life sentence must be imposed. *Commonwealth v. Baker*, 614 A.2d 663, 677 (Pa. 1992). Here, the jury found mitigation. Thus, the burden of persuasion as to whether a death sentence should be imposed rested with the Commonwealth. *Id.*; *see also Commonwealth v. Eichinger*, 915 A.2d 1122, 1138 (Pa. 2007) (stating that the capital sentencing statute's "clear indication that life in prison is the sentence unless the Commonwealth meets its high burden is sufficient to convey the fact that life is presumed").

The court instructions, however, told the jury it had to *reject death* to impose a life sentence and thus improperly fostered a presumption in favor of death. *See Sandstrom v. Montana*, 442 U.S. 510, 523 (1979) (holding that due process is violated where an instruction "conflict[s] with the overriding presumption of innocence with which the law endows the accused and which extends to every element of the crime"). Here, the trial court instructed:

126

> Now, if your sentence is life imprisonment, you should check the finding of either C-1 or C-2 which explains why you're *rejecting the death penalty* and imposing a life sentence.
>
> If the reason for *rejecting the death penalty* is that one or more of you find no aggravating circumstance check C-1. If the reason for *rejecting death* is that although all of you agree on at least one aggravating circumstance, one or more of you find that the mitigating [circumstances] are not outweighed by the [aggravating] circumstance, then check C-2.

NT 11/12/97, 151. This instruction undermined Petitioner's statutory and constitutional presumption to life. Further, the court's erroneous instructions compounded the prosecutor's improper closing argument, which told the jury that it needed to find a mitigating circumstance—even if it found no aggravating circumstances—in order to sentence Petitioner to life. NT 11/12/97, 134 ("If you find an aggravating – if you found no aggravating circumstance, no aggravating circumstance or circumstances and this mitigating circumstance of the character and the record or the circumstances of his offense, then you must and I compel you to sentence Ricardo Natividad to life.").

By repeatedly telling the jurors that their function was to explain why they "rejected" the death penalty, the court's instruction incorrectly suggested that there was a presumption that the death penalty was the appropriate sentence. This presumption unconstitutionally skewed the jury towards a death sentence and prevented the jury from giving full consideration and effect to the mitigating evidence presented at trial as required by the Eighth Amendment. *See* Section A.1, *supra*; *see also Jackson v. Dugger*, 837 F.2d 1469, 1473-74 (11th Cir. 1988) (reversing death sentence where the court instructed the jury that "death is presumed to be the proper sentence unless [any aggravators] are overridden by one or more of the mitigating circumstances"). The instruction also improperly shifted the burden of persuasion from the Commonwealth to the defense and effectively required the defense to rebut the presumption of death with evidence of mitigation. *Francis v. Franklin*, 417 U.S. 307, 317-18 (1985); *Sandstrom*, 442 U.S. at 523.

Because the jury "may have interpreted the judge's instruction as constituting either a burden-shifting presumption . . . or conclusive presumption," the instruction violated Petitioner's right to due process of law. *Sandstrom*, 442 U.S. at 523.

These instructional errors, individually and in combination with trial counsel's failure to object, rendered the resulting death sentence arbitrary and unreliable in violation of the Sixth, Eighth, and Fourteenth Amendments. Petitioner is entitled to a new sentencing proceeding.

### 3. The preclusion from considering sympathy

Upon further review and consideration, Petitioner withdraws this aspect of this claim.

### B. Trial Counsel Was Ineffective for Failing to Object to the Instructions

Counsel made efforts during the trial to limit evidence to be used against Petitioner, and his stated goal was to persuade the jury to sentence Petitioner to life, not death, for his crimes.

> I put on that mitigation evidence that I thought would . . . offer some type of explanation as to why Rick Natividad committed crimes in the past; to offer some explanation of where he came from, what put him on the slope or why he even went up that slope that lead to the death of Mr. Campbell.

NT 11/12/97, 137. Counsel, however, did not object to the trial court's erroneous instructions that inhibited the jury's ability to understand the full range of mitigating evidence that it could consider and which party bears the burden of persuasion.

To the extent counsel failed to properly object to or litigate claims relating to these instructions, counsel lacked any strategic basis to do so, as Petitioner stood only to gain from having the jury properly instructed. Courts have consistently found that counsel's failure to ensure that the jury was properly instructed is objectively unreasonable and constitutionally deficient where, as here, the constitutionally erroneous instructions went to the heart of the jury's sentencing determination. *See, e.g.*, *Breakiron v. Horn*, 642 F.3d 126, 137-41 (3d Cir. 2011) (counsel ineffective for failing to seek lesser-included-offense instruction that was supported by

the evidence and which, if found by the jury, would have negated an aggravating circumstance); *Everett v. Beard*, 290 F.3d 500, 514 (3d Cir. 2002) ("[C]ounsel must not neglect to suggest instructions that represent the law that would be favorable to his or her client."); *Carpenter v. Vaughn*, 296 F.3d 138, 158-59 (3d Cir. 2002) (counsel ineffective for failing to ensure that the jury received an accurate instruction on parole eligibility).

The two statutory aggravators offered by the Commonwealth were easily proved by basic evidence relating to the convictions and Petitioner's criminal history. *See* 42 Pa. C.S. § 9711(d)(6) (killing occurred during the perpetration of a felony); 42 Pa. C.S. § 9711(d)(9) (significant history of felony convictions involving the use or threat of violence). Thus, Petitioner's case in mitigation rested on convincing the jury that the Commonwealth had not met its burden of persuasion and/or demonstrating that there were details about his background—as opposed to specifics of the crime—that warranted a life sentence. The trial court's erroneous instructions deprived the jury of its opportunity to fully consider that evidence, and counsel's failure to properly object to and litigate the claims prevented the errors from being corrected. But for counsel's deficient performance, there is a reasonable probability that at least one juror would have voted to impose a life sentence.

Moreover, appellate counsel failed to raise claims relating to the erroneous instructions. Indeed, counsel failed to raise *any* claims related to the sentencing phase of Petitioner's trial. Counsel lacked a sound strategic basis for his decision, and thus performed deficiently. But for appellate counsel's deficient performance, there is a reasonable probability that Petitioner would have prevailed in his direct appeal.

### C.    The State Court Opinion

Petitioner raised this instructional error claim in post-conviction proceedings. *See* Brief for Appellant at 80-91, App. Exh. No. 26. The Pennsylvania Supreme Court denied these claims.

129

Neither holding with respect to instructional error warrants AEDPA deference. As to the first error, the state court failed to adjudicate Petitioner's federal constitutional arguments on the merits. As to the second error, the state court unreasonably determined facts based on the record. This Court's review is therefore *de novo* as to all aspects of this claim.

1. **The state court did not adjudicate Petitioner's constitutional arguments regarding the "more terrible/less terrible" instruction**

With regard to the trial court's first instructional error—the "more terrible/less terrible" instruction—the state court failed to consider, let alone adjudicate, the federal constitutional arguments presented and instead rested its decision entirely on state-law grounds. Specifically, citing to its own jurisprudence, the court simply stated: "We have, however, found no merit to this exact argument on numerous occasions before and after *Marinelli*." *Natividad-2* at 339 (citing *Commonwealth v. Washington*, 927 A.2d 586, 613-14 (Pa. 2007); *Commonwealth v. Rios*, 920 A.2d 790, 817 (Pa. 2007); *Commonwealth v. Johnson*, 815 A.2d 563, 587-88 (Pa. 2002); *Commonwealth v. Stevens*, 739 A.2d 507, 527 (Pa. 1999)).

The cases relied upon by the court also fail to consider federal constitutional principles in upholding the improper "more terrible/less terrible" instruction. Because the state court failed to mention any of the federal constitutional principles implicated by this claim, the decision is not an adjudication on the merits, and this Court's review is *de novo*.

Further, even assuming the decision could be considered an adjudication of the merits of the federal constitutional claims, the determination is contrary to and/or an unreasonable application of the principles of clearly established federal law discussed above because the state court failed to articulate any federal constitutional standards in denying the claim. *See, e.g.*, *Lockett*, 438 U.S. at 604; *Skipper*, 476 U.S. at 4; *McKoy*, 494 U.S. at 441; *Tennard*, 542 U.S. at 287.

Finally, with regard to Petitioner's claim of ineffectiveness, the state court stated that "[w]hile his claim arguably has merit, [Petitioner] cannot demonstrate that he was prejudiced by the court's omission . . . [because] [t]he jury found in favor of [Petitioner] for the Section 9711(e)(8) mitigator . . . ." *Natividad-2* at 340. The fact that one or more jurors found (e)(8) does not mean that Petitioner was not prejudiced. It may have been only a single juror who found the mitigating factor. Other jurors may well have been persuaded by the idea that mitigating evidence not directly connected to the offense—such as Petitioner's dysfunctional childhood and longstanding alcoholism—should be discounted entirely.

Moreover, the thrust of the court's instruction was not to deny the fact that Petitioner had suffered abuse but to deny that the jury should give that fact any weight if it had no nexus to the crime. *Cf. Penry II*, 532 U.S. at 797 (holding that "the key . . . is that the jury be able to 'consider and *give effect* to [a defendant's mitigation] evidence in imposing sentence.'" (quoting *Penry I*, 492 U.S. at 319) (alterations and emphasis in original)). Any juror or jurors who followed the court's instruction could have "found" the (e)(8) mitigator without weighing its impact on Petitioner's moral culpability. Thus, the fact that some jurors found the mitigating circumstance to exist does not mean that any or all of them gave effect to the evidence, especially when directed not to by the judge. The state court's ruling is unreasonable both in law and in fact.

> **2.     The state court's holding regarding erroneously placing the burden of persuasion on Petitioner involved an unreasonable application of clearly established law and/or an unreasonable determination of the facts**

As to the trial court's second error—erroneously placing the burden of persuasion on Petitioner and not on the Commonwealth—the state court ruled that because the instruction was ambiguous, rather than clearly erroneous, it was subject to the "reasonable probability" test under *Boyde v. California*, 494 U.S. 370 (1990), which held that the proper inquiry for an

ambiguous instruction is "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Id.* at 380. Based on that ruling, the court asserted that the challenged instruction was not *per se* unconstitutional in light of the jury instructions as a whole. *See Natividad-2* at 338-39. The state court decision was based on an unreasonable application of the law and an unreasonable determination of the facts in light of the state court record.

First, while the state court described the correct standard under *Boyde*, it ultimately held Petitioner to a higher standard and required him to show "that the jury was forced to render a sentence of death by the instruction." *Natividad-2* at 339. *Boyde* merely requires that there be a "reasonable likelihood" that the jury applied the instructions in the unconstitutional manner described by Petitioner. Even assuming that the instructions as a whole contain correct statements of law, under Supreme Court precedent, instructional "language that merely contradicts and does not explain a constitutionally infirm instruction will not suffice to absolve the infirmity." *Francis*, 471 U.S. at 322. Here, the improper instruction was, at best, contradicted by other instructions but was never explained or withdrawn.

Moreover, it is reasonably likely that the jury relied upon the challenged instructions because of the nature of the challenged instruction. It was given at the end of the overall instructions, and jurors typically "attempt to make sense of a confusing earlier portion of the instruction by reference to a later portion of the instruction." *Francis*, 417 U.S. at 321 n.7. Further, the erroneous instruction concerned the jury's use of the sentencing verdict sheet. As the Pennsylvania Supreme Court explained in another case, the use of a written verdict sheet "encourage[s] the jury to ignore the court's general instruction and focus upon . . . portions of the charge" related to the written verdict sheet. *Commonwealth v. DeHart*, 650 A.2d 38, 48-49

(Pa. 1994). For these reasons, it is reasonably likely that the jury relied on the erroneous instructions, and therefore that the instructions as a whole do not "absolve the infirmity." The state court's conclusion is contrary to and/or an unreasonable application of *Boyde* and *Francis*.

Second, the instructions as a whole failed to cure the error because the instructions skewed the jury's deliberations towards death in other respects. For example, the court also instructed the jury:

> Now, members of the jury, if you do not agree unanimously on a death sentence, and on one of the two general findings that would support it, then you can do two things immediately. You may either continue to discuss the case and deliberate the possibility of a death sentence, or if all of you agree to do so you can stop deliberating and sentence the defendant to life imprisonment.

NT 11/12/97, 147-48. This instruction not only gave primacy to the possibility of unanimous agreement on death over any other possible sentencing outcome, it specifically indicated the jury should "deliberate the possibility of a death sentence," excluding deliberation for a life sentence altogether, and required unanimity to cease deliberations. These instructions, along with instructions that mischaracterized the nature and scope of mitigating evidence in a manner that unconstitutionally limited the jury's consideration of mitigating factors, *see* Section A.1, *supra*, created a presumption of death that pervaded the entire penalty phase and impermissibly shifted the parties' burden of persuasion. The state court's suggestion that the remainder of the trial court's charge clearly established that the Commonwealth maintained the burden of persuasion is unreasonable in light of the record. *See Natividad-2* at 339.

Finally, the state court failed to address Petitioner's argument that the instructions prevented the jury from giving full consideration and effect to his mitigating evidence under *Lockett* and *Eddings*. Because the state court failed to mention any of the federal constitutional principles implicated by this claim, the decision is not an adjudication on the merits, and this Court's review is *de novo*. Similarly, because the state court failed to address Petitioner's

asserted violation of his right to effective counsel in relation to the "reject death" instruction, *de novo* review is required on these aspects of the claim. Relief is appropriate for the reasons stated above.

**XIII.**  **PETITIONER WAS DENIED HIS CONSTITUTIONAL RIGHTS TO A FAIR AND IMPARTIAL CAPITAL JURY WHERE THE TRIAL COURT AND TRIAL COUNSEL FAILED TO ENSURE THAT THE JURORS SELECTED WOULD CONSIDER THE POSSIBILITY OF A LIFE SENTENCE, IN VIOLATION OF PETITIONER'S RIGHTS UNDER THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS.**

**A.**  **Trial Counsel Ineffectively Failed to Life-Qualify the Jury**

Trial counsel was ineffective for failing to life qualify any of the veniremen during Petitioner's jury selection. A prospective juror may be excused for cause because of his or her views on capital punishment if the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Adams v. Texas*, 448 U.S. 38, 45 (1980); *Wainwright v. Witt,* 469 U.S. 412, 424 (1985). Under *Witt* and *Adams*, a juror whose ability to consider and give effect to relevant mitigating evidence is substantially impaired must be excluded for cause because he "will fail in good faith to consider the evidence . . . as the instructions require him to do." *Morgan v. Illinois*, 504 U.S. 719, 729 (1992).

In this case, the trial court conducted a voir dire process in which the Commonwealth received the benefit of death qualification, but there was no life qualification. *See, e.g.*, NT 10/30/97, 58; NT 10/31/97, 26-27; NT 11/3/97, 27; NT 11/5/97, 26. Trial counsel failed to object to the trial court's one-sided questioning, which ensured that no unduly life-prone jurors would be selected but allowed death-prone jurors to sit. Nor did trial counsel himself make any attempt to insure that the jurors selected were capable of imposing a sentence of life. Professionally reasonable trial counsel would have life qualified the jury.

At the time of Petitioner's trial, *Morgan* had been decided, and the availability and benefits to the defense of life qualification were well established. *See generally Hinton v. Alabama*, 571 U.S. 263, 274 (2014) (counsel has duty to know applicable law). Moreover, at least three cases decided by the Pennsylvania Supreme Court in the 1970s approved inquiring of prospective jurors whether they had any conscientious objections to returning a life sentence for murder in the first degree during voir dire. *See Commonwealth v. Johnson*, 400 A.2d 583, 586-87 (Pa. 1979); *Commonwealth v. Kingsley*, 391 A.2d 1027, 1033-34 (Pa. 1978); *Commonwealth v. Weeden*, 322 A.2d 343, 347 (Pa. 1974). Under these circumstances, trial counsel could not have had any reasonable basis for failing to life qualify the jury. As the *Morgan* Court stated: "The risk that such jurors may have been empaneled in this case and infected petitioner's capital sentencing is unacceptable in light of the ease with which that risk could have been minimized." 504 U.S. at 736 (quotations omitted).

Failure to life qualify the jury is a type of error whose precise effect on the verdict cannot be reasonably assessed. Accordingly, such an error should be considered structural error. *See Brecht v. Abrahamson*, 507 U.S. 619, 629-30, 638 (1993) (recognizing distinction between "trial errors" that are "amenable to harmless-error analysis" and "structural defects" in the trial that infect the trial process and are not subject to harmless error analysis); *Neder v. United States*, 527 U.S. 1, 7 (1999) (quoting *Brecht* and explaining concept of errors that are so "intrinsically harmful as to require automatic reversal"); *United States v. Gonzalez-Lopez*, 548 U.S. 140, 149 n.4 (2006) (some errors are deemed structural because of the "difficulty of assessing the effect of the error"). Therefore, prejudice from counsel's deficient performance should be presumed.

Alternatively, Petitioner was prejudiced by trial counsel's deficient performance. As a result of the court's one-sided questioning during voir dire and trial counsel's failure to object,

jurors who were improperly prone to a death sentence and unable to give fair consideration to a life sentence were empaneled on Petitioner's jury. Indeed, as recently recognized by the Joint State Government Commission Report on Capital Punishment in Pennsylvania, the "death qualification" process "is a suggestive and influential process that leads to conviction prone juries by creating juries that are less likely to share attitudes in opposition of giving a death penalty and reaffirming jurors' willingness and expectations to convict the defendant and sentence him to death." Joint Sate Government Commission, *Capital Punishment in Pennsylvania: The Report of the Task Force and Advisory Committee*, 147 (June 2018) (internal references omitted). It was therefore critical that trial counsel serve as a countervailing force to ensure that jurors who were incapable of following the law and imposing a life sentence were excluded from Petitioner's jury.

The relevant inquiry does not focus on the empaneling of a specific, identifiably biased juror but rather "whether the composition of the *jury panel as a whole* could possibly have been affected . . . ." *Gray v. Mississippi*, 481 U.S. 648, 664 (1987) (emphasis in original). It may be impossible to determine for certain how many of the jurors seated at trial would automatically vote for death because trial counsel failed to question them. But the death sentence must be vacated if "even *one* such juror" was empaneled, *Morgan*, 504 U.S. at 729, which is enough to undermine confidence in the sentence and establish prejudice.

B.      The State Court Opinion

Petitioner raised this claim in the post-conviction proceedings. *See* Brief for Appellant at 77-80, App. Exh. No. 26. The Pennsylvania Supreme Court denied relief, asserting that Petitioner had not proven he was prejudiced by trial counsel's failure to life qualify jurors. *Natividad-2* at 336. Because the court did not address whether counsel performed deficiently, Petitioner is entitled to *de novo* review of the first prong of *Strickland*. *See Porter v. McCollum*,

136

558 U.S. 30, 39 (2009) (per curiam) ("Because the state court did not decide whether Porter's

counsel was deficient, we review this element of Porter's *Strickland* claim *de novo*.").

     The state court's ruling that Petitioner was not prejudiced was an unreasonable

application of clearly established Supreme Court precedent and was unreasonable in light of the

state court record for at least two reasons.

     First, in determining that trial counsel was not ineffective for failing to life qualify the

jurors, the state court applied a rule that counsel can *never* be ineffective for this failure,

asserting that trial counsel is not ineffective for failing to life qualify a jury so long as the jury

selection process is otherwise fair and impartial. *Natividad-2* at 336. This assertion is an

unreasonable application of *Strickland* because such bright line rules are inimical to *Strickland*

and wholly inconsistent with the case-specific analysis *Strickland* requires. Under *Strickland*, a

determination of counsel's effectiveness depends upon the particular circumstances and facts of

each case. *See, e.g.*, *Strickland*, 466 U.S. at 681 (counsel's strategic choices are deferred to when

they "are reasonable given the totality of the circumstances").

     Second, the Pennsylvania Supreme Court asserted Petitioner had not proved he was

prejudiced by trial counsel's failure to life qualify jurors. *Natividad-2* at 336. However, errors in

the jury selection process are not subject to harmless error review, and thus prejudice from

counsel's deficient performance is presumed. *See, e.g.*, *Gray*, 481 U.S. at 665; *Rose v. Mitchell*,

443 U.S. 545, 556 (1979) ("revers[ing] the conviction . . . without inquiry into whether the

defendant was prejudiced in fact by the discrimination [,]" where racial discrimination has

altered the composition of the indicting grand jury). The Pennsylvania Supreme Court's

application of harmless analysis to Petitioner's claim of error in the jury selection process was

contrary to *Gray*.

**XIV.   ALL PRIOR COUNSEL WERE INEFFECTIVE FOR FAILING TO RAISE
EACH AND EVERY ISSUE PRESENTED HEREIN.**

For this claim, Petitioner refers the Court to the other claims, as briefed in this

Memorandum of Law.

**XV.   PETITIONER IS ENTITLED TO RELIEF FROM HIS CONVICTION AND
SENTENCE BECAUSE OF THE PREJUDICIAL EFFECTS OF THE
CUMULATIVE ERRORS IN THIS CASE.**

For the reasons set forth herein, to the extent that trial/appellate counsel failed to properly

investigate and to make the objections and arguments raised throughout this Petition, he provided

ineffective assistance of counsel in violation of Petitioner's rights under the Sixth, Eighth, and

Fourteenth Amendments to the United States Constitution. Similarly, to the extent that counsel

failed to raise on direct appeal any of the claims set forth herein, he also rendered ineffective

assistance of counsel in violation of Petitioner's rights under the Sixth, Eighth, and Fourteenth

Amendments to the United States Constitution. Although each instance of counsel's failures

requires relief individually, in addition, the cumulative effect of each instance of counsel's

failures is sufficiently prejudicial to require relief.

Each of the claims contained herein provides a basis for relief from Petitioner's

conviction and sentence. Should this Court find that Mr. Natividad is not entitled to relief based

on any single claim because he has failed to show the prejudicial effect of a single error, he is

entitled to relief because of the cumulative prejudicial effect of all of the errors set forth in this

petition.

**A.      Legal Standards**

The United States Supreme Court has long recognized that cumulative error can give rise

to a constitutional violation. *See Taylor v. Kentucky*, 436 U.S. 478, 487-88 & n.15 (1978)

(cumulative effect of potentially damaging instructions and prosecution argument violated due

process guarantee of fundamental fairness); *Donnelly v. DeChristoforo*, 416 U.S. 637, 639-42

(1974) (considering totality of prosecutorial misconduct in context of entire trial to decide if

misconduct was sufficiently prejudicial to violate defendant's due process rights); *Chambers v.*

*Mississippi*, 410 U.S. 284, 290 n.3 (1973). The Third Circuit has recognized the same principle.

*United States ex rel. Sullivan v. Cuyler*, 631 F.2d 14, 17 (3d Cir. 1980) ("[T]he cumulative effect

of the alleged errors may violate due process, requiring the grant of the writ, whereas any one

alleged error considered alone may be deemed harmless."); *Cannon v. Maroney*, 373 F.2d 908,

909-10 (3d Cir. 1967) (reviewing the cumulative prejudicial effect of several errors in order to

determine whether those errors were so prejudicial as to deprive the defendant of a fair trial). The

Court reaffirmed the availability of habeas relief for cumulative error in *Marshall v. Hendricks*,

307 F.3d 36 (3d Cir. 2002), where it reviewed Marshall's claims of trial error to determine if "the

errors of all kinds," in the aggregate, amounted to a denial of due process. *Id.* at 94. *See also*

*Fahy v. Horn,* 516 F.3d 169, 205 (3d Cir. 2008) (reviewing claim of cumulative error); *Albrecht*

*v. Horn*, 485 F.3d 103, 139 (3d Cir. 2007) (same).

     In *Collins v. Secretary of the Pennsylvania Department of Corrections*, 742 F.3d 528 (3d

Cir. 2014), the court held that cumulative error is not simply a way of measuring prejudice, but

rather a standalone claim that due process was violated as a result of multiple errors. *Id.* at 542

("[C]umulative error doctrine allows a petitioner to present a standalone claim asserting the

cumulative effect of errors at trial that so undermined the verdict as to constitute a denial of his

constitutional right to due process"). The Court reiterated that "[c]umulative errors are not

harmless if they had a substantial and injurious effect or influence in determining the jury's

verdict . . . ." *Collins*, 742 F.3d at 542 (quoting *Fahy*, 516 F.3d at 205)).

Determining prejudice with respect to ineffective assistance of counsel claims also requires the reviewing court to assess the cumulative impact of all of counsel's errors. In *Strickland*, the Court consistently referred to counsel's errors in the plural, illustrating this point. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984) (explaining that prejudice "requires showing that counsel's *errors* were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable"); *id.* at 694 ("The defendant must show that there is a reasonable probability that, but for *counsel's unprofessional errors*, the result of the proceeding would have been different."); *id.* at 695 (explaining that "the question is whether there is a reasonable probability that, *absent the errors*, the fact finder would have had a reasonable doubt respecting guilt"). The Third Circuit has likewise recognized that the prejudicial effect of claims of ineffective assistance must be assessed cumulatively. *Berryman v. Morton*, 100 F.3d 1089, 1102 (3d Cir. 1996) (looking to the prejudicial effect of multiple errors by counsel).

The prejudice resulting from counsel's ineffective assistance can also be combined with the prejudicial effects of other types of error to establish a due process violation. *See Affinito v. Hendricks*, 366 F.3d 252, 261-63 (3d Cir. 2004) (examining the combined prejudicial effect of counsel's deficient performance and an erroneous jury instruction); *Sullivan*, 631 F.2d at 17 (remanding the case to the district court to consider the cumulative prejudicial effect of various claims of counsel's ineffectiveness, along with claims of other trial court and prosecutorial errors). *Accord Cargle v. Mullin,* 317 F.3d 1196, 1209 (10th Cir. 2003) (concluding that petitioner, challenging both his conviction and death sentence, was "entitled to relief . . . on the basis of cumulative error combining ineffective assistance of counsel with instances of prosecutorial misconduct and the use of improper victim impact evidence"); *Alcala v. Woodford*,

334 F.3d 862, 894 (9th Cir. 2003) (concluding that cumulative effect of counsel's ineffectiveness and various trial errors deprived petitioner of a fundamentally fair trial).

### B. The State Court Opinion

In his initial post-conviction appeal, Mr. Natividad raised a claim of cumulative error relating to both guilt and penalty phase claims. Brief for Appellant at 92-93, App. Exh. No. 26. The Pennsylvania Supreme Court only addressed the cumulative prejudice of the penalty phase claims. The state court denied relief, holding that no number of failed claims can collectively warrant relief if they fail to do so individually. *Natividad-2* at 340-41.

Petitioner's cumulative error claim raised a federal due process issue. Because the state court did not consider the prejudicial impact of the guilt phase assertions of error, there was no adjudication of the claims as pled by Petitioner. Thus, this court's review is *de novo*.

As to the cumulative prejudice arising from the penalty phase issues, the state court effectively rejected the concept of cumulative prejudice. The court found that only individual claims that have merit can justify relief. Such a ruling is contrary to, and an unreasonable application of, the clearly established Supreme Court case law cited above. *E.g.*, *Taylor*, *Collins*, *supra*.

### XVI. AGGRAVATING CIRCUMSTANCE, 42 PA. C.S. § 9711(D)(9) (SIGNIFICANT HISTORY OF FELONY CONVICTIONS INVOLVING THE USE OR THREAT OF VIOLENCE TO THE PERSON), IS VOID FOR VAGUENESS, AND PETITIONER'S DEATH SENTENCE VIOLATES THE EIGHTH AND FOURTEENTH AMENDMENTS AND MUST BE REVERSED.

Mr. Natividad was convicted of first degree murder and related charges by a jury in the Philadelphia County Court of Common Pleas. One of the aggravating circumstances found by the jury was that Petitioner had a significant history of felony convictions involving the use or

threat of violence to the person, 42 Pa. C.S. § 9711(d)(9).[25]  Pursuant to *Johnson v. United States*, 135 S. Ct. 2551 (2015), the aggravating circumstance is invalid because it is unconstitutionally vague under the Eighth and Fourteenth Amendments to the United States Constitution.

In *Johnson*, the Supreme Court held that the residual clause of the Armed Career Criminal Act ("ACCA"), 18 U.S.C. § 924(e)(2)(B)(ii), was unconstitutionally vague. Because *Johnson* sets forth a new rule of constitutional law expressly made retroactive, and because the language of 42 Pa. C.S § 9711(d)(9) is materially indistinguishable from the provision ruled unconstitutional in *Johnson*, Petitioner's death sentence must be reversed.

A.  **Post-*Johnson* Procedural History**

1.  **State court proceedings**

On June 17, 2016, following the decision of the United States Supreme Court in *Welch v. United States*, 136 S. Ct. 1257 (2016), Mr. Natividad filed a second supplement to the Successor PCRA Petition.[26]  He challenged as unconstitutionally vague one of the two aggravating circumstances the sentencing jury found:, specifically, 42 Pa. C.S. § 9711(d)(9) (the defendant had a significant history of felony convictions involving the use or threat of violence to the person).[27]

---

[25] The jury found as an aggravating circumstance that Petitioner had "a significant history of felony convictions involving the use or threat of violence to the person." 42 Pa. C.S. § 9711(d)(9). In support of this aggravating circumstance, the prosecution offered a stipulation regarding two juvenile adjudications, three adult convictions and the robbery and kidnapping conviction in this case. NT 11/12/97, 52-55. The jury also found the aggravating circumstance that the killing was committed while in the perpetration of a felony. 42 Pa. C.S. § 9711(d)(6). It found Petitioner's life history as a mitigating circumstance. NT 11/12/97, 156.

[26] The second supplement also relied on *Johnson v. United States*, 135 S. Ct. 2551 (2015).

[27] The jury also found the aggravating circumstance that the killing was committed while in the perpetration of a felony, 42 Pa. C.S. § 9711(d)(6). On the other side of the equation, the jury found Appellant's life history to be a mitigating circumstance. NT 11/12/97, 156.

On July 7, 2016, the PCRA court signed two Orders granting Mr. Natividad permission to file the October 6, 2014 and June 17, 2017 supplements to the Successor PCRA Petition. There was no objection from the Commonwealth. NT 7/7/16, 61-63.

The PCRA court initially *granted* relief, vacating Mr. Nativdad's death sentence, because the (d)(9) aggravating circumstances was unconstitutionally vague. *See* Order dated 12/21/16. The Commonwealth filed a motion for reconsideration and, on January 13, 2017, the PCRA court vacated the December 21, 2016 Order.

The PCRA court then dismissed the Successor PCRA Petition in its entirety on February 14, 2017. Mr. Natividad timely appealed. On August 9, 2017, the PCRA court issued an Opinion in support of its February 14, 2017 Order. On January 23, 2019, the Pennsylvania Supreme Court affirmed the lower court's ruling. *Natividad-3* at 41.

### 2.    Federal habeas proceedings

On April 4, 2017, while state court proceedings were pending and habeas proceedings were in suspense, Petitioner filed a motion for leave to lodge a supplement to his habeas petition. The attached Supplement raised the *Johnson* claim addressed here, but did not ask this court to take any action on the supplement until after state court proceedings were completed. On August 29, 2017, this Court issued an Order allowing the Supplement to be lodged and continued to hold proceedings in suspense.

### B.    *Johnson v. United States* and Its Progeny

At issue in *Johnson* was a defendant's eligibility under a provision of the ACCA providing for enhanced penalties for certain offenders with a history of convictions for "crimes of violence." The relevant portion of § 924(e) defining a "crime of violence" has two clauses. The first clause, § 924(e)(2)(B)(i), is commonly referred to as the force clause. The other, § 924(e)(2)(B)(ii), is commonly referred to as the residual clause. The Supreme Court invalidated

the ACCA's residual clause as too vague to provide adequate notice under the due process protections of the Fifth Amendment.

To determine the applicability of predicate offenses under the residual clause, courts employed a "categorical" approach, requiring courts to assess "how the law defines the offense and not . . . how an individual offender might have committed it on a particular occasion." *Johnson*, 135 S. Ct. at 2557. This approach ultimately proved unworkable because it "ties the judicial assessment of risk to a judicially imagined 'ordinary case' of a crime, not to real-world facts or statutory elements." *Id.* The Court noted that many of the crimes invoked, on the face of the statutes, could be committed in a variety of ways, not all of which were violent. As a result, the "residual clause leaves grave uncertainty about how to estimate the risk posed by a crime" and "offers no reliable way to choose between . . . competing accounts of what 'ordinary'" involves. *Id.*

The Court concluded that the "indeterminacy of the wide-ranging inquiry required . . . both denies fair notice to defendants and invites arbitrary enforcement by judges" and thus "denies due process of law." *Id.* Moreover, the Court rejected calls to look at the particular facts of the case in issue, noting, "If we hold a statute to be vague, it is vague in all its applications (and never mind the reality)." *Id.* at 2561.

Subsequent cases recognize that the *Johnson* rule is not limited to ACCA but must be applied to other statutes that have similarly vague language. In *Sessions v. Dimaya*, 138 S. Ct. 1204, 1218 (2018), the respondent, James Dimaya, was a lawful permanent resident who had two first-degree burglary convictions. An Immigration Judge and the Board of Immigration Appeals held that Dimaya's convictions were "crime[s] of violence" under 18 U.S.C. § 16(b), which

made him deportable. Relying on *Johnson*, the Ninth Circuit held that § 16(b) was unconstitutionally vague. *Dimaya v. Lynch*, 803 F.3d 1110, 1120 (9th Cir. 2015).

On appeal to the United States Supreme Court, the Government argued that the textual distinctions between ACCA and § 16(b) removed § 16(b) from the purview of *Johnson*. The Supreme Court rejected the argument that the textual variations made a difference:

> [The Government] points to three textual discrepancies between ACCA's residual clause and § 16(b), and argues that they make § 16(b) significantly easier to apply. But each turns out to be the proverbial distinction without a difference. None relates to the pair of features—the ordinary-case inquiry and a hazy risk threshold—that *Johnson* found to produce impermissible vagueness.

*Dimaya*, 138 S. Ct. at 1218. Thus, like ACCA, § 16(b) was "void for vagueness." *See also United States v. Davis*, 139 S. Ct. 2319 (2019) (residual clause defining crimes of violence in 18 U.S.C. §924(c)(3)(b) is unconstitutionally vague under *Johnson*).

## C.     42 Pa. C.S. § 9711(d)(9) Is Unconstitutional under *Johnson*

"A vague law is no law at all." *Davis*, 139 S. Ct. at 2323. Section 9711(d)(9) suffers from the same defects as the statutes at issue in *Johnson, Dimaya,* and *Davis*.

### 1.     *Johnson* applies to death penalty schemes

Both the ACCA residual clause and § 9711(d)(9) are penalty enhancement provisions. The ACCA provides for increased sentences for offenders who had committed qualifying predicate offenses; § 9711(d)(9) is an aggravating circumstance that, if proved, renders the offender eligible for a death sentence. As *Johnson* itself makes clear, "[due process] principles apply not only to statutes defining elements of crimes, but also to statutes fixing sentences. 135 S. Ct. at 2557.

### 2.    As in the ACCA provision at issue in *Johnson*, Pennsylvania employs a categorical approach to determining whether a predicate offense applies

Key to the resolution in *Johnson* was the mandated use of the categorical approach employed in resolving applicability of the ACCA. *Taylor v. United States*, 495 U.S. 575, 600 (1990) (holding that the ACCA requires courts to employ categorical approach). Under this approach, courts "look only to the fact of conviction and the statutory definition of the prior offense" and do not generally consider the "particular facts disclosed by the record of conviction." *Shepard v. United States*, 544 U.S. 13, 17 (2005) (quoting *Taylor*, 495 U.S. at 602). The focus is on whether the *elements* of the offense are of the type that would justify its inclusion within the residual provision, without inquiring into the facts leading to the conviction. *Johnson*, 135 S. Ct. at 2557.

Under § 9711(d)(9), just as under the ACCA residual clause, courts look not to the particular facts of the crime but to whether the predicate crime itself "by its nature" fits the statutory language. In Pennsylvania, the issue typically arises in the context of burglary, which has no element that requires proof of use or threat of violence. One early case, *Commonwealth v. Christy*, 515 A.2d 832 (Pa. 1986), involving the applicability of burglary and escape, seemed to suggest that Pennsylvania would adopt a case-by-case approach to § 9711(d)(9). However, just two years later, the Pennsylvania Supreme Court, rejecting the contention that the law in this area was inconsistent, made clear that the case-by-case language employed in *Christy* was mere dicta, and that burglary categorically qualified under § 9711(d)(9). *Commonwealth v. Rolan*, 549 A.2d 553, 559 & n.5 (1988) (discussion in *Christy* was "obiter dictum"; "burglary has always been and continues to be viewed as a crime involving the use or threat of violence to the person"); *Commonwealth. v. Small*, 980 A.2d 549, 576 (2009) (portion of *Christy* discussing burglary was merely dicta; burglary qualifies as a crime involving the use or threat of violence to

146

the person); *Commonwealth v. Spotz,* 47 A.3d 63, 104 (Pa. 2012) ("The fact that a defendant's specific burglaries did not involve violence does not preclude their use to satisfy aggravating circumstance 9711(d)(9).").

### 3. The clauses are materially indistinguishable

At issue in *Johnson* was an enhancement provision of ACCA applying a more severe punishment if a defendant convicted of being a felon in possession of a firearm has three or more prior convictions for a "violent felony" – a term defined to include any felony that "involves conduct that presents a serious potential risk of physical injury to another." 18 U.S.C. § 924(e)(2)(B). Comparably, the (d)(9) aggravating circumstance applies if the defendant has significant history of felony convictions **"**involving the use or threat of violence to the person." The clauses are materially indistinguishable.

**Involving.** In each clause, the drafters eschewed a requirement that violence be an *element* of the predicate offense. Rather, each employs the imprecise term "involv[ing],"[28] respectively, the risk or threat of violence. *See, e.g.*, *State v. Hughes*, 907 P.2d 336, 339 (Wash. App. 1995) ("'Involved' is an imprecise term incorporating such concepts as being a part of, contributing to and being a participant" (citing William C. Burton, Legal Thesaurus, at 298 (2d ed.1992))).

**Physical injury/violence to the person**. Section 924(e) speaks of "physical injury to another [person]" whereas § 9711(d)(9) says "violence to the person" – terms that are materially indistinguishable.

---

[28] The *Johnson* Court drew the distinction this way: "[U]nlike the part of the definition of a violent felony that asks whether the crime 'has as an element the use . . . of physical force,' the residual clause asks whether the crime 'involves conduct' that presents too much risk of physical injury." *Johnson*, 135 S. Ct. at 2557.

**Risk/threat.** Section 924(e) requires assessment of the "risk" of injury, an amorphous term resistant to unambiguous application. *Johnson*, 135 S. Ct. at 2558 ("the residual clause leaves uncertainty about how much risk it takes for a crime to qualify as a violent felony"); *id.* at 2551 (discussing some of the troublesome candidates for inclusion, including burglary, the Court notes, "These offenses are far from clear in respect to the degree of risk each poses") (citation omitted).

The (d)(9) aggravating circumstance employs an equally vague term – "threat" – which Pennsylvania courts use interchangeably with "risk." *See Commonwealth v. Thomas*, 561 A.2d 699, 709 (Pa. 1989) ("unprivileged entries into buildings and structures where people are *likely* to be found is a clear threat to the safety of those therein"); *Commonwealth  v. Pruitt*, 951 A.2d 307, 321 (Pa. 2008) (same); *Rolan*, 549 A.2d at 560–61 (Zappala, J., dissenting) (noting that in assessing applicability of burglary under (d)(9), "the majority confuses the concepts '*risk*' and '*threat*'") (emphasis supplied); *id.* ("It is true that the types of structures subject to being burgled . . . might be occupied, but it is not necessary that the structure in fact be occupied."). Neither the residual clause nor § 9711(d)(9) defines precisely how much threat or risk of violence is required for a crime to qualify. *See Christy*, 515 A.2d at 841 (noting in dicta, "Every felony has the potential for violence if the actor is caught"). This sentiment is echoed in *Johnson*. *See* 135 S. Ct. at 2559 (prior precedent "failed to establish any generally applicable test that prevents the risk comparison required by the residual clause from devolving into guesswork and intuition").

It is the rule of law that is significant; there is no requirement of complete identity in the offending language. The Supreme Judicial Court of Massachusetts, under the authority of *Johnson*, invalidated a state enhancement provision that employed similar but not identical language. Finding no "*meaningful* difference between the two provisions," it ruled that the

Massachusetts statute was unconstitutionally vague. *Commonwealth v. Beal*, 52 N.E.2d 998

(Mass. 2016) (emphasis supplied). *See also Pursell v. Horn*, 187 F. Supp. 2d 260, 387-88, 390

(W.D. Pa. 2002) (court concluded that, while the language of the aggravator and instruction were

not identical to the language held unconstitutional in *Godfrey v. Georgia*, 446 U.S. 420 (1980),

and *Maynard v. Cartwright*, 486 U.S. 356 (1988), because the jury had "[no] more guidance than

the juries received" in those cases, the aggravator, as it had been defined by the trial court, was

unconstitutionally vague).[29]

### 4.      Petitioner is entitled to relief

A defendant sentenced to death pursuant to a clause that is void for vagueness is entitled

to relief regardless of the underlying facts. *Johnson*, 135 S. Ct. at 2561 ("[O]ur holdings squarely

contradict the theory that a vague provision is constitutional merely because there is some

conduct that clearly falls within the provision's grasp. . . If we hold a statute to be vague, it is

vague in all its applications (and never mind the reality)."). In other words, the

unconstitutionality of the provision is not rendered harmless by a showing that the actual conduct

may have involved the threat of violence.

Similarly, Pennsylvania law is clear that a new penalty hearing is required

notwithstanding the presence of additional aggravating factors, so long as the jury, as was the

case here, found mitigating circumstances and proceeded to the weighing stage. *Commonwealth

v. Williams*, 650 A.2d 420, 430 (1994) (when an aggravator is struck down on appeal in a case

---

[29] In *Beckles v. United States*, 137 S. Ct. 886, 895 (2017), the Court held that "the advisory
Sentencing Guidelines are not subject to a vagueness challenge under the Due Process Clause."
However, the Court observed that, as is the case here, it "applie[s] the vagueness rule to a statute
fixing permissible sentences." *Id.* at 892.

where the jury engaged in a weighing of aggravating and mitigating circumstances, a new penalty hearing is required).

Because § 9711(d)(9) suffers from the same defects that rendered the ACCA residual clause unconstitutional,[30] it is void for vagueness under the due process provisions of the Fourteenth Amendment and cannot be invoked to support Petitioner's death sentence. Similarly, it gives too little guidance to permit juries to rationally distinguish among the most culpable offenders in a non-arbitrary way, in violation of the Eighth Amendment. Petitioner's death sentence must be reversed.

### D.    The State Court Opinion

Relying on its decision in *Commonwealth v. Spotz*, 171 A.2d 675 (Pa. 2017), the Pennsylvania Supreme Court held that it lacked jurisdiction to address the merits of Petitioner's challenge to the (d)(9) aggravator. *Natividad-3* at 41. And while Petitioner argued in his reply brief that *Dimaya,* which had been decided after Petitioner's Initial Brief had been filed, required a different result, the Pennsylvania Supreme Court refused to consider *Dimaya* because that argument had not been raised in the PCRA court below, even though *Dimaya* had not yet been decided at the time of the lower court litigation. *Id.* at n.23.

---

[30] The (d)(9) circumstance is arguably vaguer in terms of notice to the offender. The clause does not define what constitutes a *significant* history, nor does define what constitutes a "conviction." *Commonwealth v. Holcomb*, 498 A.2d 833, 851 (Pa. 1985) (holding two convictions suffice even though both arise from the same incident and otherwise were merged for sentencing purposes); *Commonwealth v. Williams*, 660 A.2d 1316, 1323 (Pa. 1995) (holding that jury may consider all of defendant's convictions, including for crimes committed *after* the crime at issue); *Commonwealth v. Baker*, 614 A.2d 663, 676 (Pa. 1992) (holding juvenile adjudications count as "convictions" notwithstanding Juvenile Act, section 6354, expressly says an adjudication is "not a conviction of crime"). And, notably, in this case (d)(9) was supported by juvenile adjudications which do not carry the same safeguards that attend criminal convictions. *McKeiver v. Pennsylvania*, 403 U.S. 528 (1971) (no due process right to trial by jury); *In Interest of J.F.*, 714 A.2d 467, 470 (Pa. Super. Ct. 1998) (same).

*Spotz* held that *Johnson* and *Welch* did not satisfy an exception to Pennsylvania's PCRA time bar because neither *Johnson* nor *Welch* created a new rule of constitutional law that applied retroactively to Spotz's challenge to the (d)(9) aggravator. *Spotz*, 171 A.3d at 676. In the court's view, the determination that ACCA was retroactively unconstitutional had no impact on the challenge to a state statute and thus did not satisfy any exception to the time bar. This is not an adjudication of the merits of the claim.

Here as well, the court relied on *Spotz* without adjudicating the merits of the claim. Indeed, under *Spotz*, there is no process that would allow Natividad to raise a *Johnson* challenge to the constitutionality of the (d)(9) aggravator in state court. Thus, this Court's review is *de novo*.

The state court's refusal to consider the impact of *Dimaya* on its prior holding makes matters worse. *Dimaya* was controlling law at the time of the state court's decision and it was brought to the state court's attention at Petitioner's first opportunity to do so after the decision was rendered. The Pennsylvania Supreme Court's refusal to consider *Dimaya* is contrary to the basic principles of judicial review, as well as to *Dimaya* itself. Again, *de novo* review is appropriate.

**CONCLUSION**

WHEREFORE, for the foregoing reasons Petitioner respectfully requests that this Court grant him habeas relief, in the form of a new trial and sentencing, or conduct such evidentiary hearings and allow discovery as may be appropriate.

Respectfully submitted

/s/ Stuart Lev
LEIGH M. SKIPPER
Chief Federal Defender
STUART B. LEV
SAMUEL J.B. ANGELL
AYANNA WILLIAMS
Assistant Federal Defenders
Federal Community Defender Office
  for the Eastern District of Pennsylvania
601 Walnut St., Suite 545 West
Philadelphia, PA 19106
(215) 928-0520
Stuart_Lev@fd.org
Samuel_Angell@fd.org
Ayanna_Williams@fd.org

Counsel for Petitioner Ricardo Natividad

Dated: October 21, 2019

**CERTIFICATE OF SERVICE**

I, Stuart Lev, hereby certify that on the 21st day of October, 2019, I served a copy of the

foregoing on all counsel of record via the Court's ECF system.


/s/ Stuart B. Lev
Stuart B. Lev