**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **RICARDO NATIVIDAD,** | : | |
| **Petitioner** | : | |
| | : | |
| **v.** | : | **No. 08-cv-449** |
| | : | **(CAPITAL CASE)** |
| **JOHN E. WETZEL, et al.,** | : | |
| **Respondents** | : | |

**ANSWER TO PETITION FOR
<u>WRIT OF HABEAS CORPUS</u>**

Petitioner Ricardo Natividad is a Pennsylvania state prisoner who has been sentenced to death. Before this Court is his petition for a writ of habeas corpus alleging, among other claims, serious violations of his due process rights under *Brady v. Maryland*. Based on the pleadings, the trial and post-conviction records, and the factual record set forth below, the Commonwealth concedes that Natividad is entitled to relief.[1] The prosecution's decision to withhold exculpatory evidence from Natividad's trial attorney, and to continue withholding that evidence for years afterward, undermined the Commonwealth's confidence in the verdict that was rendered against Natividad and deprived him of a fair trial.[2]

Criminal prosecutors have a special responsibility in the law and must be careful to protect an individual's constitutional rights. Pursuant to that special responsibility, the Commonwealth recognizes the *Brady* violations that occurred in this case. However, that recognition comes only

---

[1] The Commonwealth withdraws and disavows any prior pleadings to the extent that they are inconsistent with this Answer.

[2] First Assistant District Attorney Carolyn Temin participated personally and substantially as a judge in a related matter, adjudicating a motion to consolidate the homicide and carjacking cases for which Natividad was convicted. First Assistant Temin has been screened from all participation in this matter.

1

after a careful review and investigation of the facts in this case as well as a close analysis of applicable law regarding materiality in the context of *Brady* violations.

The Commonwealth also recognizes that while the *Brady* violations in this case are material to Natividad's conviction such that he was deprived of his right to a fair trial, there is still enough evidence of Natividad's guilt to justify a retrial. Rather than facing the inherent risks of a retrial, the parties have agreed to a negotiated plea agreement in the event this Court grants habeas relief to Natividad. That agreement has been memorialized in a Joint Stipulation which is being filed concurrently with this Answer.

## I.      BRIEF OVERVIEW OF NATIVIDAD'S DEFENSIVE THEORY AT TRIAL AND THE SUPPRESSED INFORMATION

On November 10, 1997, a jury convicted Natividad of first-degree murder, two counts of robbery, robbery of a motor vehicle, kidnapping, two counts of carrying a firearm on a public street, two counts of possession of an instrument of crime, and criminal conspiracy in connection with the 1996 carjacking of Michael Havens and the subsequent murder of Robert Campbell. At trial, Havens testified that Natividad was one of two men who had stolen Havens's dark blue Lincoln at gunpoint in the early hours of November 9, 1996. Eyewitnesses to Campbell's murder then testified that, around 9:40 P.M. that same day, they saw Campbell's shooter climb into the driver's seat of a similar Lincoln and flee the scene. Two days later, police found Havens's car in Philadelphia's Germantown neighborhood. The car had been set on fire and abandoned.

The prosecution's theory of the case was that Natividad stole Havens's Lincoln early November 9, then drove it to an Exxon station that evening where he shot and killed Campbell. Natividad then burned and abandoned the Lincoln to cover his tracks. Natividad's then-friend Byron Price corroborated this version of events, testifying that Natividad picked him up in a dark

Lincoln the evening of November 9 and told him to wait in the car at the Exxon station while Natividad got out of the car, confronted Campbell, and then shot him. Three other individuals who knew Natividad testified that they had heard him confess to killing Campbell.

At trial, the defense's cross examination of several witnesses raised questions about the above version of events. Through cross examination, the jury learned that Havens had already seen Natividad's picture in a news story about Campbell's murder when he identified Natividad as his carjacker in a photo lineup seven months after the incident. Additionally, Havens's initial statement to police describing his attacker was inconsistent with the testimony he gave at trial, and both descriptions omitted any mention of Natividad's missing front teeth. The jury also learned that Price had been promised that he would not be charged as an accessory to Campbell's murder if he agreed to testify against Natividad and that, after talking with Price, Price's then-girlfriend, Natasha Catlett, made a call that implicated Natividad to a tip line promising a reward.

Despite being presented with inconsistent descriptions, the possibility of a faulty identification, and allusions to self-interested testimony, the jury found Natividad guilty beyond a reasonable doubt. It is likely the jury returned a guilty verdict in part because Natividad's attorney was essentially forced to argue the implausible defensive theory that Natividad was acting in self-defense when he shot Campbell, whose gun was holstered at the time of the shooting. We now know that Natividad's attorney pursued that defensive theory and the jury made its decision without access to important pieces of exculpatory information.

Neither the jury nor Natividad knew at the time of trial that the prosecution withheld two sets of evidence that not only substantially strengthened the doubts that Natividad's attorney raised at trial but could have served as the foundation necessary to present a credible defensive theory at trial—one that specifically included an eyewitness to the crime testifying that the shooter he saw

fleeing the scene was not Natividad and that not only did someone else commit the crimes, but that the alternate suspect confessed to the crimes and had a motive for committing the crimes. Natividad's most recent amendment to his habeas petition centers on that suppressed evidence.

Until forced to disclose them during the discovery process for this habeas proceeding, the Commonwealth withheld interviews that it conducted with two individuals who claimed that a man named Rolston Ricardo Robinson confessed to murdering Campbell, as well as an interview with Robinson himself in which he lied about certain events but also accurately described Campbell's prone body, clothing, and holstered gun. The Commonwealth also withheld a hand-written note police made during the investigation into Campbell's murder that identified an eyewitness to the shooting: John McCullough.[3] Had this evidence been made available to Natividad prior to his trial, his attorney could have used it in conjunction with the impeaching testimony that he originally elicited to cast serious doubt on Natividad's identity as Havens's carjacker and Campbell's murderer.

In his amended habeas petition, Natividad makes sixteen arguments as to why this Court should grant the habeas relief that he requests. The Commonwealth addresses only the issues raised in Claim V, as supplemented by the arguments laid out in the October 21, 2019 Memorandum of Law in Support of Amended Petition for Writ of Habeas Corpus (ECF No. 108), which alleges that Natividad was deprived of his due process rights when the Commonwealth failed to disclose exculpatory information that was material to his ability to present a defense at trial. For the reasons set forth below, the Commonwealth concedes that Natividad's right to due process was violated by the prosecution's suppression of this evidence.

---

[3] Subsequent post-conviction investigation by Natividad's lawyers revealed that McCullough knew Natividad from when Natividad was young and he was certain that Natividad was not one of the two men he saw kill Campbell (a fact which was almost certainly known by homicide detectives during their investigation but was not memorialized and/or recorded in their file).

The Commonwealth does not address the other fifteen claims laid out in Natividad's habeas petition because the Commonwealth believes that Claim V is sufficient to sustain the relief that Natividad requests. Natividad's petition should be granted. He is entitled to relief in the form of a new trial.

## II.     FACTS AND PROCEDURAL HISTORY[4]

### A.  The Crimes

At trial, the Commonwealth emphasized the common components of the two crimes to connect Natividad to the carjacking of Havens and the murder of Campbell. Additional details of the crimes relevant to the *Brady* issues currently before this Court are as follows.

### i.     The Carjacking

Havens was carjacked at gunpoint around 2:00 A.M. on November 9, 1996 and his dark blue Lincoln Continental was stolen. N.T. 11/5/1997 at 146-51 (Supp. App. 146-51). Police recovered the car two days later, on November 11. *Id.* at 137, 157 (Supp. App. 137, 157). The car had been set on fire and abandoned, *id.*, but the police recovered a purple plaid jacket from the car. N.T. 11/7/1997 at 51 (Supp. App. 504). The police attempted to take fingerprints from the car, but were unable to find any useable prints. *See* Supp. App. 1049-50. They did not maintain possession of the jacket that was in the car to test it for forensic evidence. N.T. 11/7/1997 at 52-53 (Supp. App. 505-07); *see* Supp. App. 1050. There is no indication that Natividad wore the purple and black jacket found in Havens's car, nor that he even knew it existed.

---

[4] The Commonwealth concurs with and stipulates to the facts and procedural background set forth in Natividad's Memorandum of Law (ECF No. 108 at 2-8), which are accurate in all material respects and confirmed by the Commonwealth's independent review of the case. Citations to the Appendix included with Natividad's Memorandum of Law are styled as "App." followed by a reference to the exhibit number. Citations to the Supplemental Appendix included with this Answer are styled as "Supp. App." followed by a reference to the page number.

Sometime later, Havens saw Natividad's photograph on television, in a report about Natividad's arrest for the Campbell shooting. N.T. 11/5/1997 at 186 (Supp. App. 186). Havens testified at trial that he remembered thinking, "[t]hat's the guy that stole my car," when he saw the photograph. *Id.* The police subsequently contacted Havens to participate in a photographic lineup of possible suspects in his carjacking. *Id.* at 187 (Supp. App. 187). At that lineup, Havens identified Natividad as one of the two men involved in his carjacking but could not recall whether the picture he selected was identical to the picture he had seen on television. *Id.* at 194 (Supp. App. 194).

At trial, Havens described his carjacking: two men approached him as he tried to enter a combination lock on his driver's side door and forced him into the back seat of the car at gunpoint. *Id.* at 148-49 (Supp. App. 148-49). They took his wallet and car keys, then left him on the side of the road. *See id.* at 149, 153 (Supp. App. 149, 153). Havens described the gun that was used in the carjacking as "stainless steel with black rubber grips," *id.* at 169 (Supp. App. 169), and was shown a photograph of a gun by the prosecution that he identified as the one used in his carjacking. *Id.* at 170 (Supp. App. 170).

Subsequent witnesses impeached Havens's testimony. Officer Brian James testified about inconsistencies in Havens's statements to police. N.T. 11/10/1997 at 9-16 (Supp. App. 688-95). On the day of his carjacking, Havens described the carjacker later identified as Natividad as wearing a sweatshirt and jeans. *Id.* at 11 (Supp. App. 690). Later, on December 2, he described that same carjacker as wearing a long, black-leather jacket. N.T. 11/5/1997 at 180-81 (Supp. App. 180-81). Catlett, who knew Natividad prior to the events of November 9, 1996, also testified that Natividad was missing his front teeth—an important detail absent from any of Havens's descriptions. *See* N.T. 11/6/1997 at 157 (Supp. App. 396).

ii.     *The Murder*

At trial, Price testified that Natividad picked him up in a black Lincoln at around 7:00 P.M. on November 9, 1996. N.T. 11/6/1997 at 7-8 (Supp. App. 246-47). They drove together to a gas station, where Natividad got out of the car. *Id.* at 9 (Supp. App. 248). Price then testified that he heard a gunshot and Natividad ran back to the car holding a gun, then "sped out from the gas station." *Id.* According to Price, Natividad told him that he shot a man because that man "drew on" him. *Id.* at 15 (Supp. App. 254). Price maintained that he never exited the car while it was on the lot and he had nothing to do with the shooting. *See id.* at 11-12 (Supp. App. 250-51).

Two individuals, Martin and Beth Johnson, lived cater-corner to the gas station where the shooting took place and testified that they saw the immediate aftermath. *Id.* at 77-78, 93-94 (Supp. App. 316-17, 332-33). They heard a gunshot and looked toward the gas station, where they saw a man in a plaid jacket run from another man, who was falling backward. *Id.* at 78, 85, 94-95 (Supp. App. 317, 324, 333-34). The fleeing man got into a dark car whose tags or exact make they could not identify, *id.* at 82-83, 95-99 (Supp. App. 321-22, 334-38), but that Martin Johnson described as looking like a Lincoln. *Id.* at 82 (Supp. App. 321). In an early statement to police, Beth Johnson described the car as having four doors, not two doors like Havens's stolen Lincoln (App. Exh. No. 13). Neither witness could identify the shooter, but Beth Johnson described him as wearing a "red plaid jacket." *Id.* at 94-95 (Supp. App. 333-34).

The Commonwealth called several other witnesses—Catlett, Eugene Wilson, and Robert Golatt—who testified to statements allegedly made by Natividad just days after Campbell's killing in which he took credit for the shooting. N.T. 11/6/1997 at 155, 165, 182 (Supp. App 394, 404, 421). Catlett, after talking to Price, called a tip line to report Natividad. *Id.* at 153-54 (Supp. App. 393-94).

An attorney representing a man named Keith Smith also took the stand to testify that he had surrendered a firearm to police on behalf of his client. *See* N.T. 11/7/1997 at 14-16 (Supp. App. 466-68). The Commonwealth tried its best to imply that Smith purchased the gun from Natividad. *See* N.T. 11/6/1997 at 113-15 (Supp. App. 352-54). The gun was purported to be cosmetically similar to the one used to kill Campbell, but no ballistic and forensic testing tied the weapon to the shooting. *See* N.T. 11/5/1997 at 221 (Supp. App. 221); N.T. 11/6/1997 at 198, 200 (Supp. App. 437, 439).

**B. Procedural History & After-Discovered Evidence**

Following his trial, Natividad's conviction and death sentence were affirmed by the Pennsylvania Supreme Court ("SCOPA") and the United States Supreme Court denied certiorari. *Commonwealth v. Natividad*, 773 A.3d 167, 171-73 (Pa. 2001), *cert. denied*, 535 U.S. 1099 (2002). Natividad filed an initial Postconviction Relief Act ("PCRA") petition which was denied by the PCRA court, and whose denial SCOPA affirmed in 2007. *Commonwealth v. Natividad*, 938 A.2d 310 (Pa. 2007).

In 2008, Natividad filed a Petition for Writ of Habeas Corpus in this Court (ECF No. 7). Natividad then filed a Motion for Discovery (ECF No. 24) and the Commonwealth opposed, representing to this Court that there was no evidence that should have previously been turned over under *Brady v. Maryland* (ECF No. 29 at 35).

In 2011, this Court issued an order that granted Natividad partial discovery (ECF No. 38). The Commonwealth produced discovery pursuant to that Order in March of 2012 (the "first production"). *See* ECF No. 108 at 3.

The first production of suppressed evidence at issue in this case is what has been referred to as the "Maculla note." Once produced by the Commonwealth, Natividad filed a Successor

8

PCRA Petition stating a claim pursuant to *Brady* and its progeny. *See Commonwealth v. Natividad*, 200 A.3d 11, 18 (Pa. 2019). That petition dealt primarily with the hand-written note, reproduced in full below.[5] *See id.* at 17-18.



This cryptic note, by itself and on its face, is not in any way exculpatory, but it ultimately led defense investigators to exculpatory evidence.

Following the defense investigation prompted by the note's contents, Natividad discovered that "John 'Maculla'" referred to McCullough, who claimed to have seen Campbell's murder. McCullough provided a statement to Natividad's post-conviction defense team in which he swore that he saw two men accosting Campbell, heard gunshots, and then saw the two men flee the scene in a black car. McCullough also stated that he knew Natividad, and that neither of the men was Natividad (ECF No. 108 at 17-19). McCullough told defense investigators that he was interviewed by police over the days following the murder, *see* N.T. 4/28/2016 at 27 (Supp. App. 878), but that the police did not reach out to him after Natividad became a suspect. *See id.* at 59 (Supp. App. 886). The police maintained that they never formally interviewed McCullough. *See* N.T. 5/20/2016 at 48-54 (Supp. App. 925-27).

---

[5] The relevant portion of the note reads: "727-8853 John 'Maculla' B/M 40's Stocky, Reddish Hair, 5'11" Lt Comp Told manager on Sunday that he was on lot + saw incident."

In 2013, Natividad filed another discovery motion in federal court to supplement the discovery the Commonwealth produced in 2012 (ECF No. 46). The Commonwealth again maintained that there was no further *Brady* material to disclose, *see* ECF No. 48 at 2, but ultimately did not file an opposition to the Supplemental Motion and the Motion was granted (ECF No. 49).

Pursuant to that Discovery Order, Natividad's defense team attempted to review the homicide investigative file and the prosecution files (ECF No. 56 at 5-6), but the Commonwealth opposed on the grounds that the defense's discovery request was meritless, as no further *Brady* material existed, and that the discovery order was in direct conflict with a contemporaneous state court discovery ruling. (ECF No. 58 at 14). The federal court ordered the Commonwealth to grant Natividad's defense team complete access to the files in 2014 (resulting in the "second production") (ECF No. 73).

The second production of suppressed evidence at issue in this case is what has been referred to as the "Robinson material." Because of this Court's Order which resulted in the defense's ability to inspect files, Natividad uncovered information regarding Joseph Rutherford and Cynthia Smith, who both told police five days after Campbell was killed that Robinson had confessed to the murder. *Natividad*, 200 A.3d at 20-21.

In a statement to police, Smith explained that on the night Campbell was killed, Robinson came into a house where she was staying and revealed that he had been at the gas station where the murder took place. *Id.* at 21. On November 13, four days after the murder, Smith asked Robinson whether he had killed Campbell, and he responded "Yeah—I did it" and then "that's what happens to snitches." *Id.* Smith told police that Robinson then left the house but returned shortly afterward and offered to loan her money for drugs, which she interpreted as an attempt to buy her silence. *Id.*

Rutherford stated that he got into an argument with Robinson on the night of November 11, 1996 and threatened to kill him. *Id.* at 20. In response, Robinson said that he would "do [Rutherford] like he did Bob down at the gas station." *Id.*

During an interview with police on November 14, Robinson told police that he had stopped at the gas station following Campbell's murder because he saw all the police cars at the scene, but then lied when he said that he did not know anything about the murder. *Id.* at 21. Robinson described Campbell as a white male lying on the ground with blood around his shoulders, who was wearing a jacket and had a gun holstered at his waist. *Id.*

Police investigatory paperwork that was prepared contemporaneously with the formal statements corroborated the Robinson confessions. *Id.* at 21-22. Tracie Durham told Officer Shane Darden that she had seen Robinson near the gas station ten minutes before the shooting. *Id.* at 22. Michael Cupaiuolo told Officer Darden that Robinson admitted to being at the scene when Campbell was shot. *Id.* In sum, Robinson was placed at the scene before, during, and after the shooting.

The suppressed documents also reveal a motive for Robinson to shoot and kill Campbell. According to investigative notes in the police homicide file, Campbell was part of a "town watch" and at the time of his murder, members of the town watch had been targeting an address where Robinson was dealing drugs. App. Exh. No. 3. This fact considered in light of Robinson's comment to Cynthia Smith that Campbell was a snitch, makes the alternate suspect theory suppressed by the Commonwealth even more compelling.

Within 60 days of discovering this evidence, Natividad filed a supplement to his Successor PCRA Petition that outlined, among other claims, further *Brady* violations related to the

Commonwealth's failure to disclose statements it had taken from Rutherford and Smith. *Id.* at 14-17.

The PCRA court granted an evidentiary hearing about the timeliness of the Successor PCRA Petition's claim relating to McCullough. *Natividad*, 200 A.3d at 23. At the hearing, Natividad presented McCullough's testimony, N.T. 4/28/2016 at 15-154 (Supp. App. 875-910), while the Commonwealth responded with testimony from McCullough's son, John McCullough III, N.T. 5/20/2016 at 5-42 (Supp. App. 915-924), Detective James Dougherty, *id.* at 43-75 (Supp. App. 924-32), and Assistant District Attorney Jason Harmon, N.T. 7/7/2016 at 46-58 (Supp. App. 946-49).

At the hearing, McCullough testified that at the time Campbell was killed, he was near the Exxon station with his son, John McCullough III. N.T. 4/28/2016 at 18-19 (Supp. App. 876). He heard a gunshot come from three men who were standing near the station's gas pumps, then saw two of those men run across the street to a black car and flee the scene. *Id.* at 20-21 (Supp. App. 876-77). McCullough, who was familiar with Natividad from a summer program, said that Natividad was not one of the two men he saw fleeing. *Id.* at 22-23 (Supp. App. 877).

McCullough went on to testify that he immediately told police what he had seen and was taken to a police station at 55th and Pine Streets in Philadelphia to be interviewed further, and from there to "the Roundhouse," a building located at Eighth and Race Streets. *Id.* at 27-28 (Supp. App. 878). That same week, police contacted McCullough and conducted a photo lineup, but he did not identify any of those photos as belonging to individuals involved in the shooting. *Id.* at 30 (Supp. App. 879).

John McCullough III, on the other hand, contradicted his father and testified that they were nowhere near the Exxon station on the night Campbell was killed. N.T. 5/20/2016 at 6 (Supp. App.

915). This straightforward rebuke of the elder McCullough's testimony was called into question by evidence that John McCullough III was being held by police for stealing copper when he first met one-on-one with Detective James Dougherty, the lead detective for the Campbell case, and made his statement contradicting his father's version of events. *See id.* at 21-25 (Supp. App. 919-20). Importantly, after he gave that statement, the Commonwealth declined to charge John McCullough III over the actions for which he was arrested. *See id.* at 41 (Supp. App. 924). John McCullough III said that the police did not make any overt request that he testify in any particular way, *id.* at 31 (Supp. App. 921), but in a letter to his father that he wrote while being held, the younger McCullough said, "[t]hey kept me at 8th and Race for two days questioning me about a murder I don't know anything about" and entreated his father to "let Detective Dougherty know [the elder McCullough was] persuaded by the people who are backing Ricardo Natividad to say these things." N.T. 4/28/2016 at 44 (Supp. App. 882). When cross-examined, the younger McCullough explained that what he wrote regarding being held for two days was untrue. N.T. 5/20/2016 at 40-41 (Supp. App. 923-24). However, two days did elapse between his post-arrest transport to a police district and his transfer to a state facility. *Id.*

Detective Dougherty reiterated the Commonwealth's claims that the elder McCullough had not been transported to any location for further questioning following Campbell's shooting and produced a police document that indicated as much. N.T. 5/20/2016 at 47-51 (Supp. App. 925-26). He also testified that he had spoken to McCullough following the murder but declined to make any notes memorializing the conversation. N.T. 7/7/2016 at 9 (Supp. App. 937). Furthermore, Detective Dougherty explained that when he spoke to John McCullough III, he showed the younger McCullough his father's affidavit on behalf of Natividad and explained "that it could be

perjurious if someone lied on an affidavit like that" in order to "make [John McCullough III] aware of the fact of what his father was opening himself up to by lying." *Id.* at 7 (Supp. App. 936).

ADA Harmon testified that the charges against John McCullough III were dismissed because there was insufficient evidence to sustain them, not because of any quid pro quo arrangement the younger McCullough had made with the Commonwealth. *See id.* at 49 (Supp. App. 947).

The PCRA court denied relief based on claims stemming from the Maculla note, explaining that it did not find McCullough's testimony to be credible. N.T. 7/14/2016 at 60-61 (Supp. App. 968-69). The court then granted relief based on other, non-*Brady* claims, and vacated Natividad's conviction and death sentence. *See Natividad*, 200 A.3d at 25. The Commonwealth filed a motion for reconsideration, and in 2017, the PCRA court vacated its order granting relief and dismissed the successor petition in its entirety. *Id.*

On appeal, SCOPA denied all of Natividad's *Brady* claims. *Id.* at 41. Specifically, the court found that the claims stemming from the Maculla note were time barred because, although Natividad filed his claim within the requisite 60 days of obtaining McCullough's exculpatory statement, he did not file within 60 days of obtaining the note. *Id.* at 28-29. Thus, SCOPA did not consider the merits of McCullough's testimony. *See id.* at 29. The court then ruled that, because the Maculla note claim was time barred, it could not consider the cumulative prejudicial effect of the Maculla note and Robinson material. *Id.* at 39. The court found claims related to Robinson's alleged confession were timely, *id.* at 29, but were insufficiently material to establish a *Brady* violation. *Id.* at 32-38.

14

Following SCOPA's ruling, Natividad amended his Petition for Writ of Habeas Corpus to request habeas relief stemming from the Commonwealth's suppression of the Maculla note and Robinson material.

### III.   PROCEDURAL POSTURE

This petition for a writ of habeas corpus was timely filed following Natividad's initial exhaustion of his state post-conviction remedies. This Court has retained jurisdiction for many years while the parties pursued state-court claims arising from the evidence uncovered by this Court's Discovery Orders. The case now returns to this Court, after SCOPA rejected Natividad's claims arising from the newly discovered evidence.

The Commonwealth knowingly and intelligently waives its right to raise any time bar as a defense to the Maculla note claim, and therefore the merits of all Natividad's *Brady* claims are properly before this Court.

### A.  The Commonwealth Waives All Procedural Defenses, Including but Not Limited To, Default.

The Commonwealth's position is that Natividad did not default on his claims and that SCOPA's ruling to the contrary is in error. Consequently, the Commonwealth elects not to raise SCOPA's ruling that Natividad procedurally defaulted on his claims related to the Maculla note as a defense to the instant habeas litigation. *See Natividad*, 200 A.3d at 26-29. The Antiterrorism and Effective Death Penalty Act ("AEDPA") of 1996 permits—but does not require—states to raise a petitioner's procedural default during state court proceedings as an affirmative defense to federal habeas corpus claims. *See Showers v. Beard*, 635 F.3d 625, 629 (3d Cir. 2011) (citing *Trest v. Cain*, 522 U.S. 87, 89 (1997)). However, the Commonwealth believes that SCOPA's decision to deny Natividad's claim as untimely pursuant to § 9525(b)(1)(i) of Pennsylvania's PCRA, but

overlook his alternate path to relief under § 9525(b)(1)(ii), is an inconsistent application of an otherwise "generally sound rule" and cannot form an adequate state law basis for denying federal habeas relief.

The PCRA requires that all post-conviction petitions be filed within one year of the date on which the judgment that is being collaterally attacked became final. *See* 42 Pa. C.S. § 9545(b)(1) (2020). Section 9545(b)(1)(i) permits PCRA claims that are raised after that year has elapsed when "the failure to raise the claim previously was the result of interference by government officials." *Id.* § 9545(b)(1)(i). Section 9545(b)(1)(ii), on the other hand, permits untimely claims when "the facts upon which the claim is predicated were unknown to the petitioner and could not have been ascertained by the exercise of due diligence." *Id.* § 9545(b)(1)(ii). At the time Natividad raised his *Brady* claims, claims brought after the initial one-year limitations period elapsed must have been brought within 60 days of the time at which the facts justifying the late filing accrued. *Id.* § 9545(b)(2).[6]

Natividad argued that his claims related to the Maculla note were excused from default by both § 9545(b)(1)(i) and (b)(1)(ii) (ECF No. 108 at 32). Natividad argued that the Maculla note satisfied § 9545(b)(1)(i) because the Commonwealth prevented him from obtaining the note, and therefore the evidence to which the note led. *See* Appellant's Br. 25 (Supp. App. 1000). He argued that it also satisfied § 9545(b)(1)(ii) because no amount of due diligence would have allowed Natividad to locate McCullough unless and until the Commonwealth disclosed the Maculla note's existence. *See id.* at 26 (Supp. App. 1001).

In its decision adjudicating Natividad's PCRA claims, SCOPA ruled that Natividad failed to raise his claims related to the Maculla note in a timely fashion, *Natividad*, 200 A.3d at 26-29,

---

[6] The PCRA was amended in 2018 to afford a year, rather than 60 days, in which to bring claims whose tardiness is excused under 42 Pa. C.S. § 9545(b)(2) (2020).

but its analysis of his claim was an unreasonable determination. SCOPA reached this conclusion because Natividad filed his petition within 60 days of obtaining McCullough's affidavit, but not within 60 days of obtaining the note itself. *See id.* By disclosing the note, the Commonwealth had ended any government interference and started § 9545(b)(1)(i)'s 60-day clock. *See id.* However, SCOPA did not address Natividad's argument that it was McCullough's statement, not the note itself, that contained newly discovered, exculpatory evidence, and that his exercise of due diligence in obtaining that statement and filing a petition within the subsequent 60 days was sufficient to independently satisfy § 9545(b)(1)(ii)'s "after-discovered evidence" exception. *See id.* Failure to satisfy one exception cannot foreclose the availability of another in this way because Pennsylvania Supreme Court precedent requires that each of the three prongs of § 9525(b)(1) be analyzed independently. *See Commonwealth v. Yarris*, 731 A.3d 581, 587-92. (Pa. 1999). When the facts of his *Brady* claim are applied to § 9525(b)(1)(ii), Natividad very clearly satisfies the after-discovered evidence exception requirements, making the question of whether he satisfied the government interference exception moot. This is because it is uncontested that he uncovered McCullough's identity and testimony with due diligence following the note's disclosure, and then filed his related *Brady* claim within 60 days of interviewing McCullough.

Under normal circumstances, SCOPA's ruling that the Maculla note was untimely would provide an adequate and independent state law ground barring federal habeas relief. However, the Commonwealth agrees with Natividad that SCOPA did not apply the state post-conviction filing deadlines in their regular fashion, and therefore those deadlines are not adequate to form the basis for a procedural default.

Typically, a federal court is barred from reviewing any claims for post-conviction relief that were not raised "at a time or in a manner required by state procedures" during state appellate

17

or post-conviction review. John C. Jeffries, Jr. & William Stuntz, *Ineffective Assistance and Procedural Default in Federal Habeas Corpus*, 57 U. Chi. L. Rev. 679, 681 (1990). This includes both instances in which a petitioner "understandingly and knowingly . . . deliberate[ly] by-pass[ed] . . . state procedures," *Fay v. Noia*, 372 U.S. 391, 438 (1962), and those in which a petitioner defaults on a claim unintentionally. *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977).

A defaulted state procedural requirement is only sufficient to bar federal habeas review when it is independent of any federal question at issue and adequate to support the state's judgment. *See Lee v. Kemna*, 534 U.S. 362, 375 (2002). "The adequacy of state procedural bars to the assertion of federal questions . . . is not within the State's prerogative finally to decide; rather, adequacy 'is itself a federal question.'" *Id.* (quoting *Douglas v. Alabama*, 380 U.S. 415, 422 (1965)). "Ordinarily, [a petitioner's] violation of 'firmly established and regularly followed' state rules . . . will be adequate to foreclose review." *Id.* at 376 (*quoting James v. Kentucky*, 466 U.S. 341, 348 (1984)); *see also Walker v. Martin*, __ U.S. __, 131 S. Ct. 1120, 1127 (2011) (stating that the test for determining whether a rule is adequate is whether that rule is "firmly established and regularly followed"). In "exceptional cases," however, a "generally sound rule" might nevertheless be applied in such a way that it is inadequate to bar federal review. *Id.*

The Commonwealth believes that SCOPA's decision to deny Natividad's claim as untimely is one of those exceptional cases. The purposes of the adequacy doctrine are to "ensure that state courts do not set traps for unwary litigants bringing disfavored claims" and "to ensure that habeas petitioners have fair notice of what they must do to avoid default." *Kindler v. Horn*, 642 F.3d 398, 401 (3d Cir. 2011). Natividad's case appears to implicate both those purposes.

First, this Court has found a pattern of SCOPA misapplying the standards used to evaluate *Brady* claims in a way that suggests those claims are disfavored. In particular, SCOPA has been

applying a materiality analysis that is contrary to clearly established federal law. *See* Part IV(A)(1)(i), *infra*. After being alerted to this discrepancy by the Third Circuit, SCOPA reacted by changing the rule it articulated in its opinions, but retaining its prior, more demanding standard in application. When the Third Circuit's attempts to redirect SCOPA's materiality analysis became more forthright, SCOPA defended itself by noting that lower federal court decisions have no power to bind state courts. The Commonwealth is aware of the substantial overlap between SCOPA's opinion and the Commonwealth's brief in their respective materiality analyses and disavows prior pleadings to the extent that they are inconsistent with this Answer.

Second, when Natividad received the Maculla note, there was no way that he could have predicted that SCOPA expected him to file any related *Brady* claims immediately, rather than conducting further investigation. Section 9525(b)(1)(ii)'s exception for newly discovered evidence is straightforward and relatively unequivocal, and Natividad appears to have complied with its requirements. Natividad could not have known that McCullough possessed exculpatory evidence purely based on the Maculla note and so the 60-day run date for newly discovered evidence would not ordinarily have started at its disclosure.[7]

In order to comply with the timeliness requirement SCOPA ultimately applied in his case, Natividad would have had to predict that the court would choose not to apply a section of the PCRA, and therefore speculatively file a claim based on the contents of the Maculla note itself, hoping that an interview with McCullough would yield exculpatory information. It is difficult to imagine what argument a PCRA petition based solely on the Maculla note might have contained,

---

[7] SCOPA has found a petitioner's claim of bias to be predicated upon an article that detailed a judge sending and receiving objectionable emails rather than an earlier article linking the judge to an email scandal with no further information. *Commonwealth v. Robinson*, 204 A.3d 326, 342 (2018). SCOPA similarly found the 60-day run date for a post-conviction claim started when the FBI conceded widespread error in a forensic technique in 2015, not when the scientific foundation of such a technique could be questioned starting in 1974. *Commonwealth v. Chmiel*, 173 A.3d 617, 626-27 (Pa. 2017).

but it almost certainly would have been insufficient in the eyes of the court. As a result, the approach that SCOPA took in this case was too unpredictable to provide fair notice as to how Natividad could avoid default.

Because the state procedural rule that resulted in Natividad's default was applied inaccurately, inconsistently, and unpredictably, the Commonwealth cannot, in good faith, rely on that rule as a basis for challenging Natividad's request for habeas relief.

**B.  Natividad's Ultimate *Brady* Claim Must be Reviewed *De Novo*, but Any State Court Findings of Fact Must be Presumed Correct pursuant to 2254(e)(1).**

Under AEDPA, federal courts must defer to state courts' legal determinations and findings of fact, unless they are rebutted by clear and convincing evidence. § 2254(e)(1).  Here, Natividad's ultimate claim has not been addressed by the state courts, and the demanding standards of 28 U.S.C. § 2254(d) are therefore inapplicable. Accordingly, Natividad's claims should be reviewed *de novo*. *See, e.g.*, *Cone v. Bell*, 556 U.S. 449, 472 (2009).

Natividad's PCRA claim requested relief because the Commonwealth suppressed two sets of evidence: the Maculla note and the Robinson material. Because SCOPA found that Natividad's Maculla note claims were untimely, it did not consider the cumulative impact of both the Maculla note and the Robinson[8] material. *See Natividad*, 200 A.3d at 39 ("Given our determination that appellant's *Brady* claim concerning the Maculla note is untimely, that evidence is not properly before us, and we therefore decline to consider it in the analysis."). And the Commonwealth has waived any alleged procedural default that prevented SCOPA from considering the cumulative

---

[8] The Commonwealth recognizes that this Court must review the Robinson Brady claim through the lens of 28 U.S.C. 2254(d). As discussed further below, the Commonwealth avers that the state court's materiality analysis represents was contrary to clearly established federal law and constituted an unreasonable determination of the facts in light of the evidence presented in the State court proceedings. *See* § 2254(d).

effect of the suppressed evidence. Consequently, the cumulative effect of both the Maculla note and the Robinson material is properly before this Court—a claim on which no state court has ruled. *See id.*

While Natividad's claim must be reviewed *de novo*, this Court must presume that all state court findings of fact are correct absent clear and convincing evidence to the contrary. 28 U.S.C. § 2254 (e)(1).

## IV.   ARGUMENT

### A.  Natividad Is Entitled to Relief on His *Brady* Claim.

At this point in Natividad's case, it is uncontested that the evidence at issue is both favorable to the accused and suppressed by the state. SCOPA ruled as much with regard to the Robinson material. *Natividad*, 200 A.3d at 32 ("We need not belabor our discussion of whether appellant has satisfied the first two components of *Brady*: without a doubt the trove of statements and investigatory paperwork revealed during the federal discovery process were suppressed by the government and favorable to appellant."). That analysis is equally applicable to the Maculla note, and so the Commonwealth readily concedes the point.

What has been disputed, however, is whether the suppressed evidence satisfied *Brady*'s materiality requirement. SCOPA ultimately ruled that the Robinson material, when considered alone, was not material. SCOPA made no determination as to the Maculla note's materiality, nor whether both sets of evidence were material when considered cumulatively.[9] Upon further

---

[9] The state courts should have analyzed the cumulative materiality of Natividad's claims even if it found one of the two to be immaterial on its own or defaulted. *See Commonwealth v. Abdul-Salaam*, 42 A.3d 983 (Pa. 2012) (analyzing the cumulative materiality of two *Brady* claims even after one had been determined to be immaterial, non-exculpatory, and waived in prior proceedings). It's failure to do so was contrary to clearly established federal law. *See Kyles v. Whitley,* 514 U.S. 419, 437 (1995); *Dennis v. Sec., PA Dept. Corr.*, 834 F.3d 263, 311-13 (3d Cir. 2016).

consideration, the Commonwealth concedes that the suppressed evidence meets the standard for materiality whether viewed individually or cumulatively.

Although the collections of evidence will be analyzed individually for the sake of clarity, it is the Commonwealth's position that the only relevant analysis for this Court's purposes is the cumulative effect of all the suppressed material and clearly established federal law requires as much.

1. The Robinson material

SCOPA analyzed the Robinson material and concluded that it, alone, was not sufficiently material to justify PCRA relief. However, the Commonwealth believes that SCOPA's materiality analysis was mistaken in two ways. First, although the court stated it was applying the proper standard in Natividad's case, its reasoning shows that it applied a materiality standard that was more demanding than warranted by clear Supreme Court jurisprudence. Second, the court's findings represent an unreasonable determination of the facts in light of the record. Specifically, the court overstated the strength of the evidence the Commonwealth presented at trial. The result being that the court failed to credit the strength of the unified theory of the case that Natividad's defense counsel might have been able to produce had the Commonwealth not suppressed exculpatory evidence.

i.   *SCOPA Unreasonably Engaged in an Overly Demanding Materiality Analysis that Is Contrary to Clearly Established Federal Law.*

Although SCOPA correctly stated the standard under which *Brady* violations are reviewed, the language that the court relied on in its opinion makes clear that it actually held Natividad to a much higher standard, contrary to clearly established federal law and Supreme Court jurisprudence.

Suppressed evidence is material when "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682 (1985). Importantly, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434. The fact that a juror might not afford the suppressed evidence great weight does not excuse the Commonwealth's *Brady* obligations. *See Lambert v. Beard*, 537 Fed. App'x 78, 86 (3d Cir. 2013). Even evidence with only "some value" in exculpating the defendant or impeaching a witness should be disclosed. *See id.* (citing *Kyles*, 514 U.S. at 419).

This Circuit has previously found that SCOPA's materiality analysis pursuant to *Brady* was contrary to clearly established federal law and Supreme Court jurisprudence. *Dennis v. Sec., PA Dept. Corr.*, 834 F.3d 263, 311-13 (3d Cir. 2016).[10] In *Dennis v. Secretary of the Pennsylvania Department of Corrections*, the Third Circuit observed: "that the Pennsylvania Supreme Court knew the proper standard for materiality does little to demonstrate that it actually applied [that standard] reasonably. Instead of engaging in a holistic materiality inquiry . . . the Pennsylvania Supreme Court proceeded down an analytical path that hinged . . . materiality on the sufficiency of the evidence." 834 F.3d 263, 303 (3d Cir. 2016). The Third Circuit characterized SCOPA's analysis as "evaluat[ing] whether, after considering [the suppressed] testimony, the remaining

---

[10] Similarly, SCOPA has been criticized for applying a materiality standard that was too stringent. *See generally Wilson v. Beard*, 589 F.3d 651 (3d Cir. 2009); *Haskins v. Superintendent Greene SCI*, 755 Fed. App'x, 184 (3d Cir. 2018); *Lambert v. Beard*, 537 Fed. App'x. 78 (3d Cir. 2013).

eyewitness testimony was sufficient for Dennis's conviction." *Id.* at 304. The Third Circuit reached

that conclusion through inferences it drew from the language SCOPA relied on in its opinion. *Id.*

In its opinion denying Natividad PCRA relief, SCOPA's language—and the cases it chose

to cite—likewise suggest that the court engaged in an analysis that was overly demanding, despite

articulating the proper "reasonable probability" standard. *Natividad*, 200 A.3d at 26.

The first piece of evidence that SCOPA engaged in an unreasonable application of clearly

established federal law was the court's decision to cite *Agurs v. United States*, 427 U.S. 97, 112-

13 (1976), for the proposition that "[i]f there is no reasonable doubt about guilt whether or not the

additional evidence is considered, there is no justification for a new trial." *Natividad*, 200 A.3d at

33 (quoting *Agurs*, 427 U.S. at 112-13). Requiring that suppressed evidence create a reasonable

doubt is a more stringent standard than clearly established United States Supreme Court precedent

permits. If the evidence's suppression resulted in an unfair trial or a trial whose outcome is not

worthy of confidence, that is enough. *See Kyles*, 514 U.S. at 434.

As the *Natividad* dissent pointed out, cases subsequent to *Agurs* clarify that case's

reasoning and flatly state that "a showing of materiality does not require demonstration by a

preponderance that disclosure of the suppressed evidence would have resulted ultimately in the

defendant's acquittal (whether based on the presence of reasonable doubt or acceptance of an

explanation of the crime that does not inculpate the defendant)." *Natividad*, 200 A.3d at 44 n.3

(Wecht, J., dissenting) (quoting *Kyles*, 514 U.S. at 434).

Additionally, the language that SCOPA used to distinguish their reasoning in *Natividad*

from that in *Dennis* further suggests that the court's analysis turned on an evidentiary standard that

is contrary to clearly established federal law. In *Dennis*, the Third Circuit described evidence that

SCOPA previously held to be immaterial as "effectively gutt[ing]" the Commonwealth's case and

therefore granted habeas relief. *Dennis*, 834 F.3d at 269. SCOPA justified a different outcome for Natividad by noting that the suppressed evidence in his case did not "effectively gut" the Commonwealth's original case. *Natividad*, 200 A.3d at 36. This attempt to distinguish the cases is an unreasonable application of clearly established federal law, however. Suppressed evidence need not "effectively gut" the Commonwealth's case for that evidence to be material. Any evidence that guts the Commonwealth's case most likely also leaves the Commonwealth *without sufficient evidence to convict*, which is more than clearly established federal law and Supreme Court precedent requires. The extraordinary favorability of the evidence in *Dennis* should therefore not be regarded as the floor for materiality. The Third Circuit's choice to describe the evidence as "gutting" the Commonwealth's case is better read as an attempt to portray how seriously mistaken SCOPA's analysis in that case was, not to describe a quality that evidence must possess to be considered material. *See Dennis*, 834 F.3d at 269.

To further explain its decision, SCOPA contrasted *Dennis*, where the suppressed evidence "effectively gutted" the Commonwealth's case, *id.*, with *Turner v. United States*, where the evidence of guilt remained overwhelming even after taking the suppressed evidence into account. 137 S.Ct. 1885, 1894, 198 L. Ed. 2d 443 (2017). SCOPA began its application of *Turner* to the present case by admitting that *Turner* is "bound to [its] unique facts," *Natividad*, 200 A.3d at 37, echoing the United States Supreme Court's emphasis that *Brady* claims are "fact-intensive." 137 S.Ct. at 1888. Nevertheless, it concluded that there was enough uncontradicted evidence in *Natividad* to render the suppressed evidence similarly immaterial. *See Natividad*, 200 A.3d at 37. But in its discussion of *Turner*, SCOPA missed the crux of the issue in the case: the overwhelming evidence of guilt. *See* Natividad, 200 A.3d at 37. The type of overwhelming evidence extant in *Turner* does not exist in Natividad's case.

*Turner* involved the robbery, assault, rape, and murder of Catherine Fuller. 137 S.Ct. at 1889. Fuller was found in an alley garage. *Id.* At trial, the prosecution advanced the theory that Fuller was attacked in the alley by a large group, based on evidence supplied by the cooperation of two of the perpetrators, an eyewitness who saw the group selecting Fuller as a target, three eyewitnesses who saw the group attack, and a videotaped confession of one of the defendants. *Id.* at 1889-90. The *Brady* claim in *Turner* involved the identities of two men who were seen running into the alley after Fuller's body had been discovered. *Id.* at 1891.[11] In post-conviction review, the petitioners in *Turner* learned that one of the two men was James McMillan, who was arrested for beating and robbing two women in the neighborhood in the weeks following Fuller's death but prior to the petitioners' trial. *Id.* The petitioners also learned that seven years after their trial, McMillan had robbed, sodomized, and murdered a young woman in an alley. *Id.*

The United States Supreme Court found that in the context of the entire record, the suppressed evidence was "too little, too weak, or too distant from the main evidentiary points to meet *Brady*'s standards." *Id.* at 1894. In order to find the *Brady* claim material, the petitioners' alternate theory would have had to persuade the jury that 1) both testifying perpetrators falsely confessed to being active participants in a group attack that never occurred; 2) a disinterested witness who recognized the petitioners and saw the attack fabricated his story, 3) two other witnesses testified to seeing a group attack that did not occur; 4) a witness lied about seeing petitioners identify Fuller as a target; and 5) the videotaped defendant falsely implicated himself in that group attack and gave a similar account of the attack to the prosecution's witnesses. *Id.* All told, five identification witnesses who saw or participated in the attack, one identification witness

---

[11] The *Brady* claim rested on the identities of the two men, as the petitioners in *Turner* were aware that two men had been seen entering the alley after Fuller's body was discovered. *Id.* at 1894. The United States Supreme Court suggested that the reason no petitioner raised a single-attacker theory despite such knowledge was the overwhelming evidence that there had been a group attack. *See id.*

who saw the petitioners in the moments before the attack, and one recorded confession would have to be disbelieved, all because two men, one of whom went on to commit other crimes, were spotted in the alley after the attack had already taken place. McMillan's later crimes—although horrific—have little bearing on the exculpatory value of his presence near the alley where Fuller was attacked, since McMillan's most relevant crime—the alleyway murder—did not take place until long after the trial concluded. Even if one were to assume that McMillan's later actions demonstrate that his modus operandi were attacking women in alleys, the prosecution could not have known to disclose the information seven years before it existed.

The evidence against Natividad was nowhere near as conclusive, and the suppressed evidence is more concrete. The prosecution presented two identification eyewitnesses who have substantial credibility issues, *see* Part IV(A)(1)(ii), *infra*., and three identification witnesses who were not at the scene of the carjacking or the shooting. In the seven months that elapsed between the carjacking and the date that Havens first identified Natividad, Havens had seen a photograph of Natividad on the news in connection with Campbell's shooting. N.T. 11/5/1996 at 183-86 (Supp. App. 183-86). Price exculpated himself in his statements and testimony, contradicting a statement from Dwayne Davis, a disinterested third party. *See* App. Exh. No. 18. Catlett called a tips line offering reward money after speaking to her then-boyfriend Price about the shooting. N.T. 11/6/1997 at 153-54 (Supp. App. 393-94).

For the suppressed evidence to be material here, only one juror would have to believe that 1) Havens made a mistaken identification after inconsistently describing the carjacker, being tainted with a news report, and the passage of time, *see* N.T. 11/5/1996 at 177, 181-86 (Supp. App. 177, 181-86); 2) Price and Catlett blamed Natividad in order to exculpate Price and/or receive reward money, *see* N.T. 11/6/1996 at 37, 153-54 (Supp. App. 276, 393-94); and 3) the Robinson

material was more persuasive than the testimony of Price's friends, one of whom suggested the impossible motive of self-defense against a holstered gun. *See* N.T. 11/6/1996 at 165 (Supp. App. 404). The remaining circumstantial evidence presented at trial involved the "look alike" firearm, discussed below, that was never directly linked to the crimes.

Carl Harris testified that he saw Natividad walk around a corner with the man he allegedly sold the murder weapon, and then saw the man return with a revolver. N.T. 11/6/1996 at 110-15 (Supp. App. 349-54). Harris did not see the man purchase the gun. *Id.* at 108 (Supp. App. 347). In fact, Harris was not sure who else, if anybody, was with the man and Natividad around the corner. *Id.* at 120 (Supp. App. 359). Nor did Harris describe any distinctive black grips on the firearm. *Id.* at 115 (Supp. App. 354). The man's attorney received a revolver from him a month and a half after the alleged sale. *See id.* at 109 (Supp. App. 348); N.T. 11/7/1996 at 14-15 (Supp. App. 466-67). Ballistic testing did not tie that weapon to the gun that killed Campbell. *See* N.T. 11/7/1997 at 41-43 (Supp. App. 493-95). As a result, although the Commonwealth tried to link Natividad to the revolver produced at trial, the link that was established is relatively weak compared to the evidence that remained uncontradicted in *Turner*.

In its analysis, SCOPA did not discuss the strength and credibility of the specific evidence in *Turner*, but instead reduced it to the idea that the suppressed evidence was immaterial because it merely "may have opened the door to an otherwise unavailable defense theory." *See Natividad*, 200 A.3d at 37. To that end, SCOPA drew a direct comparison between the value of McMillan's identity in *Turner* and the Robinson material. However, unlike the suppressed evidence in *Turner*, which required the jury to speculate about what a man's presence near the scene of a crime might have meant, the Robinson material requires no speculation. It includes Robinson's confession to two different witnesses, his admission to another witness that he was on the lot *at the time of the*

28

*shooting*, an eyewitness who saw him drive past the gas station twice *prior to the shooting*, his admission to police that he was at the scene *after the shooting* despite untruthfully claiming he knew nothing about the crime, and police investigatory paperwork that was prepared contemporaneously corroborating the statements. App. Exh. Nos. 1-9.

And finally, as noted earlier, the suppressed evidence also provides a compelling motive for Robinson to shoot Campbell, beyond the fact that he told Cynthia Smith that Campbell was a snitch. App. Exh. No. 2. Campbell was apparently threatening Robinson's source of income and Campbell would have been identifiable by the portable radio that he carried as a town watchman. *See* App. Exh. 3. This type of evidence is readily distinguishable from McMillan having been seen entering the scene of the crime in *Turner* after the crime had already been completed. *Turner* dealt with overwhelming evidence of guilt foreclosing the materiality of a minutely favorable piece of evidence. But in Natividad's case, there is a dearth of credible identification testimony being challenged by substantive evidence that someone other than Natividad committed the shooting.

The Commonwealth believes that, had SCOPA applied the correct standard, it would have found that the Robinson material had a reasonable probability of affecting the outcome of Natividad's trial.

      ii.      *SCOPA's Disregard of Testimony Elicited at Trial That Bolstered the Robinson Material Constituted an Unreasonable Determination of Facts in Light of the Record.*

SCOPA mischaracterized the evidence against Natividad as "extensive." *Natividad*, 200 A.3d at 34. A review of the Notes of Testimony from Natividad's trial, however, reveals that the evidence against Natividad was not at all "ironclad" as SCOPA suggested.

When viewed with an eye to what might have happened had Natividad's defense been given access to the suppressed evidence, the Notes of Testimony reveal witnesses whose testimony

was successfully impeached, but whose uncertainties and contradictions lacked any unified theory to tie them together and grant them persuasive force—a theory that the suppressed evidence would have provided. It also reveals startling similarities in character between testimony about Natividad's confessions—which SCOPA credited—and statement detailing Robinson's confessions—which SCOPA dismissed as mere gossip.

To begin with, SCOPA's certainty that the suppressed evidence would not change the outcome of a new trial relied heavily on the fact that Havens identified Natividad as the man who carjacked him. *See id.* at 33. Placing Natividad at the carjacking put him in possession of a distinctive lumberjack jacket, revolver, and Lincoln later seen at the murder. *See id.* To the court's thinking, this was ironclad evidence of Natividad's guilt and cast Robinson's confessions as obvious puffery—making them immaterial. *See id.* The court concluded that the evidence linking Natividad to the carjacking was ironclad because:

> Havens's identification of appellant as the assailant who carjacked him, pointed a gun at his face, and threatened to kill him before speeding off in his Lincoln was unwavering. He identified appellant from a photo array and at the preliminary hearing. When Havens identified appellant as his armed carjacker at trial, he explained he had no difficulty seeing appellant's face while being held hostage for fifteen to twenty minutes, as he was within one foot of him and the dome light was on inside the car.

*Id.* But, despite Havens's certainty, his identification was not ironclad.

During a pretrial motion to suppress Havens's identification, Natividad's defense attorney elicited testimony from the detective who conducted the identification: prior to the photo lineup, Havens saw Natividad's picture on television in connection with Campbell's murder. N.T. 11/5/1997 at 67-68 (Supp. App. 67-68). Then, during the trial, Natividad's defense attorney elicited testimony from Catlett that Natividad was missing his top two teeth—identifying information that Havens did not include in his report to police. N.T. 11/6/1997 at 157 (Supp. App.

396). The defense also called a police officer as a witness who testified that Havens initially described his carjacker as wearing a sweatshirt and jeans, and in a later interview a long, black leather jacket. N.T. 11/10/1997 at 11 (Supp. App. 690). A competent defense attorney could have used these pieces of evidence to argue that Havens did not get as good a look at his carjacker as he thought, and that his certainty as to Natividad's identity was a consequence of seeing Natividad's picture on television at some point after his carjacking.

Given Price's testimony that he was present on the night of Campbell's murder, a jury might expect the police to ascertain whether or not Price had any knowledge of the allegedly related carjacking, but police did not appear to pursue that line of investigation. This would have also allowed defense counsel to paint the police as more interested in obtaining an identification of Natividad than in ascertaining the truth of who carjacked Havens or murdered Campbell.

Despite Havens's assertion that he was carjacked by two men, the police never had Havens address whether the second carjacker was Price, the man who was allegedly with Natividad the night Campbell was killed. N.T. 11/6/1997 at 69 (Supp. App. 308). If they had, they might have corroborated Havens's identification of Natividad, and the police department's failure to do so might have been used to cast doubt on the identification's accuracy.

The questions that these facts raise about Havens's identification both strengthen and are strengthened by the confession alluded to in the Robinson material. It is easy for a juror to paper over Havens's inconsistencies if brought to the jury's attention on their own—after all, other evidence pointed in the direction of the same suspect that Havens identified. Without evidence of an additional suspect, the inconsistencies brought out on cross examination are easily explained-away as the foibles of human recollection. They suggest that the eyewitness's memory might be fallible—but only about the small details. When viewed on their own, mistakes about collateral

issues such as whether Havens got a good look at his carjacker's teeth or clothing do not call into question the larger issue: whether the man in the courtroom was the same man who carjacked Havens. When paired with testimony about an alternate suspect, however, the doubts raised during trial become more pointed.

Natividad's defense attorney elicited similarly impeaching testimony regarding the gun, jacket, and car that SCOPA regarded as "unchallenged evidence" directly connecting Natividad to the murder. *See Natividad*, 200 A.3d at 36. In conjunction with the Robinson material, this testimony raises significant questions about whether the items from the carjacking were the same ones spotted at the gas station.

SCOPA relied on Havens's and Price's descriptions of the guns used in the carjacking and the murder to link Natividad to both crimes. The gun that Keith Smith's lawyer surrendered prior to trial resembled those descriptions and strengthened the inferences that could be drawn about Natividad's involvement. But SCOPA did not address evidence produced at trial that undermined those inferences. This included testimony elicited from Price on cross examination that he had originally told police that the gun used in Campbell's murder was a .38 caliber, and that he testified at trial that the gun was a .357 because police fed him that information. N.T. 11/6/1997 at 66-67 (Supp. App. 305-06). Price also admitted that he neglected to mention whether the gun had any distinctive black grips—the presence of which played a vital role in linking the gun used in the murder to the gun used in the carjacking. *Id.* at 67 (Supp. App. 306). And then there was the less than certain testimony from Harris about what he saw and did not see regarding the supposed transfer of the gun from Natividad to Smith. The notion of an ironclad link between the gun used to shoot Campbell and the gun in the Commonwealth's possession is belied by the notes of testimony.

There were also questions raised about the plaid "lumberjack jacket" used to link the carjacker and the shooter. *Natividad*, 200 A.3d at 36. It is not clear that the plaid jacket the killer wore was the same as the jacket that was in Havens's car when he was carjacked. Beth Johnson testified that the man who killed Campbell wore "a red plaid kind of jacket, like a—I think about Paul Bunion [sic] lumberjack kind of jacket." N.T. 11/6/1997 at 95 (Supp. App. 334). However, Havens described the jacket that was in his car as "black and purple." N.T. 11/5/1997 at 158 (Supp. App. 158). There is nothing in the record to suggest that Havens owned a red lumberjack style jacket that would match the description of the shooter's jacket or that the jacket in the trunk of Havens's car was disturbed. SCOPA misstates the value of Havens owning a black and purple jacket and the shooter wearing a red plaid jacket in that there is nothing linking the two other than their style.

Finally, SCOPA relied on testimony from Price, Martin Johnson, and Beth Johnson to establish that the car Campbell's killer drove was the same dark Lincoln that was stolen from Havens. Yet remarkably, Martin Johnson only assumed the car was a Lincoln because it had a tire well and Beth Johnson was unable to identify Havens's burned-out two-door Lincoln as the car in which she saw the shooter flee. *See* Part II(A)(ii), *supra*. What Beth Johnson was able to describe, however, was a four-door vehicle instead of a two-door Lincoln. *Id.*

Meanwhile, the Commonwealth elicited testimony that placed Natividad in a dark colored Lincoln around the time of the murder, but Harris testified that Natividad's godbrother owned a dark colored Lincoln, and that he had seen Natividad drive that car in the past, providing a benign explanation for any sightings of Natividad in a dark Lincoln. N.T. 11/6/1997 at 122 (Supp. App. 361). However, the Commonwealth impeached this testimony with a prior statement Harris made

to detectives asserting that he had only ever seen Natividad driving a Lincoln once—and that was shortly after Campbell was killed. *Id.* at 123-129 (Supp. App. 362-68).

Price identified the car with certainty—he testified to having ridden in it with Natividad. N.T. 11/6/1997 at 8-9 (Supp. App. 247-48). But since the defense's strategy for undermining Price's testimony was to suggest that he was lying about what happened, not to suggest that he was mistaken, raising questions about the accuracy of other witnesses' testimony would also serve to cast doubt on Price's honesty.

Taken together, testimony linking the car that was stolen from Havens to the car that was used during Campbell's murder, and then linking both of those events to Natividad, is far from being as clear-cut as SCOPA maintained. And, as with the other physical evidence in this case, the uncertainties and inconsistencies grow more compelling when presented alongside the evidence of an alternate suspect contained in the Robinson material.

Perhaps most importantly, if Natividad had been supplied with the identity of an alternate suspect, all the evidence that the Commonwealth submitted to rebut his claim of self-defense would have instead supported an argument that Natividad's alleged confessions were nothing more than macho bragging—or that testimony about his confessions was false. This may have drastically altered the course of the trial.

The reason that Natividad allegedly gave for shooting Campbell is so inconsistent with the uncontroverted facts of the murder that it further supports the conclusion that Natividad was bragging, rather than confessing. Two witnesses, Price, *id.* at 15 (Supp. App. 254), and Golatt, *id.* at 165 (Supp. App. 404), testified that Natividad told them that he shot Campbell because Campbell "drew on him." However, the Commonwealth produced substantial evidence that this could not have been the case. George Williams, a police officer who arrived on the scene shortly after

34

Campbell was killed, testified that Campbell was carrying a gun at the time he was killed, but that the gun had no bullet chambered, was holstered underneath a zippered jacket, and clipped into that holster. N.T. 11/5/1997 at 205-08 (Supp. App. 205-08). Williams's partner Stanley Sanford confirmed that Campbell's gun was snapped into its holster and that no round was chambered. *Id.* at 219-20 (Supp. App. 219-20).

Martin Johnson also testified that the holster was snapped shut. N.T. 11/6/1997 at 84 (Supp. App. 321). Furthermore, both Martin and Beth Johnson testified that, after Campbell was shot, he fell back with his hands raised, far from his holstered gun. *Id.* at 79, 94 (Supp. App. 318, 333).

In short, there is compelling evidence that Campbell did not make any attempt to draw his gun—or even to reach for it—and no evidence on the record to the contrary. Nonetheless, Natividad's attorney was forced to present an implausible self-defense theory at trial due to exculpatory information being suppressed.

A competent defense attorney with knowledge of an alternate suspect might use this information to argue either of two things: First, they could argue that Natividad's "confessions" were simply braggadocio; Natividad wanted to take credit for a murder he did not commit, and the details of which he did not know, so he concocted a version of events for his friends that made him look "tough." Alternately, they could argue that, since it is not clear what motive Natividad would have for lying about why he shot Campbell, the statements that Price and Golatt attributed to Natividad are evidence that they jointly fabricated the version of events they related at trial.

This is particularly important because it would provide the defense an opportunity to turn Commonwealth testimony meant to rebut any theory of self-defense into defense testimony meant to support a theory that Natividad's confessions were either puffery or were never made in the first place. This is a powerful use of suppressed evidence, and one that SCOPA did not consider. In

35

*Dennis*, the Third Circuit noted that "[t]ransforming . . . a disinterested individual . . . into a defense witness meets the requirements of *Brady* materiality . . . ." 834 F.3d at 295. Without an alternate suspect for the defense to point to, testimony from Officers Williams and Sanford that Campbell's gun was snapped in its holster was incredibly prejudicial: it painted Natividad as a ruthless killer and a half-hearted liar. But if the jury had been allowed to consider Robinson as the potential killer, the officers' testimony would instead have impeached the stories that Price and Golatt told. Since information about Campbell's gun could likely be brought out on cross-examination, even if the Commonwealth chose not to elicit that testimony, it might prompt the Commonwealth to eschew calling Williams and Sanford as witnesses entirely. *Cf. id.* at 294 (finding it significant that "likely, the prosecution would not have called [the witness] at all, and [the defendant] would have called [her] to corroborate his testimony").

Finally, SCOPA unreasonably discredited the Robinson material because it found the testimony about Robinson's alleged confession to be nothing more than "gossip circulating in early November 1997." *Natividad*, 200 A.3d at 49 (Wecht, J., dissenting). This characterization appears to have been lifted from the Commonwealth's argument, but the Commonwealth no longer considers it appropriate to draw such a distinction between the two sets of testimony. As the *Natividad* dissent correctly notes, the Commonwealth relied on "comparable evidence" to convict Natividad in the first place. *See id.*

The "unsubstantiated and disproven gossip" in the Robinson material consists of a series of statements by two individuals to whom Robinson allegedly confessed to the murder of Campbell. *See id.* at 50. But the same description could be applied to the statements from Natividad that Catlett, Wilson, and Golatt testified to on behalf of the Commonwealth. *See id.* The *Natividad* dissent points out that "[t]he Commonwealth discredits some exculpatory statements as mere street

gossip far removed from *Brady*'s materiality standard, while simultaneously bolstering its case against Natividad with other, inculpatory street gossip." *Id.* The Commonwealth now agrees with that assessment and believes that recasting the Robinson material as being evidence similar to the statements of Catlett, Wilson, and Golatt substantially strengthens its exculpatory value in relation to the evidence against Natividad.

By failing to credit the uncertainties, inconsistencies, and other issues that peppered the evidence against Natividad, SCOPA overstated the strength of the Commonwealth's evidence at trial and minimized the impact that the Robinson material might have had on the outcome of the trial. Upon further review of the trial record, the Commonwealth has concluded that, when coupled with impeachment testimony produced at trial, the Robinson material had a reasonable probability of changing the trial's outcome, had it been properly disclosed from the start.

2. The Maculla note

The Commonwealth believes that the Maculla note is material for *Brady* purposes because McCullough's testimony directly contradicts the chain of inferences that the Commonwealth relied on to prove that Natividad shot Campbell. McCullough testified that he was present at the gas station on the night that Campbell was murdered, that he saw three people arguing near a gas pump, heard the sound of a gunshot—possibly two—and then saw two of the three people run to a black car and drive off. *See* N.T. 4/28/2016 at 19-20 (Supp. App. 876). Vitally, McCullough also testified that he knew Natividad from an at-risk youth program, *id.* at 55 (Supp. App. 885), and that Natividad was not one of the people involved in the altercation nor otherwise present at the gas station on the night of the murder. *Id.* at 22-23 (Supp. App. 877). Moreover, McCullough testified that he gave police a statement to that effect shortly after the

murder, but that the Commonwealth did not disclose any record of that statement to the defense. *Id.* at 27-29 (Supp. App. 878-79).

Taken at face value, this statement very clearly satisfies the test for materiality outlined in Part IV(A)(1)(i), *supra*.: McCullough, an eyewitness to the crime told police that two men, rather than one, were involved in Campbell's murder, and that those men jumped into a dark-colored car, but neither one of those men appeared to be Natividad—whom McCullough knew as a teenager. McCullough's post-conviction testimony recounting those events goes to the heart of Natividad's primary defense at trial: that inconsistencies in the testimony of Commonwealth witnesses raised a reasonable doubt as to whether Natividad killed Campbell. McCullough's testimony, if believed, weaves those inconsistencies into a solid theory of the case. According to that theory, the disinterested witnesses, such as Havens and the Johnsons, were mistaken about who and what they saw. Price, on the other hand, was pressured by police into providing false testimony against Natividad—or else lied to protect himself. And, if it is true that Natividad bragged about killing Campbell, that was just young braggadocio, corroborated by the fact that McCullough could say with certainty that Natividad was not present at the gas station on the night of the murder.

The PCRA court that heard McCullough's testimony ultimately found that the testimony was not credible, and therefore not material. *See* N.T. 7/14/2016 at 61 (Supp. App. 969). The PCRA court's credibility determination, however, is not controlling because SCOPA determined that it lacked jurisdiction to make such a determination. *See Natividad*, 200 A.3d at 27-29; *Commonwealth v. Chester*, 895 A.2d 520, 522 (Pa. 2006) ("[I]f a PCRA petition is untimely, neither this Court nor the trial court has jurisdiction over the petition. Without jurisdiction, we simply do not have the legal authority to address the substantive claims."). Even so, for the

following reasons, the Commonwealth concedes that SCOPA's credibility finding has been rebutted by clear and convincing evidence, pursuant to § 2254(e)(1).

The basis for granting a new trial in a *Brady* case is the government's constitutional violation, not a PCRA judge's independent determination that suppressed testimony is credible. In *Smith v. Cain*, the United States Supreme Court explained that if two conflicting sets of testimony "merely leave[] us to speculate about which . . . contradictory declaration[] the jury would have believed" then the exculpatory testimony is material. *See* 565 U.S. 73, 76 (2012). In other words, a statement is often material *because* it conflicts with testimony that was elicited at trial. *See id.* In order to discount the materiality of that sort of statement, a court must have confidence that not one juror would have believed the suppressed evidence. *See id.* Having carefully reviewed the record in this case, the Commonwealth has concluded just the opposite—that is there is a reasonable probability that at least one juror would have been swayed by the suppressed evidence had it been presented.

In McCullough's case, the credibility issues that arose were apparent inconsistencies in his testimony brought out on cross-examination, directly contradictory testimony from both his son and the lead police detective on the case, and aspects of his personality that might be taken to suggest mental instability. Upon further consideration, the Commonwealth does not find these issues to call McCullough's credibility so much into question as to be confident that no juror would have believed him.

To support its argument that McCullough's testimony was not credible, the Commonwealth originally pointed to four things: McCullough's inability to remember whether he walked or drove to the gas station where the murder took place, his characterization of what he

39

saw at the gas station, his description of Sixty-Third Street between Vine and Jefferson Streets, and inconsistencies about the timeline of the investigation.

Rather than suggesting that McCullough was being dishonest, the Commonwealth now believes that these inconsistencies tend to suggest that he is hard of hearing, *see* N.T. 4/28/2016 at 36-37 (Supp. App. 880-81), and unaccustomed to the hostile—and at times overly legal—manner in which questions were posed. This led to frequent confusion about exactly what was being asked or answered. The Commonwealth also views the inconsistencies as reasonable in light of the fact that many of the events were almost twenty years in the past by the time McCullough testified about them—an issue that undoubtedly impacts the clarity of his recollection.

McCullough's willingness to admit when his memory was faulty bolstered his credibility, rather than undermining it. Early in his direct examination, McCullough confessed that he could not recall whether he walked or drove to the gas station on the night of the murder. *Id.* at 19 (Supp. App. 876). He was forthright about his uncertainty on both direct and cross examination. *See id.* at 19, 95 (Supp. App. 876, 895). Compared to the intensity of the other events that took place that night, this piece of information is relatively mundane, and seems to be the kind of detail that could credibly be forgotten over the course of twenty years.

McCullough also made several mistakes about the years in which interviews or conversations took place. He was unclear about when he found out that Natividad was the person who had been arrested for Campbell's murder. *See* N.T. 7/14/2016 at 36 (Supp. App. 962). However, the years of complex litigation that this case involves explain away those inconsistencies readily enough. And, importantly, it was not obvious that he and the Commonwealth were fully understanding one another when McCullough was cross examined on the subject. *See* N.T. 4/28/2016 at 111 (Supp. App. 899).

In contrast, McCullough seemed to have a very clear memory of what he saw at the gas station. He described three men standing near a gas pump before hearing a gunshot. *Id.* at 19 (Supp. App. 876). He admitted to being uncertain what kind of interaction he was seeing—whether they were shoving each other, moving excitedly, or whether one man was holding another back. *See id.* at 97 (Supp. App. 896). But this did not raise questions about whether he was lying about what he saw, as the Commonwealth insinuated at the time. Rather, it was a candid admission that he was not sure how to interpret what he observed.

Some of the alleged inconsistencies were misunderstandings of the Commonwealth. The Commonwealth also originally attacked McCullough's credibility for sometimes saying that he saw the shooting and sometimes saying that he did not. *See* N.T. 7/14/2016 at 29-30 (Supp. App. 961). It seems clear, however, that what McCullough is saying is that he saw *the shooting*—as in, the incident as a whole—but did not see the moment in which Campbell *was shot*. Likewise, the Commonwealth criticized McCullough for being inconsistent about the number of people at the gas station. Sometimes he mentioned that there were six or seven, and sometimes three. *See id.* at 30 (Supp. App. 961). But here as well, McCullough seemed to be answering two different questions: the number of people who were at the gas station and the number of people who were involved in the shooting. *See* N.T. 4/28/2016 at 19 (Supp. App. 876). The Commonwealth relied on its misinterpretation of these statements to create the appearance of inconsistency.

The Commonwealth also originally attacked McCullough for describing Sixty-Third Street as being "straight" between Vine and Jefferson Streets, the direction in which he testified that the shooters fled. *See* N.T. 7/14/2016 at 34 (Supp. App. 962). The Commonwealth described this misrepresentation as "the famous Sixty-Third Street incident," and noted that when viewed from above, Sixty-Third Street hooks slightly to the left after it crosses Haverford Avenue, between

Vine and Jefferson Streets. *Id.* It is important to note, however, that the change in direction is slight, and that an ordinary individual giving driving directions would likely describe crossing Haverford Avenue on Sixty-Third Street as "going straight" through that intersection. *See* Supp. App. 1048.

The Commonwealth also relied on contradictions between McCullough's testimony and testimony from both his son, John McCullough III, and the lead detective on the case, Detective Dougherty, as evidence that the elderly McCullough was lying. *See, e.g.*, N.T. 7/14/2016 at 27 (Supp. App. 960). Detective Dougherty repeatedly contradicted McCullough regarding the timing, existence, and content of interviews that Detective Dougherty allegedly conducted. *See id.* John McCullough III flatly testified that neither he nor his father were even present at the scene of the murder. *See* N.T. 5/20/2016 at 6 (Supp. App. 915).

The Commonwealth does not view these inconsistencies as dispositive evidence of McCullough's deception. This is because they are the very things that make suppression of the McCullough information a *Brady* violation. In one version of events, McCullough was never interviewed by police after the murder and fabricated his eyewitness testimony after the fact to satisfy Natividad's lawyers. McCullough, however, paints a picture in which the Philadelphia Police Department conveniently lost his statement, misrepresented its interest in the case after it found out he had been meeting with Natividad's counsel, and browbeat his son into committing perjury—all to protect Natividad's conviction. The true version of events would have been best ascertained by a jury.

However, any search for the truth of what occurred is complicated by the fact that some of those contradictions do not come from genuine disputes about what happened in the case, but rather from lies that McCullough candidly admitted to telling Detective Dougherty. *See* N.T.

4/28/2016 at 121 (Supp. App. 902). McCullough testified that, during a meeting with Detective Dougherty in 2012, he intentionally gave wrong answers to some of the questions that he was asked. *See id.* This is because he was concerned that the detective was trying to set him up in some way and wanted to protect himself. *See id.* For instance, McCullough once gave Detective Dougherty "the wrong location because [he] didn't know if [Dougherty] knew the right location." *Id.* Since the Commonwealth relied heavily on the documents that Detective Dougherty prepared following that conversation for impeachment purposes, it is at times difficult to determine which of McCullough's inconsistencies are due to his faulty memories, which are due to his fabrications, and which are due to Detective Dougherty's faulty memories or fabrications. Recognizing the difficulties that this causes in ascertaining the truth, the Commonwealth no longer discredits McCullough's sworn testimony simply because of the prior statements he gave in accordance with his personal and profound distrust for police.

Finally, the Commonwealth originally argued that McCullough's testimony demonstrated that he was either "an inveterate . . . liar" or mentally ill. *See* N.T. 7/14/2016 at 34 (Supp. App. 962). The Commonwealth no longer takes this position.

As evidence of the elder McCullough's alleged insanity, the Commonwealth pointed to a letter that John McCullough III sent him. *See id.* at 42 (Supp. App. 964). During the hearing, the Commonwealth maintained that the elder McCullough was mentally ill because he described his son as having been "badgered" to write the letter by police. The Commonwealth then produced the letter, the text of which allegedly proved that his son was never badgered. *See id.* But, on cross examination, the Commonwealth read the following passage from the letter into the record: "They kept me at 8th and Race **for two days questioning me** about a murder I didn't know anything about." N.T. 4/28/2016 at 44 (Supp. App. 882) (emphasis added). When cross-examined, the

younger McCullough explained that what he wrote regarding being held for two days was untrue. N.T. 5/20/2016 at 40-41 (Supp. App. 923-24). He clarified on cross-examination that two days elapsed between his post-arrest transport to a police district and his transfer to a state facility. *Id.* However, this testimony did not occur until after the elder McCullough's characterization of police conduct as "badgering." Upon further reflection, the Commonwealth finds that two days of questioning might reasonably be described as "badgering" and no longer considers the elder McCullough's characterization of the letter to be evidence of mental illness.

As further evidence that McCullough was not of sound mind, the Commonwealth also relied on an incident in which Detective Dougherty arrived at McCullough's house for an interview only to find that McCullough had left the key to his house in the lock. *See* N.T. 5/20/2016 at 61 (Supp. App. 929). In particular, the Commonwealth noted that Detective Dougherty took the keys and left a note informing McCullough that he had done so, but McCullough never contacted him and seemed unconcerned about the missing keys during a later conversation. *Id.* at 61-63 (Supp. App. 929). McCullough tells it differently, however. To him, this was another one of the "those cop games." *See* N.T. 4/28/2016 at 118 (Supp. App. 901). He had his locks changed the same night the keys went missing, was uncertain about Detective Dougherty's true motive, and so was uninterested in getting the missing set back. *See* N.T. 4/28/2016 at 117-18 (Supp. App. 901).

Perhaps most damning to his credibility, McCullough mistook the age his son would have been at the time of the murder in a statement he gave to Natividad's counsel. *See id.* at 95 (Supp. App. 895). Significantly, however, McCullough maintained throughout that he had a strained relationship with his son that might have contributed to that kind of error. *See, e.g.*, *id.* at 41 (Supp. App. 882). And, although McCullough was willing to acknowledge that his memory of his son's

age was probably faulty, his demeanor changed drastically when the Commonwealth suggested that he and his son might not have been at the gas station at all on the night Campbell was killed.

> Q. Now, you understand, sir, that your son would have been 17 that day?
> A. Might be possible.
> Q. So you are off by three years?
> A. Probably off by a couple years.
> Q. And you do understand that your son says he was not with you that day at all?
> A. My son was wrong.

*Id.* at 95 (Supp. App. 895). The certainty with which McCullough refutes his son's assertion, when contrasted with his willingness to stand corrected about his son's age, suffices to convince the Commonwealth that McCullough is not a man with a failing memory.

Taken as a whole, McCullough's testimony does not appear to be that of a pathological liar or a man of declining mental health, but that of a 71-year-old man who distrusts law enforcement simply trying to be as honest and specific as possible in the face of hostile questioning by a Commonwealth attorney. Consequently, the Commonwealth concedes that his testimony is material to the case against Natividad and that the state court findings to the contrary have been rebutted by clear and convincing evidence.

3. The evidence is material when considered cumulatively.

The measure of a *Brady* violation is the cumulative effect of all evidence that was favorable to the defense and suppressed by the government, not the item-by-item analysis that has dominated this litigation up to now. *See Kyles*, 514 U.S. at 437. The foregoing analysis recounted in detail each collection of evidence and the effect it might have had on Natividad's trial, but the Commonwealth believes that one must be considered in conjunction with the other when determining whether a *Brady* violation has occurred. This cumulative materiality analysis, however, was not addressed by the state courts and is now before this Court *de novo*. *See* Part

III(B), *supra*. [12] When viewed cumulatively, the Robinson material and the Maculla note shore up one-another's evidentiary weakness. As a consequence, viewed together, there is a reasonable probability the information would have affected the outcome of Natividad's trial, if it had been disclosed prior to trial.

The primary weakness of the Robinson material is that it forces jurors to decide which confession, Robinson's or Natividad's, is genuine and which is merely braggadocio. Without the evidence derived from the Maculla note, there is more circumstantial evidence implicating Natividad than there is implicating Robinson. Even then, SCOPA considered the Robinson material to be a "close call." *See Natividad*, 200 A.3d at 32-33. When testimony about Robinson's confession is paired with information from McCullough that Natividad was not at the scene of the murder, the argument that Natividad's confessions were mere puffery becomes much more powerful.

McCullough's testimony also weakens Price's firsthand testimony that Natividad was the killer. At trial, the defense attempted to elicit testimony from Price that suggested he was testifying under pressure from the police but was relatively unsuccessful. *See* N.T. 11/6/1997 at 37 (Supp. App. 276). The theme of police coercion reappears in the events surrounding McCullough's testimony before the PCRA court, however. For instance, McCullough implied that Detective Dougherty coerced a false statement from his son. *See* N.T. 4/28/2016 at 41 (Supp. App. 882). Detective Dougherty denied making a direct request of the younger McCullough but seemed to communicate his desires clearly enough through statements that appeared to contain a veiled threat

---

[12] No court has engaged in the requisite cumulative materiality analysis, so this Court may review de novo. However, as discussed *infra*, relief is warranted even under a 2254(d)(1) analysis. SCOPA's failuire to consider all of the withheld evidence cumulatively is contrary to clearly established federal law. *See See Kyles v. Whitley,* 514 U.S. 419, 437 (1995); *Dennis v. Sec., PA Dept. Corr.*, 834 F.3d 263, 311-13 (3d Cir. 2016)

of legal ramifications for both father and son if John McCullough III did not comply. *See* N.T. 7/7/2016 at 7 (Supp. App. 936) (telling McCullough III "that it could be perjurious if someone lied on an affidavit like that"). The ability to point to multiple instances of alleged police misconduct makes it more likely that a jury would question Price's motives.

The primary weakness of McCullough's testimony is likewise bolstered by the Robinson material. McCullough's testimony is weakened by the fact that it conflicts with testimony from John McCullough III, Detective Dougherty, and Price. However, testimony about Robinson's confession as well as other testimony placing Robinson in a dark-colored Lincoln around the time of the murder helps to corroborate the elder McCullough's assertions that he did not see Natividad at the scene of the murder.

The Robinson material and information regarding the Maculla note are mutually reinforcing and the Commonwealth now concedes that when viewed cumulatively they are material for *Brady* purposes.

## V.      CONCLUSION

Natividad was convicted of killing Campbell and sentenced to death based on contested, circumstantial physical evidence, neighborhood gossip, and two eyewitnesses with significant credibility issues. The suppression of exculpatory evidence forced his attorney to mount an implausible defense that relied on doubts raised through cross examination and a theory of self-defense that the Commonwealth decisively rebutted at the start of the trial. Natividad's attorney called only one witness: a police officer that testified about minor discrepancies in two of Havens's statements to police.

Unbeknownst to the judge, jury, and the defense, the Commonwealth possessed information that might have led the defense to an alternate suspect and an eyewitness who would

testify that Natividad was not at the Exxon station where Campbell was killed. If that information had been disclosed to Natividad as required by the United States Constitution, there is a reasonable probability that he would have obtained a different outcome at trial. To remedy this violation, Natividad must be afforded a new trial.

The Court should grant a conditional writ of habeas corpus as supported by the record and as specifically set forth in the Joint Stipulations filed concurrently with the Commonwealth's Answer.

Respectfully submitted,

LAWRENCE KRASNER
District Attorney of Philadelphia

*/s/Patricia Cummings*

PATRICIA CUMMINGS
Supervisor, Assistant District Attorney
Conviction Integrity Unit
District Attorney's Office
Three South Penn Square
Philadelphia, PA 19107
215-686-9948

Date: June 15, 2021

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **RICARDO NATIVIDAD,** | : | |
| **Petitioner** | : | |
| | : | |
| **v.** | : | **No. 08-cv-449** |
| | : | **(CAPITAL CASE)** |
| **JOHN E. WETZEL, et al.,** | : | |
| **Respondents** | : | |

## CERTIFICATE OF SERVICE

I, Patricia Cummings, certify that on June 14, 2021 a copy of this Answer was served via this Court's ECF System on counsel for Petitioner:

> Samuel J.B. Angell, Esq.
> Stuart Lev, Esq.
> Federal Community Defender Office
>    for the Eastern District of Pennsylvania
> The Curtis Center, Suite 545 West
> Philadelphia, PA 19106

*/s/ Patricia Cummings*
Patricia Cummings
Supervisor, Conviction Integrity Unit
Philadelphia District Attorney's Office
3 South Penn Square
Philadelphia, PA 19107