**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **RICARDO NATIVIDAD** | |
| **Petitioner,** | **CIVIL ACTION NO. 08-449** |
| **v.** | **(CAPITAL CASE)** |
| **JEFFREY BEARD,** *et al.*, | |
| **Respondents.** | |

**<u>MEMORANDUM OPINION</u>**

**Rufe, J.**                                                                      **August 24, 2021**

This federal death penalty habeas petition poses a unique procedural posture, where the Commonwealth argues, by consent and stipulation, that Petitioner Ricardo Natividad is entitled to relief.

Natividad is a Pennsylvania state prisoner who was convicted of first-degree murder and sentenced to death in November of 1997. In July of 2008, he petitioned this Court for a writ of habeas corpus, challenging his conviction and sentence on multiple grounds, including that the Commonwealth withheld exculpatory and material evidence, in violation of *Brady v. Maryland*,[1] which deprived him of a fair trial.

Natividad's petition was filed more than thirteen years ago.[2] During this time Natividad was granted additional discovery by this Court which yielded exculpatory evidence that had been withheld by the State, and Natividad sought relief in state court based on the evidence. Until

---

[1] 373 U.S. 83 (1963).

[2] The case was placed in civil suspense in October of 2008. *See* Order dated Oct. 20, 2008 [Doc. No. 10].

recently, the Commonwealth was represented by the Philadelphia District Attorney's Office's Law Division, which vehemently fought discovery and argued against relief.

In early 2021, the Philadelphia District Attorney's Office transferred Natividad's case internally to the Philadelphia District Attorney's Conviction Integrity Unit, a division that reviews claims of innocence and wrongful conviction.[3] The Conviction Integrity Unit reexamined the full evidentiary record, including the previously withheld evidence, and concluded that Natividad's constitutional rights had been violated.

On June 15, 2021, the Conviction Integrity Unit filed an Answer to Natividad's petition, in which the Commonwealth withdrew and disavowed *all* prior pleadings and arguments and conceded that Natividad was entitled to habeas relief under *Brady*.[4] On July 8, 2021, the Court heard oral argument from the parties in open court, for which notice was provided to all interested parties, including the deceased victim's relatives.[5] At the hearing, the Court addressed the parties' agreed statement of facts and stipulations.[6]

The Court now considers the post-conviction remedies, along with the evidence that Natividad's jury never saw or heard. The Court also has independently reviewed both the state court PCRA record and the record developed and presented by the parties in this federal, death

---

[3] *See* Commonwealth's Mot. for Extension [Doc. No. 121] ¶ 5.

[4] *See* Commonwealth's Answer [Doc. No. 125] at 1 & n.1.

[5] *See* Order Dated June 29, 2021 [Doc. No. 131].

[6] Hearing Exh. 1 ¶ 27 ("If the . . . suppressed evidence had been made available to Natividad prior to his trial, his attorney would have been able to use it in conjunction with the impeaching evidence that he originally elicited."

On the same day the Commonwealth filed its Answer, the parties filed a stipulation in which the parties agreed that habeas relief was warranted, and that upon the granting of relief, Natividad would plead guilty to third-degree murder. *See* Stipulation of the Parties [Doc. No. 126]. After the hearing, the parties determined that it was not necessary for the Court to consider a stipulation or proposed order which incorporated the parties' negotiated guilty plea and sentence, and moved to withdraw. *See* Joint Letter Dated July 12, 2021 [Doc. No. 133]; Joint Mot. to Withdraw Stipulation [Doc. No. 134].

penalty habeas. The Court will first outline the factual and procedural history, followed by the after-disclosed evidence. The Commonwealth's concession and the parties' agreement that petitioner should be granted the requested relief of a new trial does not relieve the Court of its own duty to consider Natividad's petition under federal and constitutional law.

## I.   BACKGROUND

### A.  Factual Background

Ricardo Natividad was indicted for the carjacking of Michael Havens and the shooting death of Robert Campbell the following evening. Although Natividad was indicted separately for these crimes, the two cases were consolidated for trial based on the trial court's determination that "[t]he evidence from the robbery of Mr. Havens'[s] vehicle was relevant to establish the identity of the person who shot Robert Campbell."[7]

#### 1.  The Carjacking of Michael Havens

Michael Havens's dark blue Lincoln was stolen at gunpoint by two men at 2:00 A.M. on November 9, 1996. At trial, Havens testified that two men approached him as he tried to enter his car, forced him into the backseat, took his wallet and car keys, and abandoned him on the side of the road. He testified that Natividad was one of two men, and that the gun used was a "stainless steel" revolver "with black rubber grips" that "looked a little scratched up . . . in the light."[8]

The Commonwealth presented to the jury a chrome-plated .357 revolver with black rubber grips that Havens identified as the gun used in the carjacking. The jury heard testimony

---

[7] *Commonwealth. v. Natividad*, 773 A.2d 167, 174 (Pa. 2001) ("*Natividad I*").

[8] N.T. 11/5/1997 at 169. During cross examination, Havens admitted that he had seen Natividad's picture in a television news story before identifying Natividad as his carjacker in a photo lineup. *Id.* at 67–68. Additionally, although Natividad was missing his two front teeth, Havens's initial descriptions of his carjacker did not include this detail.

suggesting that Natividad had given the gun to a man named Keith Smith,[9] Smith had given the gun to his attorney, and Smith's attorney surrendered the gun to police.

Two days later, Havens's car was found abandoned and on fire. In the trunk of the car, police found Havens's work bag and "one of the work jackets [Havens] kept in [his] trunk."[10] Havens described the jacket as a "quilted flannel shirt. It was like a black and purple in color."[11] The jacket was not retained by the police or analyzed for forensic evidence, and there was no evidence that Natividad had removed the jacket from the trunk or had even known it was there.

### 2.  *The Shooting of Robert Campbell*

Robert Campbell was a member of the town watch. He was shot and killed at an Exxon gas station at around 9:40 P.M. on the evening of November 9, nearly 20 hours after the Havens carjacking. Forensic reports showed that Campbell had been shot once in the head at a distance of at least two feet with the bullet exiting the body. Dr. Preston, assistant medical examiner, testified that Campbell's wound "could" have been caused by a .357 caliber bullet.[12] No ballistics evidence, shell casings, or bullets were recovered from the Exxon station or from the body, and there was no physical evidence linking Natividad to the shooting.

Mr. and Mrs. Johnson, who lived across the street from the gas station, witnessed the shooting. Mr. Johnson testified that he heard a gunshot and saw a man in a plaid jacket run from another man who was falling backward. The fleeing man climbed into the driver's seat of a car

---

[9] The jury heard testimony from a witness who had been washing his car with the help of Smith. He testified that Natividad arrived, and Natividad and Smith walked around a corner out of sight. When Smith returned, he had in his possession the revolver.

[10] N.T. 11/5/1997 at 158.

[11] *Id.*

[12] *Id.* at 232.

that was "black or dark blue or something like that" and "looked like a Lincoln."[13] Mrs. Johnson testified that the car was "either black or very dark" and that the shooter was wearing "a red plaid" lumberjack jacket.[14] Neither witness saw the shooter well enough for an identification. Mrs. Johnson testified that she "couldn't see any features or anything," and all she could tell was that the shooter was "dark" and the victim was "lighter."[15]

The only evidence directly implicating Natividad in the shooting was the testimony of Byron Price, a friend of Natividad. Price testified that on the night of the shooting Natividad had picked him up in a black Lincoln at around 6:30 P.M. and they drove around for "about an hour or two" while drinking beer.[16] According to Price, Natividad then pulled into the Exxon station and told him "to wait for him till he came back."[17] Three to four minutes later, Price heard a gunshot and saw Natividad run back to the car holding a chrome revolver. Price testified that after they had driven a few blocks, he asked Natividad what had happened. Natividad said he had shot the man because "he drew on me."[18] During cross-examination, Price testified that he had been promised by authorities that he would not be charged as an accessory to Campbell's murder.[19]

---

[13] N.T. 11/6/1997 at 78, 82.

[14] *Id.* at 95–96. In a statement to police, Mrs. Johnson described the car used by the shooter as having four doors. Havens's stolen Lincoln was a two-door model. *See* Commonwealth's Answer [Doc. No. 125] at 7.

[15] *Id.* at 95.

[16] *Id.* at 11.

[17] *Id.* at 9.

[18] *Id.* at 15.

[19] Price did not testify as to at least one significant fact. As Pennsylvania Supreme Court Justice Wecht noted in his dissent from a decision denying Natividad PCRA relief:

> Interestingly, neither the Commonwealth nor Natividad's trial counsel asked Price what Natividad was wearing on the night of the Campbell murder. Considering that the "lumberjack style" jacket was a key piece of evidence supporting the Commonwealth's theory that the perpetrator of the

Price originally told the police was that the revolver in Natividad's hand looked like a .38 special, before learning from the officers that it was a .357 Magnum. Additionally, Price's original description did not mention distinctive black rubber grips that Havens noted in his testimony. However, at trial, Price identified the surrendered gun as the gun he saw in Natividad's hand.

The jury also heard testimony from three friends of Price, who claimed that Natividad had admitted to the shooting of Campbell. First Price's former girlfriend, Natasha Catlett, testified that Price told her about the shooting shortly after it happened, and that she had called the crime stoppers tip line which offered a reward. According to Catlett, Natividad called her a month later and told her "that he killed the man and there was no evidence against him," and asked if they "could split the $10,000 reward."[20]

Next, Robert Golatt testified that a day or two after the shooting, Natividad and Price pulled up to him in a "navy blue Lincoln Continental." [21] Golatt told the jury that he got into the car with the two, and asked Natividad about the shooting. According to Golatt, Natividad told him that "he was at the service station and some, you know, the guy drawed [sic] on him and he, you know, he popped him first."[22] Golatt further testified that he then asked Natividad about the gun and Natividad said it was a ".357."[23] However, later in his testimony, Golatt contradicted

---

curious that a key Commonwealth witness would not be employed to establish this evidence
probative of the perpetrator's identity.

*See Commonwealth v. Natividad*, 200 A.3d 11, 46 n.6 (Pa. 2019) ("*Natividad III*") (Wecht, J., dissenting).

[20] N.T. 11/6/1997 at 155.

[21] *Id.* at 163, 165.

[22] *Id.* at 165.

[23] *Id.* at 165.

himself about the gun. He said that he had *not* asked Natividad about the gun, but was told by detectives that the gun was a .357.[24]

Finally, Eugene Wilson testified that the day after the shooting, Natividad arrived at the corner of 60th and Catharine Streets in a Lincoln and boasted about the shooting to a crowd of approximately 15 people. According to Wilson, Natividad said "you know I got that body, the town watch man."[25] Wilson testified that after hearing this, he pulled Price aside and Price told him what had happened.

Natividad's case-in-chief consisted of only one witness. Officer Brian James testified as to Havens's initial statements to police, which were inconsistent with his trial testimony.[26] Natividad's counsel also requested and received a self-defense jury instruction.

On November 10, 1997, the jury convicted Natividad on all charges. For the carjacking case, the jury found Natividad guilty of robbery of Michael Havens, robbery of a motor vehicle, kidnapping, carrying a firearm on a public street, possession of an instrument of crime, and criminal conspiracy. For the Campbell case, the jury found Natividad guilty of first-degree murder, the robbery of Robert Campbell, carrying a firearm on a public street, and possession of an instrument of crime. The only evidence supporting the conviction for Campbell's robbery was testimony from the Johnsons that "the victim raised his hands in the air and then fell backwards at the same time that a gunshot was heard."[27]

---

[24] *Id.* at 173, 175.

[25] *Id.* at 182.

[26] *See* N.T. 11/10/1997 at 9–16.

[27] *Natividad I*, 773 A.2d at 173.

During the penalty phase, the jury found two aggravating factors; "killing while in the perpetration of a felony," based on the robbery/attempted robbery of Campbell, and "a significant history of violent felony convictions." The jury found that these aggravating factors outweighed the only mitigating factor, that being Natividad's life history.[28] The jury returned the verdict of death.

### B. Procedural History and After-Discovered Evidence

Natividad's conviction and death sentence were affirmed by the Pennsylvania Supreme Court on direct appeal.[29] Natividad filed an initial Postconviction Relief Act ("PCRA") petition which was denied by the PCRA court, and the Pennsylvania Supreme Court affirmed.[30] On June 27, 2008, Natividad, represented by the Federal Community Defender Office, filed this Petition for Writ of Habeas Corpus.[31] Natividad's petition raised a claim of insufficient evidence for the robbery conviction as to Campbell,[32] claims of ineffective assistance of trial counsel, and a claim of *Brady* violations. Natividad also raised claims based on the sentencing phase.

#### 1. The "Maculla" Note

After filing the habeas petition, Natividad made a request for comprehensive discovery. The Commonwealth declined to produce the requested material absent a court order, and instead

---

[28] *See Natividad III*, 200 A.3d at 16.

[29] *See Natividad I*, 773 A.2d at 171–73.

[30] *See Commonwealth v. Natividad*, 938 A.2d 310 (Pa. 2007) ("*Natividad II*"). On March 11, 2008, Natividad filed a second PCRA petition, *pro se*, challenging his PCRA counsel's handling of his first petition. Natividad's second PCRA was dismissed as untimely and Natividad did not seek further review. *See Natividad III*, 200 A.3d at 17.

[31] *See* Pet. for Writ of Habeas Corpus [Doc. No. 7].

[32] *See* Natividad's Mem. in Supp. Am. Pet. [Doc. No. 108] at 37–42. Because relief is being granted on Natividad's *Brady* claims, the Court need not determine whether the evidence supporting the conviction for Campbell's robbery was so insufficient as to violate Natividad's due process rights. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (due process violated when evidence is insufficient to prove each element of the offense beyond a reasonable doubt).

agreed to produce some materials as part of informal discovery. On September 28, 2010, Natividad then formally moved for production of additional materials.[33] The Commonwealth opposed the motion, asserting that there was no material "that should have been previously turned over to the defense under *Brady*."[34] The Court, applying "a liberal approach to permitting discovery under Federal Habeas Rule 6(a)," granted Natividad's motion in part.[35]

On March 6, 2012, the Commonwealth produced a handwritten note that contained the names and contact information of numerous potential witnesses, including the name of a previously unidentified eyewitness—John "Maculla."[36] Natividad's counsel investigated and discovered that this referred to an individual named John McCullough. On July 19, 2012, McCullough gave a sworn declaration to Natividad's counsel.

McCullough asserted the following under penalty of perjury:

1. One day in 1996, I was driving to a laundromat on 63rd Street in West Philly. I was working as a security guard at another laundromat at 60th and Cedar and had been offered part time work at the one at 63rd and Vine. That day, my 14 year old son and I had stopped by a funeral home at 63rd and Oxford. On the way home, we stopped by the laundromat at the Exxon gas station on 63rd Street.

2. I parked my car and just as we got out of the car, I noticed three men about three cars away. One guy was tall and light skinned. He was the victim. There were two darker skinned guys there. One guy was facing the victim and had his hands on the victim's shirt. There was another guy standing to the side with a gun. I froze in my tracks so as not to draw attention to myself or my son. I stood there looking at the three men for what seemed like one and a half minutes.

---

[33] *See* Natividad's Mot. for Disc. [Doc. No. 24].

[34] Commonwealth's Resp. to Mot. for Disc. [Doc. No. 29] at 35.

[35] Order dated Aug. 19, 2011 [Doc. No. 38] at 1 n.1.

[36] *See* Handwritten Note Identifying John "Maculla" [Doc. No 109 at 348]. Although the note is difficult to decipher, the relevant portion of the note reads: "John 'Maculla' B/M 40's 5' 11" Stocky, Reddish Hair. Told manager on Sunday that he was on lot + saw incident. . . Doers left in [station wagon] + Got Tag #" *Id.*

3. All of a sudden, the victim pushed the guy in front of him away and I heard one or more gunshots. I then saw the two darker guys run toward an already running car. The car was dark colored.

. . .

8. I used to work for the Greater Philadelphia Urban Affairs Coalition running summer programs for at risk youths. During one summer, Ricardo Natividad was in my programs. I got to know him and would recognize him if I saw him. Only recently did I find out that Ricardo Natividad was in prison for committing the killing I saw.

9. Ricardo Natividad was not one of the two men that I saw with the victim at the laundromat at 63rd and Vine Street.[37]

### 2. *Robinson Material*

In 2013, after reviewing the produced material, Natividad's federal habeas counsel concluded that additional relevant evidence likely existed and moved for additional discovery.[38] Although the Commonwealth again asserted that there was no further *Brady* material to disclose,[39] it did not oppose the motion. The Court granted motion for supplemental discovery as unopposed.[40]

In response to the Order by the Court, the Commonwealth initially produced six pages of additional discovery.[41] Natividad moved to compel a complete production pursuant to the Court's order, and the Commonwealth objected, claiming that there was "simply nothing more to

---

[37] McCullough Decl. [Doc. No. 109 at 401].

[38] *See* Natividad's Mot. for Suppl. Disc. [Doc. No. 46] ¶ 6.

[39] Commonwealth's Mot. for Extension of Time to Resp. to Natividad's Mot. for Suppl. Disc. [Doc. No. 48] at 2 ("As the Commonwealth reported in its response to Natividad's first *Motion for Discovery* in late 2010, respondents believe there is nothing in the file that constitutes '*Brady*' material that has not already been disclosed.").

[40] *See* Order dated Apr. 2, 2013 [Doc. No. 50].

[41] *See* Natividad's Mot. to Compel Compliance with Court's Order dated Apr. 2, 2013 [Doc. No. 56] ¶ 9.

turn over."[42] On February 10, 2014, at a hearing on Natividad's motion to compel a complete

production, where the Commonwealth stressed "the good faith we've shown up to this point,"

and represented to the Court "that what's being asked for are the files that we have already

looked through and not found anything."[43] The Court determined that because Natividad had

specific requests and it was not "a fishing expedition," relief would be granted and Natividad's

counsel could view the original homicide file.[44]

On August 7, 2014, the Commonwealth made the internal files available to Natividad's

counsel. The internal homicide files contained multiple relevant documents, including signed

witness statements and police activity sheets, showing that after the shooting, Philadelphia Police

investigated a house located at 929 Wynnewood Road as well as a man who sold drugs there

named Rolston Ricardo Robinson (known as "Rob").

The documents showed the following investigation:

a.   11/12/96 Statement of Patrick Hoban

On the afternoon of November 12, 1996, three days after the shooting, officers

interviewed a man who had been on the town watch with Campbell.[45] He explained

that the town watch had recently targeted properties at 929 Wynnewood Road and

6608 Lansdowne Avenue because of complaints about drug activities. There had

been a confrontation at the 6608 Lansdowne house between the property's

"frequenters" and anti-drug groups. At the confrontation, "[t]hreats were made

---

[42] Commonwealth's Resp. in Opp. Mot. to Compel. [Doc. No. 58] at 2.

[43] N.T. 2/10/14 [Doc. No. 60] at 22.

[44] *Id.* at 29–30.

[45] *See* 11/12/96 Statement of Patrick Hoban [Doc. No. 109 at 19].

against town watch."[46] But he had not been at the confrontation and did not think Campbell had been there, either.

> ### b.  11/12/96 Statement of Tish Ann Ambrosine

That same afternoon, a woman came to the police station for an interview. The night before, an acquaintance (who was too frightened to speak with police) relayed to her information about Campbell's shooting. She told the officers that her friend explained that the Junior Black Mafia ("JBM") had taken over two houses to sell drugs, one located at 929 Wynnewood and the other at 6608 Lansdowne. After the shooting, members of the JBM were at the 929 Wynnewood house "bragging that they had got Bob Campbell," who they believed had been part of the 6608 Lansdowne confrontation.[47]

> ### c.  Police Activity Sheets for 11/12/96 and 11/13/96

Around November 13, the assigned detective was contacted by a retired detective who had been told by an informant that "persons in 929 Wynnewood Rd. may have information as to the identity of the perpetrator" and the perpetrator "was a Jamaican male" who "may be named ROB."[48]

Although the information about the 929 Wynnewood house was hearsay, the detectives found it serious enough to warrant further investigation. On November 12, "[t]he Detectives periodically checked the residence at 929 Wynnewood Road on this date but saw no activity."[49] On November 13, detectives "set up surveillance" at the 929 Wynnewood house and observed a man they believed to be Rob leaving the house.[50]

---

[46] *Id.* at 20.

[47] 11/12/96 Statement of Tish Ann Ambrosine [Doc. No. 109 at 43]. Another individual told police that on the night of the shooting he overheard a group of young men from the neighborhood saying they thought the JBM had killed Campbell. *See* 11/12/96 Statement of Richard Anderson [Doc. No. 109 at 40].

[48] 11/13/96 Activity Sheet [Doc. No. 109 at 46].

[49] 11/12/96 Activity Sheet [Doc. No. 109 at 442].

[50] 11/13/96 Activity Sheet [Doc. No. 109 at 46].

d.  <u>11/14/96 Statement of Joseph Rutherford</u>

On the evening of November 13, a man named Joseph Rutherford called the police after being threatened by Rolston Ricardo Robinson. When officers arrived, he told them that he had information about the Campbell shooting and was brought to the police station. Rutherford gave an interview shortly after midnight.

Rutherford explained that he "frequented" the 929 Wynnewood house, and first met Robinson there. He described Robinson as "a Jamaican male [who] sells crack" and "likes intimidating people."[51]

Two days prior, on November 11, Robinson had threatened Rutherford and his girlfriend with a hammer over payment for drugs. The next day, November 12, Rutherford ran into Robinson at the 929 Wynnewood house and the two had an argument. Rutherford threatened to kill Robinson, and Robinson responded that he would "do [Rutherford] like he did Bob [Campbell] down at the gas station."[52] Rutherford told police that "[t]here was already some talk in the neighborhood about Rob having something to do with Bob Campbell's killing."[53] The day after, on the evening of November 13, Robinson threatened Rutherford with a gun and Rutherford called the police.

Rutherford told the officers that he thought that the Campbell killing may have been related to the recent 6608 Lansdowne confrontation, and that he had seen Robinson in a black Lincoln. Rutherford also told the officers that "Cindy," another 929 Wynnewood resident, had additional information, and that he would call back "with some of the addresses [and] names."[54]

_____

[51] 11/14/96 Statement of Joseph Rutherford [Doc. No. 109 at 7].

[52] *Id.* at 9.

[53] *Id.* at 8.

[54] *Id.* at 11.

e. 11/14/96 Statement of P/O Shane Darden and 11/14/16
   Statement of Tracie Durham

A few hours later, around 4 a.m. on November 14, Rutherford flagged down Officer Shane Darden and brought him to the 929 Wynnewood house, where he had a conversation with Michael Cupaiuolo, the owner. Cupaiuolo told him that Robinson had told the house that he was at the Exxon station "when Campbell was shot" and "had seen a gun and handcuffs in the belt of the dead man."[55] Officer Darden also convinced a woman there to come to the police station for an interview. She told police that about ten minutes before the shooting, she was at a pay phone near the Exxon station and saw Robinson in his silver Acura.[56] She also said that Robinson owned multiple guns, including a revolver.

f. 11/14/16 Statement of Cynthia Smith

On the afternoon of November 14, detectives brought in the woman Rutherford had mentioned for an interview, Cynthia Smith. Smith explained that she was the homeowner's girlfriend and lived at the 929 Wynnewood house with him. On the night of the shooting, Robinson walked into the house and changed the channel to the news. Smith asked what was going on and he said "yo – this is important. Didn't you hear about the guy getting shot – the fucking snitch – that town watch guy Bobby Campbell."[57] After the news story ended, Robinson left the house for an hour. When he returned, he "said that he had been there. He talked about the guy having a gun [and] the handcuffs. He said the guy was bleeding. He said he stood over the top of the guy saying 'you dumb fuck.'"[58]

Robinson spent the next few days watching the news at the 929 Wynnewood house, and had "started to get real casual about the whole thing."[59] Smith eventually

---

[55] *See* 11/14/96 Statement of P/O Shane Darden [Doc. No. 109 at 31, 32].

[56] 11/14/16 Statement of Tracie Durham [Doc. No. 109 at 34].

[57] 11/14/16 Statement of Cynthia Smith [Doc. No. 109 at 15].

[58] *Id.* at 15.

[59] *Id.* at 16.

14

asked "Are you the one they're looking for – are you the one that shot him?" and Robinson replied "Yeah – I did it."[60] Robinson told her that he shot Campbell because "that's what happens to snitches – that he had to teach somebody a lesson."[61]

g.   11/14/96 Statement of Rolston Robinson

Robinson was interviewed by police on November 14. He told the detective that he was at a club at the time of the shooting, but when he left, he stopped at the Exxon station because he saw "cops [and] the man on the ground [and] everyone looking."[62] He explained that was there for two or three minutes, and described the victim as a "white male, laying on [the] ground on his back, and blood near his shoulders. He had on a jacket and a gun in a holster on his waist."[63] Robinson added that a detective asked if anyone had seen anything and he heard "a female voice say that they left in a black Lincoln."[64]

These signed witness statements and activity sheets in the internal homicide file implicated Robinson for the murder of Campbell and were exculpatory evidence as to Natividad. They were in the possession of the Commonwealth at the time of Natividad's trial, and not disclosed to Natividad or his attorneys until ordered to do so by this Court in 2014,[65] six years after the start of *Brady* discovery in this case and seventeen years after Natividad's conviction.

---

[60] *Id.*

[61] *Id.*

[62] 11/14/96 Statement of Rolston Robinson [Doc. No. 109 at 26].

[63] *Id.*

[64] *Id.* at 25.

[65] *See* Order dated July 9, 2014 [Doc. No. 73].

### 3. Natividad's Brady PCRA petition

The "Maculla" note was produced on March 6, 2012, and four months later, John McCullough was identified as an eyewitness to the killing and gave a sworn declaration. On August 9, 2012, Natividad filed a new PCRA petition based on his declaration. While that petition was pending, the Robinson material was discovered, and Natividad amended the petition to add the additional *Brady* claims.[66] Between April and June of 2016, the PCRA court held three days of evidentiary hearings, in which John McCullough testified.[67] The PCRA court denied relief on Natividad's *Brady* claims.[68]

On appeal, the Pennsylvania Supreme Court rejected Natividad's claims based on the "Maculla" note, finding the claims untimely because the PCRA petition was not filed within 60 days after the note was turned over by the Commonwealth.[69] The court found the claims based on the Robinson evidence to be timely, but determined that the evidence was not material under *Brady*. Over the dissent of two justices, that court "deem[ed] it to be a close call" but held that "that the Commonwealth's evidence against appellant was so overwhelming there is no reasonable probability that if the Commonwealth had turned over the relevant evidence the result of the trial would have been different."[70] Natividad also argued that the cumulative effect of the "Maculla" note and Robinson evidence was material under *Brady*, but because the Pennsylvania

---

[66] While this PCRA petition was pending, Natividad moved to excuse the exhaustion requirements and to supplement his federal habeas petition with the new *Brady* claims. *See* Natividad's Mot. to Suppl. Petition and Excuse Exhaustion [Doc. No. 74]. This Court denied this request. *See* Order dated Feb. 6, 2015 [Doc. No. 76].

[67] The PCRA court also heard testimony from Detective James Dougherty (the assigned homicide detective), Assistant District Attorney Jason Harmon, and McCullough's son. *See Natividad III*, 200 A.3d at 23–24.

[68] *Id.* at 24.

[69] *Id.* at 27.

[70] *Id.* at 32–33.

16

Supreme Court found that the "Maculla" note was not properly before it, it did not consider this argument.

After exhausting the claims in state court, Natividad supplemented his habeas petition to add the "Maculla" note and Robinson material to support his previous *Brady* claim.[71] Natividad asserts he was denied a fair trial in violation of the Due Process Clause of the Fourteenth Amendment for the withholding of the "Maculla" note, the Robinson evidence, and the cumulative effect of both.[72]

## II. LEGAL STANDARDS

Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), a petition for a writ of habeas corpus may not be granted as to any claim that was adjudicated on the merits in State court proceedings unless the adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[73] However, if a state court does not adjudicate a claim on the merits, federal habeas review is *de novo*.[74]

---

[71] *See* Amend. Pet. for Writ of Habeas Corpus [Doc. No. 101].

[72] *See* Natividad's Mem. in Supp. Am. Pet. [Doc. No. 108] at 21–32; Commonwealth's Answer [Doc. No. 125] at 21–47.

[73] 28 U.S.C. 2254(d).

[74] *See Johnson v. Williams*, 568 U.S. 290, 303 (2013) ("When the evidence leads very clearly to the conclusion that a federal claim was inadvertently overlooked in state court, § 2254(d) entitles the prisoner to an unencumbered opportunity to make his case before a federal judge."); *Cone v. Bell*, 556 U.S. 449, 472 (2009); *see also Breakiron v. Horn*, 642 F.3d 126, 131 (3d Cir. 2011) ("Where the state court has not addressed the merits of a claim, and the merits of the claim are properly before us, then this deferential standard of review does not apply and we instead review the claim de novo.").

Additionally, if a state court declines to review a claim that is procedurally barred under state law, and the state court's determination is based on an "independent and adequate" state law ground, that claim is procedurally defaulted and may not be considered by a federal court.[75]

## III. DISCUSSION

Habeas relief is available for an individual "in custody in violation of the Constitution or laws or treaties of the United States,"[76] and the suppression of evidence meeting the *Brady* standard "violates due process . . . irrespective of the good faith or bad faith of the prosecution."[77] To establish a *Brady* claim, the evidence (1) "must be favorable to the accused, either because it is exculpatory, or because it is impeaching," (2) "must have been suppressed by the State, either willfully or inadvertently," and (3) "must have been material such that prejudice resulted from its suppression."[78]

The parties contend that the Pennsylvania Supreme Court unreasonably applied clearly established federal law and unreasonably determined the facts in its consideration of the Robinson evidence, and its holding that the evidence was not material under *Brady*. The parties further contend that habeas relief is warranted based on the cumulative effect of the "Maculla" note and Robinson evidence. Although either finding is sufficient to grant relief, the Court will consider both arguments for the sake of completeness.

---

[75] *See Richardson v. Superintendent Coal Twp. SCI*, 905 F.3d 750, 759 (3d Cir. 2018) (quoting *Coleman v. Thompson*, 501 U.S. 722, 729 (1991)) ("[F]ederal courts will not review federal claims when the state court's decisions are supported by a state-law reason, an 'independent and adequate state ground[ ].'").

[76] 28 U.S.C. § 2254(a).

[77] 373 U.S. at 87.

[78] *Dennis v. Sec'y, Dep't of Corr.*, 834 F.3d 263, 284 (3d Cir. 2016) (en banc) (internal quotation marks and citations omitted).

18

### A.  The Pennsylvania Supreme Court's Denial of Relief as to the Robinson Material was Contrary to Clearly Established Federal Law

The Pennsylvania Supreme Court held, in a "close call," that the Robinson evidence was not material under *Brady*.[79] Because this was an adjudication on the merits, the Court must apply the deferential AEDPA standard. Relief may only on be granted on this ground if the determination "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[80] Here, the decision was both.

In *Kyles v. Whitley*, the United States Supreme Court held that the standard for materiality under *Brady* is whether there "is a 'reasonable probability' of a different result."[81] The Supreme Court explained:

> The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial."[82]

Importantly, the United States Supreme Court made clear that the issue of materiality "is not a sufficiency of evidence test. A defendant need not demonstrate that after discounting the

---

[79] *Natividad III*, 200 A.3d at 32.  The Pennsylvania Supreme Court found that the first two prongs of *Brady* were "easily met" by the Robinson evidence. *Id.* at 30.

[80] 28 U.S.C. § 2254(d).

[81] *Kyles v. Whitley*, 514 U.S. 419, 434, 435 n.8 (1995).

[82] *Id.* at 434 (quoting *United States v. Bagley*, 473 U.S. 667, 678 (1985)).

inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict."[83]

Although the Pennsylvania Supreme Court echoed the language of the *Kyles* decision in its holding,[84] it did not follow the *Kyles* standard. Instead of considering whether the Robinson evidence undermined confidence, the Pennsylvania Supreme Court required that the evidence "weaken the main evidentiary points raised at trial."[85] Finding "overwhelming and intact evidence of [Natividad's] guilt," the Pennsylvania Supreme Court discounted Natividad's argument that he "would have had 'a much stronger defense' had he been able to present an alternate perpetrator theory."[86]

Contrary to *Kyles*, the Pennsylvania Supreme Court considered the Robinson evidence "against the backdrop of this extensive evidence of appellant's guilt,"[87] and determined that "in the context of the other evidence presented at this particular trial, the withheld evidence regarding Robinson is 'too little, too weak, or too distant from the main evidentiary points to meet *Brady*'s standards.'"[88]

---

[83] *Id.* 434–35.

[84] *Natividad III* 200 A.3d at 38 ("[W]e conclude the withheld evidence in this case does not undermine confidence in the jury's verdict, and there is not a reasonable probability the result of appellant's trial would have been different had it been disclosed, appellant's *Brady* claim does not entitle him to relief.").

[85] *Id.* at 35.

[86] *Id.* at 36.

[87] *Id.* at 34.

[88] *Id.* (quoting *Turner v. United States*, 137 S. Ct. 1885, 1894 (2017)). In responding to the dissent's assertion that the majority's "retrospective sufficiency test is directly at odds with the United States Supreme Court's explicit rejection of such an approach," *id.* at 45 n. 4 (Wecht, J., dissenting), the majority contended that it followed the Supreme Court's analysis in *Turner*. *Id.* at 35 n.7, 37–38. But the Supreme Court in *Turner* applied the *Kyles* "reasonable probability" standard and made clear that its determination was limited to "the context of this trial, with respect to these witnesses." *Turner*, 137 S. Ct. at 1895.

The analysis in *Natividad III* is substantially similar to that which the Third Circuit held to be unconstitutional three years earlier in *Dennis*.[89] There, the Pennsylvania Supreme Court had rejected the petitioner's *Brady* claims because the withheld evidence "would have had no impact upon" the testimony presented at trial.[90] The Third Circuit held that this analysis "applied *Kyles* in a manner inconsistent with Supreme Court precedent."[91] The Third Circuit explained that "[i]nstead of engaging in a holistic materiality inquiry per *Kyles*," the Pennsylvania Supreme Court "proceeded down an analytical path that hinged the . . . *Brady* materiality on the sufficiency of the evidence," specifically, the strength of the remaining inculpatory testimony.[92] The same was done here. As in *Dennis*, this was contrary to Supreme Court precedent.

Moreover, the Pennsylvania Supreme Court's decision "was based on an unreasonable determination of the facts."[93] The Pennsylvania Supreme Court based their decision on a determination that the Robinson material would not "cast into doubt or undercut" the testimony of Price, Catlett, Golatt, or Wilson.[94] But this finding is not supported by the record. The evidence that Robinson shot and killed Campbell is mutually exclusive with the testimony of Price and necessarily would have cast the testimony into doubt. Furthermore, the Robinson material was of a similar nature and quality to the testimony of Catlett, Golatt, and Wilson. It

---

[89] *See Dennis*, 834 F.3d at 311.

[90] *Commonwealth. v. Dennis*, 17 A.3d 297, 309 (Pa. 2011).

[91] *Dennis*, 834 F.3d at 298.

[92] *Id.* at 303. The majority distinguished the case from *Dennis* based on the Third Circuit's conclusion that the withheld evidence in *Dennis* "'effectively gutted' the Commonwealth's case." *Natividad III*, 200 A.3d at 36. But as the Third Circuit and Supreme Court have made clear, materiality is not dependent on "effectively gutting" the remaining evidence.

[93] 28 U.S.C. 2254(d)(2).

[94] *Natividad III*, 200 A.3d at 36.

would have undercut the Commonwealth's theory. Indeed, the Commonwealth could not argue that Natividad's involvement was the "talk of the town, talk in the street," when similar rumors were swirling about Robinson.[95]

The Pennsylvania Supreme Court also unreasonably determined that arguing that Robinson had killed Campbell would not have been "a much stronger defense."[96] The evidence showed that Robinson told others he was the shooter, had a motive to kill Campbell, and placed himself at the scene of the crime. As the *Natividad III* dissent explained:

> This is evidence which, in the hands of competent defense counsel, would have dramatically shifted the course of Natividad's defense. This is more than merely the identification of a possible theory. It is instead the exposure of a meaningful, substantial defense that would have given Natividad a much greater chance of success.[97]

 "A state court decision is an 'unreasonable application of federal law' if the state court 'identifies the correct governing legal principle,' but 'unreasonably applies that principle to the facts of the prisoner's case.'"[98] In *Natividad III*, the Pennsylvania Supreme Court recognized the correct *Kyles* standard, but unreasonably applied it by demanding an unconstitutional sufficiency of the evidence standard. The court compounded its error by unreasonably determining the facts when it found that the Robinson evidence was "too little, too weak, or too distant" as compared to the evidence presented at trial.[99]

---

[95] N.T. 11/10/1997 at 45.

[96] *Natividad III*, 200 A.3d at 36.

[97] *Id.* at 48 (Wecht, J., dissenting).

[98] *Dennis*, 834 F.3d at 281 (quoting *Williams v. Taylor*, 529 U.S. 362, 413 (2000)).

[99] *Natividad III*, 200 A.3d at 35 (quoting *Turner*, 137 S. Ct. at 1894).

Had the Robinson evidence been available, it would have countered the testimony implicating Natividad. Moreover, "[t]here is a reasonable probability that had the jury heard an 'other person' defense, the result of the proceeding would have been different."[100] The Robinson evidence is material under *Brady* and Natividad's constitutional rights were violated when it was withheld.[101]

## B. Habeas Relief is Warranted Based on the Cumulative Effect of the Withheld Evidence

In *Kyles*, the United States Supreme Court instructed that the materiality of withheld evidence is to be "considered collectively, not item by item."[102] However, the Pennsylvania Supreme Court found that, under state procedural rules, it lacked the jurisdiction to consider the "Maculla" note. As a result, the court declined to consider whether the cumulative effect of the evidence was material under *Brady*.[103] Generally, a federal court may not review claims found

---

[100] *Dennis*, 834 F.3d at 311.

[101] In previous briefings, the Commonwealth made the (now disavowed) argument to the Pennsylvania Supreme Court that it was not required to disclose the material because it was a "'fruitless lead' followed by investigators," and that "the Robinson documents merely contained gossip circulating in early November 1997 among a group of people who did not witness the murder and had scores to settle with Robinson." and contented that "the police investigation ultimately determined that Robinson was not involved in the Campbell murder." *Natividad III*, 200 A.3d at 49 (2019) (Wecht, J., dissenting) (quotations omitted). But "[t]here is no requirement that leads be fruitful to trigger disclosure under *Brady*, and it cannot be that if the Commonwealth fails to pursue a lead, or deems it fruitless, that it is absolved of its responsibility to turn over to defense counsel *Brady* material." *Dennis*, 834 F.3d at 306.

[102] *Kyles*, 514 U.S. at 436; *see also Wearry v. Cain*, 577 U.S. 385, 394 (2016) ("[T]he state postconviction court improperly evaluated the materiality of each piece of evidence in isolation rather than cumulatively.").

[103] *Natividad III*, 200 A.3d at 39 (internal citations omitted) ("[A]ppellant urges us to consider . . . the cumulative prejudice created by the Commonwealth's suppression of the 'Maculla' note along with the Robinson documents. Given our determination that appellant's *Brady* claim concerning the 'Maculla' note is untimely, that evidence is not properly before us, and we therefore decline to consider it in the analysis.").

by a state court to be barred under state law,[104] but here, the Pennsylvania Supreme Court's determination did not rest on independent and adequate state law grounds.[105]

### 1. Natividad's Cumulative Effect Claims are not Procedurally Defaulted

Under Pennsylvania law, a PCRA petition must be filed within one year of the date the judgment becomes final unless an exception applies.[106] Natividad argued that two of the exceptions applied to the "Maculla" note: the governmental interference exception, where "the failure to raise the claim previously was the result of interference by government officials;" and the after-discovered evidence exception, where "the facts upon which the claim is predicated were unknown to the petitioner and could not have been ascertained by the exercise of due diligence."[107] But even where an exception applied, the law at the time required the petition to be "filed within 60 days of the date the claim could have been presented."[108]

Three months after the disclosure of the "Maculla" note, an investigator hired by Natividad's counsel found and interviewed John McCullough.[109] A month later, McCullough signed the exculpatory sworn statement. Twenty-one days later, Natividad filed his PCRA

---

[104] See, e.g. Martinez v. Ryan, 566 U.S. 1, 9 (2012) ("[A] federal court will not review the merits of claims, including constitutional claims, that a state court declined to hear because the prisoner failed to abide by a state procedural rule."

[105] The Commonwealth has waived all affirmative defenses, including any defense of procedural default. See Commonwealth's Answer [Doc. No. 125] at 15. However, AEDPA reflects "a policy of federal-state comity" and is designed to "give the State an initial opportunity to pass upon and correct alleged violations of its prisoners' federal rights." Picard v. Connor, 404 U.S. 270, 275 (1971). Thus to "alleviate any lingering doubt regarding the propriety of federal habeas review in this case," Hull v. Freeman, 932 F.2d 159, 164 (3d Cir. 1991), the Court will consider whether review of the cumulative effect of the evidence is procedurally defaulted.

[106] See 42 Pa. C.S. § 9545(b)(1).

[107] 42 Pa. C.S. §§ 9545(b)(1)(i) and (ii). The third exception is not relevant here.

[108] See Natividad III, 200 A.3d at 25. This statute was amended in 2018 to extend the deadline from 60 days to one year. See Act of October 24, 2018, Pub. L. 894 No. 146, § 2.

[109] See Natividad III, 200 A.3d at 17.

petition. The Pennsylvania Supreme Court found the petition untimely because it was not filed within 60 days of the initial disclosure. The court reasoned that "[i]t was the disclosure of the 'Maculla' note, rather than the discovery of the declaration, that informed the basis of [Natividad's] *Brady* claim, and it was incumbent upon him to file his petition within 60 days of the date he received that material alerting him of that claim."[110]

A state law ground is adequate if it is "firmly established and regularly followed."[111] In determining if a state law ruling is adequate, a court must determine whether "the state rule is being exercised in a manner that lets people know when they are at risk of default and treats similarly-situated people in the same manner."[112]

The withholding of favorable evidence is only a constitutional violation under *Brady* where the evidence is material. The note states that John "Maculla" saw the shooting, and notes that he got the tag number, but does not say what he witnessed or what the number was. Without more, the note could not plausibly meet the standard for materiality under *Brady*. It was not until Natividad knew who McCullough was and what McCullough had seen that he could assert his constitutional rights had been violated.

The Pennsylvania Supreme Court did not consider whether counsel had acted promptly in identifying and locating McCullough, instead it determined that Natividad's *Brady* claim arose when the "Maculla" note was disclosed. Under this interpretation of the law, Natividad was required to file a PCRA petition before knowing if he had a plausible constitutional claim. The

---

[110] *Id.* at 29.

[111] *Walker v. Martin*, 562 U.S. 307, 316 (2011) (quoting *Beard v. Kindler*, 558 U.S. 53, 60–61 (2009)).

[112] *Kindler*, 642 F.3d at 403 (quoting *Campbell v. Burris*, 515 F.3d 172, 181 (3d Cir. 2008)).

court did not provide Natividad "fair notice of what [he] must do to avoid default," and its ruling is therefore not an adequate state law ground.[113]

### 2. The Cumulative Effect of Withheld Evidence Is Material under Brady

Because the Pennsylvania Supreme Court did not consider the materiality of the cumulative effect of the withheld evidence, this Court reviews the claim *de novo*.[114] As with the Robinson evidence, there is no dispute that Commonwealth should have disclosed the "Maculla" note and failed to do so.[115] Likewise, because the Robinson evidence is material, and the McCullough testimony would have reinforced the Robinson evidence, the combined effect of the withheld evidence is material.

McCullough testified under oath that he witnessed the shooting and Natividad was not involved. As with the Robinson evidence, McCullough's statement is mutually exclusive with the testimony of Price. In light of the cumulative effect, a jury may have given more weight to Price's inconsistencies. Additionally, McCullough's testimony rebuts that of Catlett, Golatt, and Wilson. With the combined withheld evidence, the jury would have been presented two narratives, one from Price, Catlett, Golatt, and Wilson and the other from McCullough,

---

[113] *Id.* at 401.

[114] *See Cone v. Bell*, 556 U.S. 449, 472 (2009). The Court is required under AEDPA to defer to state courts' findings of fact, unless they are rebutted by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1).

[115] The Commonwealth claimed pre-trial that the produced discovery contained "the names and address of all eyewitnesses." Letter from Charles Gallagher, Deputy Dist. Atty. to Donald Padova, Esq., dated April 17, 1997 [Doc. No. 108 at 341]. Because of this representation, counsel for Natividad had no reason to make an additional request. *Cf. United States v. Agurs*, 427 U.S. 97, 106 (1976) ("When the prosecutor receives a specific and relevant request, the failure to make any response is seldom, if ever, excusable.").

Rutherford, Smith, and Cupaiuolo. The question of what narrative was to be believed—or whether the competing stories created reasonable doubt—is a question reserved to the jury.[116]

The Court appreciates the role juries hold in our justice system. Juries have the grave responsibility to ensure that guilt is proven beyond a reasonable doubt before the state can take an individual's freedom or life. Juries fairly and objectively weigh the evidence presented, and they take their responsibility seriously—fully understanding the gravity of their task— particularly where, as here, the sentence of death is imposed.

The law requires a reviewing court to uphold a jury's verdict unless that verdict is the result of an unfair trial. The Philadelphia Police Department gathered evidence that was unmistakably favorable to Natividad, but the prosecutor failed to uphold its duty to disclose the evidence to Natividad's trial counsel. Because of this, Natividad's trial was not fair, and he was unconstitutionally found guilty and sentenced to death.

The Conviction Integrity Unit is correct that "[c]riminal prosecutors have a special responsibility in the law and must be careful to protect an individual's constitutional rights,"[117] and the Court appreciates the recent steps the Unit has taken to fulfill their obligation here. However, the Philadelphia District Attorney's Office's recent change in position does not erase all that came before. Throughout this habeas action, the Commonwealth fought disclosure and repeatedly represented to this Court that there was no undisclosed *Brady* material. If not for the diligent effort of the Federal Defenders, it is likely that the exculpatory evidence would have remained hidden and Natividad would have remained on death row.

---

[116] *See Dennis* 834 F.3d at 302 (holding that in the *Brady* context, questions of credibility are reserved for the factfinder).

[117] Commonwealth's Answer [Doc. No. 125] at 1

In reaching this decision, the Court does not decide the question of Natividad's guilt or innocence. These are not the questions before it. Because the prosecutors have withheld evidence, Natividad was denied due process as protected under the Fourteenth Amendment and was not given a fair trial. Habeas relief will be granted.[118]

## IV.   CONCLUSION

For the reasons stated above, Natividad's petition for a writ of habeas corpus will be conditionally granted and he must be retried within 180 days. An order will be entered.

---

[118] Because the Court has granted relief on the *Brady* claims, the court need not address Natividad's other claims for relief.